# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**FILED**

OCT 0 1 2002

~~NANCY MAYER WHITTINGTON, CLERK~~
~~U.S. DISTRICT COURT~~

| | |
|---|---|
| MEREDITH LARSON<br>c/o Mark S. Zaid, Esq.<br>1133 21st Street, N.W.<br>Suite 800<br>Washington, D.C. 20036 | * <br> * <br> * <br> * <br> * <br> * |
| and | * <br> * |
| ADRIANA PORTILLO-BARTOW<br>c/o Mark S. Zaid, Esq.<br>1133 21st Street, N.W.<br>Suite 800<br>Washington, D.C. 20036 | * <br> * <br> * <br> * <br> * <br> * |
| and | * <br> * |
| PAUL JOSLIN<br>c/o Mark S. Zaid, Esq.<br>1133 21st Street, N.W.<br>Suite 800<br>Washington, D.C. 20036 | * <br> * <br> * <br> * <br> * <br> * |
| and | * <br> * |
| THOMAS HENEHAN<br>c/o Mark S. Zaid, Esq.<br>1133 21st Street, N.W.<br>Suite 800<br>Washington, D.C. 20036 | * <br> * <br> * <br> * <br> * <br> * |
| and | * <br> * |
| LISEL HOLDENRIED<br>c/o Mark S. Zaid, Esq.<br>1133 21st Street, N.W.<br>Suite 800<br>Washington, D.C. 20036 | * <br> * <br> * <br> * <br> * <br> * |
| and | * <br> * |

CASE NUMBER   1:02CV01937

JUDGE: Paul L. Friedman

DECK TYPE: FOIA/Privacy Act

DATE STAMP: 10/██/2002

ECF

3

PATRICIA KERNDT                    *
c/o Mark S. Zaid, Esq.             *
1133 21st Street, N.W.             *
Suite 800                          *
Washington, D.C. 20036             *
                                   *
        and                        *
                                   *
KIMI OKADA                         *
c/o Mark S. Zaid, Esq.             *
1133 21st Street, N.W.             *
Suite 800                          *
Washington, D.C. 20036             *
                                   *
        Plaintiffs,                *
                                   *
    v.                             *
                                   *
DEPARTMENT OF STATE                *
Washington, D.C. 20520             *
                                   *
        and                        *
                                   *
CENTRAL INTELLIGENCE AGENCY        *
Washington, D.C. 20505             *
                                   *
        and                        *
                                   *
NATIONAL SECURITY AGENCY           *
9800 Savage Road                   *
Fort George G. Meade, Maryland 20755  *
                                   *
        and                        *
                                   *
DEFENSE INTELLIGENCE AGENCY        *
Washington, D.C. 20340-5100        *
                                   *
        and                        *
                                   *
NATIONAL TRANSPORTATION            *
SAFETY BOARD                       *
490 L'Enfant Plaza, S.W.           *
Washington, DC 20594-2000          *
                                   *
        Defendants.                *
*     *     *     *     *     *    *     *     *     *     *     *

## COMPLAINT

This is an action brought pursuant to the Freedom of Information Act, 5 U.S.C.

§ 552, et seq. ("FOIA"), and the Privacy Act of 1974, 5 U.S.C. § 552a, by Plaintiffs

Patricia Kerndt, Thomas Henehan, Lisel Holdenried, Paul Joslin, Meredith Larson, Kimi

Okada, and Adriana Portillo-Bartow, against defendants Central Intelligence Agency,

National Security Agency, Department of State the Defense Intelligence Agency, and the

National Transportation Safety Board for their failure to fully disclose atrocities and

human rights abuses committed by the Government of Guatemala.

### JURISDICTION

1.      This court has both subject matter jurisdiction over this action and personal

jurisdiction over the defendants pursuant to 5 U.S.C. §§ 552 (a)(4)(B), 552a (g)(1), and

28 U.S.C. § 1331.

### VENUE

2.      Venue is appropriate under 5 U.S.C. §§ 552a(4)(B), 552a (g)(5), and 28 U.S.C.

§ 1391.

### PARTIES

3.      Plaintiff Meredith Larson is a United States citizen, and seeks documents

regarding a stabbing attack against her in 1989, and regarding threats and bombings

against the human rights organization for which she worked in Guatemala City.

4.      Plaintiff Paul Joslin, a Christian Brother, is a United States citizen.  He seeks

documents in an effort to discover information regarding the murder of Christian Brother

James Miller, a member of his religious order with whom he worked in Guatemala.

3

5.      Plaintiff Thomas Henehan, a Maryknoll Priest, is a United States citizen. Father

Henehan seeks documents in an effort to discover information regarding another

Maryknoll Priest, Father William Woods, who was killed in an airplane crash in the

Guatemalan highlands.

6.      Plaintiff Patricia Kerndt is a United States citizen, and seeks documents in an

effort to discover information regarding the death of her sister, Ann Kerndt.

7.      Plaintiff Kimi Okada is a United States citizen and seeks documents in an effort to

discover information regarding the death of her brother, Dr. Michael Okada.

8.      Plaintiff Adriana Portillo-Bartow is a United States citizen and seeks documents

in an effort to discover information on the disappearance of her father, Adrian Portillo-

Alcantara, and her two daughters, Glenda Corina Portillo and Rosaura Margarita Corillo

Portillo, none of whom she has seen since 1981.

9.      Plaintiff Lisel Holdenried is a United States citizen and seeks documents in an

effort to discover information regarding the death of her father, Frank Holdenried.

10.     Defendant Central Intelligence Agency ("CIA") is an agency within the meaning

of 5 U.S.C. § 552 (f) and is in possession and/or control of the records requested by some

of the plaintiffs which are the subject of this action.

11.     Defendant National Security Agency ("NSA") is an agency within the meaning of

5 U.S.C. § 552 (f) and is in possession, custody and/or control of the records requested by

some of the plaintiffs which are the subject of this action.

12.     Defendant Department of State ("DOS") is an agency within the meaning of

5 U.S.C. § 552 (f) and is in possession and/or control of the records requested by some of

the plaintiffs which are the subject of this action.

13.     Defendant Defense Intelligence Agency ("DIA") is an agency within the meaning of 5 U.S.C. § 552 (f) and is in possession and/or control of the records requested by some of the plaintiffs which are the subject of this action.

14.     Defendant National Transportation Safety Board ("NTSB") is an agency within the meaning of 5 U.S.C. § 552 (f) and is in possession and/or control of the records requested by some of the plaintiffs which are the subject of this action.

## BACKGROUND

15.     Between 1960 and 1996, Guatemala was engulfed in a civil war in which more than 200,000 people are estimated to have been killed or "disappeared." According to the United Nations-sponsored Guatemalan Commission for Historical Clarification ("CEH") -- which was established in 1994 as part of the U.N.-brokered peace process to investigate and document human rights violations and violence connected with the armed confrontation -- among reported cases, eighty-three percent of the victims of this conflict were Mayan and seventeen percent were *Ladino* (of European or mixed ancestry).

16.     The final report of the CEH concluded that "state forces and related paramilitary groups were responsible for 93% of the violations documented by the CEH, including 92% of the arbitrary executions and 91% of forced disappearances. Victims included men, women and children of all social strata: workers, professionals, church members, politicians, peasants, students and academics; in ethnic terms, the vast majority were Mayans."

17.     The United States government, particularly through its intelligence agencies and the named defendants in this litigation, have long maintained an interest in Guatemala,

5

located in its "strategic backyard." In 1954, the U.S. assisted in the overthrow of the

democratically-elected President Jacobo Arbenz, because of its concern about growing

strength of the Communist Party and the possible nationalization of foreign companies,

particularly the United Fruit Company and US-owned railroads. In the years following

the coup, the U.S. government and its agencies were closely allied -- overtly and covertly

-- with successive Guatemalan governments. After the overthrow of the Arbenz

government, there was a rapid reduction of the opportunity for political expression in

Guatemala. Inspired by fundamentalist anti-communism and backed by the U.S., new

legislation outlawed the extensive and diverse social movement and consolidated power

in the hands of the military and the wealthy who were committed to preserving the status

quo. In the mid-to-late 1960s, "death squad" activity became methodical and an intrinsic

part of the state-sponsored repression in the country as the U.S. became involved in

providing training and weapons to the Guatemalan military and security forces.

18.     According to the Historical Clarification Commission, the Guatemalan "death

squads" were initially criminal groups made up of private individuals who enjoyed the

tolerance and complicity of state authorities, whose actions later became increasingly

subject to control of the Army Command. The composition of the death squads varied

over time as members of the military were incorporated, until they became, in some

cases, authentic clandestine military units. Their objective was to eliminate alleged

members, allies, or collaborators of the "subversives" using the help of civilians and lists

prepared by military intelligence.

_____

19.     Overt relations between the U.S. and Guatemalan government came under strain in the late 1970s and early 1980s as the Guatemalan army began waging a ruthless scorched-earth campaign against indigenous communities in the Guatemalan highlands (which the army believed protected the growing guerrilla opposition), and after the Carter Administration issued its first annual human rights report on Guatemala. The Guatemalan government responded to the report's negative portrayal of the military's involvement in violations of human rights in the country by refusing pending U.S. military aid.

20.     It is now known, however, that despite this apparent strain, the U.S. continued to provide aid to the Guatemalan military through third parties (e.g., Israel and South Africa). Additionally, the U.S. continued to invite Guatemalan military personnel to attend U.S.-based military institutions (e.g., officer training at Staff and Command Colleges, pilot training at the Bell installations in Texas, and training at the U.S.A.R.S.A. – more commonly referred to as the "School of the Americas"). Overt non-lethal U.S. military aid to Guatemala resumed in 1985, but was suspended again in 1990 -- this time by the U.S. -- following the murder of an American citizen, Michael Devine, by members of the Guatemalan army. Covert assistance to the Guatemalan military and security forces through the defendant CIA continued throughout these years. However, it was stopped in 1995 as a reaction to revelations of possible involvement of CIA operatives in the disappearance and murder of guerrilla leader Efrain Bamaca, the husband of U.S. citizen and attorney, Jennifer Harbury.

-------------------------

7

21.     Throughout the 1980s and into the 1990s, egregious violations of human rights continued, including the murder and "disappearance" of political opponents, as the violence which reached unbearable proportions in the mid-to-late 1970s intensified and then became somewhat more targeted and systematic in the 1980s and early 1990s.

22.     In addition to conducting the widespread "scorched earth" attacks on indigenous communities in the Guatemalan highlands described above, the Guatemalan military and security forces also systematically targeted Catholic clergy, human rights workers, labor organizers and academics, who were subjected to on-going surveillance and attacks.

23.     Attacks against members of the Catholic Church began in the mid 1960s, as members of the church began to abandon their traditionally conservative positions based upon the decisions of the Second Vatican Council (1962-1965) and the Episcopal Conference of Medellin (1968), prioritizing work with excluded, poor and under-privileged sectors and promoting the construction of a more just and equitable society. According to the U.N. Historical Clarification Commission report, these doctrinal and pastoral changes clashed with the Guatemalan military's counterinsurgency strategy, which considered Catholics to be allies of the guerrillas and therefore part of the internal enemy, subject to persecution, death or expulsion. A large number of catechists, lay activists, priests, nuns and missionaries were victims of the violence. This violence against members of the Church continued even after the Peace Accords, when Guatemalan Bishop Juan Jose Gerardi, coordinator of the Human Rights Office of the Archbishop of Guatemala was battered to death by assailants in April 1998 as he returned home. His murder came just two days after he had presided over the public presentation of the Report of the Recuperation of the Historical Memory Project ("REHMI"), which

8

synthesized testimonies collected over three years regarding the tens of thousands of extrajudicial executions and "disappearances" suffered by unarmed civilians during the conflict in Guatemala. Three military officers (including members of former President Alvaro Arzu's private security detail) were subsequently convicted for having planned and executed Gerardi's murder.

24.     Human rights workers have also been repeatedly and systematically subjected to repression in Guatemala, including surveillance, assaults, disappearance and extra-judicial executions. The Guatemalan military and security forces have engaged in organized campaigns to intimidate those dedicated to the documentation of human rights violations and bringing those responsible for them to justice. Like the attacks against members of the Church, these attacks have also continued into the post-Peace Accord era. On June 13, 2002, Amnesty International, the International Commission of Jurists and Human Rights Watch issued a joint statement of concern regarding on-going attacks against this sector.

25.     Guatemala inaugurated a new democratically-elected president, Jorge Serrano, in January 1991. In May 1993, however, President Serrano (claiming to be frustrated by corruption) illegally dissolved the Congress and Supreme Court and tried to further restrict civil freedoms. In the face of strong protests by Guatemalan citizens and in the international community (including the United States), and in the face of unrest within the Guatemalan military ranks, Serrano's Fujimori-style "auto-coup" failed. In June 1993, following President Serrano's flight from the country, the Guatemalan Congress appointed the human rights ombudsman, Ramiro de Leon Carpio, as President. In

January 1996, Guatemalans elected a new President, Alvaro Arzu Irigoyen, who was succeeded in January 2000 by President Alfonso Antonio Portillo Cabrera.

26.     During the four decades of systematic human rights violations committed by the Guatemalan military and security forces, the U.S. government supported the Guatemalan military and security forces in a perceived fight against communism.  Due to the strategic and ideological interest that the U.S. government had in Guatemala, throughout the years of armed confrontation, the U.S. failed to condemn, or seek to clarify, acts of violence committed by the Guatemalan military and government against U.S. citizens (or their family members).  The U.S. government has also been reluctant to provide information at its disposal regarding those believed to be responsible for the crimes or regarding attempts to cover-up or distort the facts of reported cases, perhaps out of concern over negative publicity regarding alleged U.S. complicity in the cases, a desire to protect matters of foreign policy or national security, or claims that delicate intelligence operations (including confidential methods and sources) were at stake.

27.     On March 30, 1995, in response to on-going frustration and concern regarding incomplete or non-responsive answers by U.S. government agencies, including the defendants, to requests for information under FOIA regarding human rights violations in Guatemala and growing public outcry regarding alleged torturers on the U.S. payroll, President Clinton directed the Intelligence Oversight Board ("IOB") to conduct a government-wide review of any existing intelligence concerning allegations of torture, disappearance, or death of U.S. citizens in Guatemala (or their family members) since 1984.  According to the IOB, its charter was to review and report to the President in a confidential matter regarding intelligence activities it believes may be unlawful or

contrary to Executive Order or Presidential Directive. In the final report on its year-long investigation, the IOB described the Guatemala review to be "unprecedented as a publicly announced inquiry."

28.     As part of its review, the IOB received reports on human rights violations in Guatemala from the Departments of State and Justice, the CIA , and the Department of Defense. These reports covered those agencies and their subordinate agencies, such as the NSA, the DIA, the Drug Enforcement Agency ("DEA"), and the Federal Bureau of Investigation ("FBI"). IOB investigators also conducted independent interviews in Guatemala and the U.S. related to cases under investigation.

29.     In the report on its investigation, released in June 1996, the IOB concluded:

> [a]s intelligence on the cases was reported to U.S. government
> officials, very little of it was shared with victims or their surviving
> family members. The IOB believes... that in such cases the United
> States should provide its citizens more information whenever
> possible. The Freedom of Information Act (FOIA) establishes the
> only legal requirement to provide such information, yet that process
> is often an unsatisfactory way through which to communicate the
> information to families and victims. The redactions necessary to
> protect sensitive information in documents released under FOIA
> naturally give the reader the impression - usually mistaken - that
> relevant information is being withheld. Further, the reader is usually
> given no indication as to the reliability of the information. Victims
> and family members who seek intelligence information outside the
> FOIA process, however, usually find that it is not within the
> authority of policy agencies, such as the State Department, to share
> intelligence originating in another agency, and that it is not within the
> intelligence agencies' charter to communicate directly with victims
> and families. We believe the State Department should demonstrate
> more initiative in seeking authorization from intelligence producers
> to share their intelligence in briefings (oral or written) to family
> members and victims. The briefings need not identify that the
> information came from intelligence, but they should attempt to
> convey some indication of its reliability.

11

30.     The IOB also highlighted specific cases that it had reviewed which in its opinion

had received inadequate responses to FOIA requests, including that of plaintiff Meredith

Larson, which it indicated were the result of "data searches that were overly narrow and

the lack of a system that would allow [the agency] to provide more information without

compromising its sources or methods."

31.     The IOB concluded that "The Department of State should implement a program to

ensure that its bureaus consider including appropriate intelligence-based information in

briefings to U.S. citizens (or relatives of those) who are killed, abducted, or tortured

abroad -- perhaps without identifying the information as intelligence-based.  The bureaus

should work with intelligence agencies to ensure that sources and methods are not

compromised in this process."

32.     Plaintiffs are members of "Coalition Missing", an organization founded for

United States citizen survivors of human rights violations in Guatemala, their U.S. citizen

family members, or U.S. citizen members of religious orders subjected to human rights

violations in Guatemala.

**Plaintiff Meredith Larson**

33.     Plaintiff Meredith Larson and seeks documents regarding a stabbing attack she

suffered in 1989, when she worked in Guatemala as an international human rights

observer.  Larson, then twenty-three years old, went to Guatemala to work for an

international organization that provides nonviolent international peacekeeping in areas of

violent conflict and repression, offering unarmed protective accompaniment to

individuals, organizations, and communities threatened with violence and human rights

abuses.

34.     Plaintiff Larson wanted to work as an international human rights observer in

Guatemala because she strongly believed in the importance of the advancement of human

rights.  On December 20, 1989, around 7:00 p.m., Meredith Larson and two Canadian

colleagues were walking toward the organization's home office in Guatemala City.

Approximately one block before reaching the house, two men rushed the three human

rights observers and attacked them with knives.  One lunged at Ms. Larson's chest with

his knife.

35.     Plaintiff Larson screamed and put her arms out in front of her to block her body.

She swung her bag at him and started to run.  The attackers never asked Plaintiff Larson

or her colleagues for their cash or any other possessions, nor did they attempt to take her

bag from her when she tripped and fell in an attempt to escape.  Plaintiff Larson

ultimately made it back to her house and was hospitalized later that night. She sustained

knife wounds to her chest and left arm and suffered nerve damage to her arm.

36.     Prior to this attack, her organization received death and bomb threats in May

1989, and in August 1989, its offices were bombed.  A demolitions expert from the police

told her organization that the grenades were US-made. The bombing occurred minutes

apart from a bombing of the offices of the *Grupo de Apoyo Mutuo* (GAM), a prominent

Guatemalan human rights organization whose offices were located in an adjacent

neighborhood.

37.     As of this date, no one has been arrested nor in any way charged or identified with

the attack against Plaintiff Larson or her co-workers, nor with the threats against and

bombing of her organization.  Immediately after the attack, then United States

Ambassador Thomas Stroock told  Plaintiff Larson's organization that he suspected that a

faction of right-wing extremists attempting to destabilize the government of Vinicio Cerezo was responsible for the attack. Shortly thereafter, however, a religious delegation reported to the organization and Plaintiff Larson that Ambassador Stroock told them that the attack was not political but had been a "street crime of passion"; as the delegation leader recalled it, the Ambassador indicated that it was " 'Latin men getting excited over North American women.'"

38.     In 1996, the President's Intelligence Oversight Board ("IOB") provided Plaintiff Larson with a declassified, formerly "SECRET" document that indicated that the "Special Operations" section of the D-2 (Guatemalan Army Directorate of Intelligence) was responsible for the bombing of her organization. The IOB report also disclosed that the CIA had maintained a close liaison relationship with the D-2, a unit widely known for its extensive human rights abuses in Guatemala. Ironically, one of the stated reasons for the CIA's liaison relationship with the D-2 was to "[protect] US citizens at risk."

39.     Another document released by the IOB indicated that a right-wing extremist with ties to the military, Lionel Sisniega Otero, was responsible for the bombing. These documents were provided to Plaintiff Larson in conjunction with a voluntary declassification by the IOB. Plaintiff Larson never received this document through her FOIA request.

**Plaintiff Paul Joslin**

40.     In 1982, Plaintiff Paul Joslin, a member of the Christian Brothers religious order, was living in Guatemala in order to teach indigenous youth of the region of Huehuetenango. He worked there with, among others, Brother James Miller.

41.     Brother James Miller, FSC, was also a member of the Christian Brothers. Brother Miller was devoted to improving the lives of peasants and indigenous people in Central America, and spent his time teaching various subjects and serving as a guidance counselor. Brother Miller arrived in Huehuetenango, Guatemala in 1981, to teach at the "Colegio de la Salle, a high school attended by young indigenous men who received scholarships from the Christian Brothers. In addition to teaching by day, Brother Miller also instructed some of the students in the latest agricultural techniques so that they could bring such skills back to their local villages in the hopes that they could better provide for themselves.

42.     On February 10, 1982, the father of a Guatemalan Christian Brother who worked as a border patrol guard told the community of Christian brothers at Colegio de la Salle that he had overheard two members of the G-2 squad, the security branch of the Guatemalan military, plotting to get rid of the "sub-director" of Colegio La Salle. Brother Miller was one of three sub-directors, so no one was clear who was the actual target or why.

43.     Three days later, on February 13, 1982 in broad daylight, Plaintiff Miller was outside patching a wall at the house where he and other students and teachers lived. Suddenly, three masked men appeared and fired several shots at Brother Miller, killing him. The three men then ran in the direction of (as opposed to away from) the police station.

44.     Plaintiff Joslin made repeated efforts to uncover information regarding the perpetrators of this crime through the American Embassy in Guatemala; however, Plaintiff Joslin received no information whatsoever from Embassy officials. In response

15

to Plaintiff Joslin's request that the U.S. Government undertake an investigation of Brother Miller's death, Plaintiff Joslin was informed that an investigation would not be undertaken because of "danger" in the region. As of this date, no one has been arrested, identified, or otherwise officially associated with the murder of Brother Miller.

**Plaintiff Thomas Henehan**

45.     Established in 1911, Maryknoll is a United States-based Catholic Mission movement. Father Henehan, a Maryknoll priest, is a member of the branch of the Catholic Foreign Mission Society of America, whose focus is to work overseas, and through education and advocacy attempt to improve the lives of those struggling due to economic or political circumstances.

46.     In 1976, Father William Woods, a Maryknoll Priest, was living and working in Guatemala, where he had been for the past 18 years. He worked as a missionary, and in the last few years of his life was working to organize five cooperatives of Mayan Indians on 80,000 acres of land in the Ixcan region. The cooperatives were being set up in an effort to allow the impoverished Mayan Indians to support themselves from the land.

47.     On November 20, 1976, Father Woods, an experienced pilot, was flying a small plane in which Ann Kerndt, Dr. Michael Okada, and two other United States citizens were also flying. The plane was headed toward the Ixcan region where the cooperatives were being set up. The plane crashed, killing Father Woods and five others on board the aircraft. The Cessna 185 which he piloted was in sound mechanical condition, and the weather was good.

48.     Following the crash, families and friends of the crash victims became suspicious when it became obvious that the official Guatemalan government reports were attempting

16

to cover up what in fact were objectively verifiable circumstances regarding the details of the plane accident. Soon after the crash, official government reports claimed that the plane had gone down due to bad weather conditions in the region; however, after civil aeronautics weather reports determined that weather conditions in the area at the time of the crash were excellent, the Guatemalan government rescinded its initial report.

49.     Thereafter, Guatemalan civil aeronautics authorities sent a team of investigators to the crash site and issued a report claiming that the plane had exploded and burned. However, witnesses at the crash site in subsequent days attested to the fact that neither the bodies of the victims nor any parts of the plane were burned. Further, a thorough examination of the engine on the part of the National Transportation Safety Board, undertaken at the behest of Maryknoll and the victims' families, revealed that the engine was in good working condition at the time of the crash.

50.     Just prior to the plane crash, Father Woods had been warned by United States Embassy officials in Guatemala that their sources revealed that his life was in danger, apparently due to his organizing work with peasant land cooperatives in the region.

51.     Additionally, in a departure from Guatemalan law which mandates that a judge must view an accident scene before bodies can be removed, the bodies of the victims and parts of the plane were removed by the Guatemalan military in the hours following the crash, prior to a judge having made official notification of the accident.

52.     Subsequent to the accident, a number of witnesses from the area came forward to say that they saw Guatemalan military snipers shoot at the plane from below the mountain.

53.    As of this date, the families and friends of Father Woods and others on the plane have not received information from U.S. or other officials regarding the investigation into the plane crash.

**Plaintiff Patricia Kerndt**

54.    Ann Kerndt was twenty-years old in 1976, when she went to Guatemala to work as a volunteer with Direct Relief Foundation, a California-based organization that supports sustainable agriculture projects. She was an agronomist, and wanted to bring her skills to the rural people of Guatemala. More specifically, Kerndt planned to teach a French method of intensive agriculture developed for use in the tropics. She was a passenger on the plane flown by Father William Woods that crashed on November 20, 1976.

**Plaintiff Kimi Okada**

55.    Dr. Michael Okada was twenty-eight years old when he went to Guatemala in 1976 as a volunteer to offer his medical skills to the rural people of Guatemala. Dr. Okada, a resident in Internal Medicine at San Francisco General Hospital in San Francisco, California, was very interested Father Woods' work in establishing agricultural cooperatives for rural Guatemalans. He planned to be in Guatemala for a short time period and then planned to return to his residency at San Francisco General Hospital. Dr. Okada was a passenger on the plane flown by Father William Woods that crashed on November 20, 1976.

**Plaintiff Adriana Portillo-Bartow**

56.    Plaintiff Adriana Portillo-Bartow's father, Adrian Portillo Alcantara, and her two daughters, Rosaura Margarita Carrillo Portillo, ten years old, and Glenda Corina Carrillo

18

Portillo, nine years old, were "disappeared" in 1981, while they were living in Guatemala City. At the time, Mr. Alcantara worked as an insurance sales agent. He was also actively involved in the movement for social change in Guatemala and was responsible for the operations of a "safe house" in Guatemala City belonging to one of the four guerrilla groups ("ORPA") organized to oust the Guatemalan government.

57.     On Friday, September 11, 1981, eight heavily armed men dressed in civilian clothing and riding in vehicles without license plates went to Adrian  Portillo Alcantara's former place of work. When they located him, they interrogated him and took him out of the office at gunpoint. Adrian Portillo Alcantara was forced into one of their vehicles, in the presence of several employees and one of his sons.

58.     The same day, several men, some in civilian clothing and others in military uniform, had taken possession of Adrian Portillo Alcantara's residence. The same son who witnessed Adrian Portillo Alcantara's kidnapping witnessed soldiers surrounding the entire block around his father's home. Other witnesses saw the men forcibly break down the door. Adrian  Portillo Alcantara's wife, his eighteen-month-old daughter, one of his daughters-in-law, and two grandchildren were in the house at the time of the attack. His two grandchildren, Rosaura Margarita Carrillo Portillo and Glenda Corina Carrillo Portillo are the daughters of plaintiff Adriana Portillo-Bartow.

59.     After the attack on the residence, the Guatemalan State security forces acknowledged that although they seized "subversive materials" in the home, they denied that anyone was in the residence, stating that the house was empty when they went in. When Plaintiff Portillo-Bartow attempted to enter the residence later that afternoon to join her father and daughters, and upon approaching the house, she was interrogated by

State security forces surrounding the home. When Plaintiff Portillo-Bartow asked about her family members, the leader of the security forces told her that they were not there. Shortly thereafter she was told by the same person and other men present that her family was inside the house, and that she could go in and see them if she wanted. Plaintiff Portillo-Bartow was too afraid to go into her father's home; however, from the street she could see that some of the men were washing the floors of the house with a hose and brooms.

60.     Adriana Portillo-Bartow remained in Guatemala for three more years after the disappearance of her father, daughters and other family members, trying to find out what had happened to her family. Portillo-Bartow and her two surviving daughters fled Guatemala in December of 1984 and arrived in the U.S. in January 1985, where she has lived since.

61.     As of this date, plaintiff Portillo-Bartow has not seen or heard from her father or her two children since the date of their disappearance. It has been twenty-one years.

**Plaintiff Lisel Holdenried**

62.     Frank Holdenried traveled to Guatemala in March 1976 after a massive earthquake, in order to locate family members of several Guatemalans living in the Los Angeles area and to assist in the relief efforts. Though initially he had planned to stay only for a brief period, Mr. Holdenried decided to remain in Guatemala after witnessing the poverty and devastation in which the Guatemalan people were living. He eventually moved into Barrio Santa Luisa, where he lived in a tin shack in a shanty town on the outskirts of Guatemala City. He remained there to live among the poor and to offer help to his new community.

63.     Mr. Holdenried eventually became accepted into the community in Santa Luisa and learned to speak Spanish.  He started an organization called "Helpers of the Poor", or *Ayudantes de los Pobres*, supported by donations largely from his hometown of Kelseyville, California.  With the funds, Frank Holdenried embarked on various barrio projects, such as setting up a shower in someone's home, installing a solar stove, and taking a local resident to the dentist.  He served as ombudsman between community and government social services (hospitals, courts, and police).

64.     Mr. Holdenried also began working with youth who lived on the streets in Guatemala City.  He opened up his home to young men, who, in exchange for living there, agreed to return to school.  He set up a large rectangular table and invited nuns to come and tutor the community children until they were able to attend a regular school.  In addition, Mr. Holdenried was also working on a book throughout the time he lived there which in the end called for radical structural change in the country.  He also wrote several freelance articles for the US press informing the public about gross violations of human rights occurring in Guatemala.

65.     Frank Holdenried became more outspoken over the years about what he saw as repression and injustice towards the poor in Guatemala.  In August 1981, a Catholic priest with whom he had been working from time to time on special cases was disappeared.  Sometime in 1981, due to increasing tensions, Holdenried was advised to leave his community and he went to work in San Lucas Toliman, Solola.  He began to take security precautions recommended by the U.S. Embassy.  In January 1983, he met with two American congressmen at the U.S. Embassy to discuss Guatemala's human rights record.

21

66.     On Easter weekend 1983, Frank Holdenried went to a small resort town in Livingston, Guatemala for some rest. Accompanying him was one of the youths who he had been looking after. It was crowded that weekend and there were no vacant hotel rooms, so they decided to sleep on the beach as many people did. Once they located a place to sleep, Mr. Holdenried hung his clothes, containing his wallet, on a nearby fence.

67.     During the night of April 2, 1983, Frank Holdenried and the youth who had accompanied him were attacked. The next morning the youth awoke to find Mr. Holdenried bleeding from the mouth and head, barely alive as a result of being severely bludgeoned. When the youth returned with the police, Mr. Holdenried was dead. The United States State Department officially concluded that Mr. Holdenried's death was a result of common crime, even though nothing—not even his wallet or its contents was taken. Independent investigations into Mr. Holdenried's death, however, identified witnesses who reported that eight men in military uniforms were present at the scene of Mr. Holdenried's death, and were responsible for his death.

### COUNT ONE (DOS - LARSON)

68.     Plaintiff Larson  repeats and realleges the allegations contained in  paragraph 1 through 67, inclusive.

69.     By letter dated July 21, 1997, Meredith Larson, through counsel, submitted a FOIA request for disclosure of all information related to the violent assault against her in 1989, or related to the threats against or bombing of the human rights organization for which she worked.

70.     In response to such request, DOS  assigned plaintiff's case control number 9702754, 97027923, 9702794, 9702795 and 9703182.

22

71.     On January 30, 1999, as to case control number 9702795, DOS withheld seven documents in their entirety.

72.     On March 22, 1999, plaintiff appealed the DOS decision regarding case control number 9702975 in which it refused to release seven documents.

73.     On July 12, 1999, DOS upheld in part its decision refusing to release documents with respect to case control number 9702795.

74.     On April 29, 1999, as to case control number 9702792, DOS released documents in part and withheld information in other documents.

75.     On January 27, 2000, plaintiff appealed the DOS decision as to case control number 9702792.

76.     On May 17, 2000, DOS upheld its decision in part as to case control number 702792 by refusing to release portions of previously withheld documents.

77.     On November 3, 1999, as to case control number 9702794, DOS released documents in part and withheld information in other documents.

78.     On January 27, 2000, plaintiff appealed the DOS decision as to case control number 9702794.

79.     On May 17, 2000, DOS upheld its decision to withhold certain documents as to case control number 9702794.

80.     Plaintiff has exhausted all applicable administrative remedies.

81.     Plaintiff has a legal right under the FOIA to obtain the information she seeks, and there is no legal basis for the denial by DOS of such right.

82.     DOS has failed to comply with the requisite statutory periods that govern compliance under the FOIA with respect to case control numbers 9702793, and 9703182. Therefore, DOS has wrongfully withheld documents from plaintiff Larson.

83.     Plaintiff Larson is not required to exhaust administrative remedies with respect to those requests where DOS has not issued a formal determination regarding the documents.

## COUNT TWO (DOS-OKADA)

84.     Plaintiff Okada repeats and realleges the allegations contained in paragraphs 1 through 67 above, inclusive.

85.     By letter dated August 23, 2002 plaintiff Kimi Okada, through counsel, submitted a FOIA request to DOS for all information related to the death of her brother, Dr. Michael Okada.

86.     By letter dated September 4, 2002, DOS assigned plaintiff Okada's request number 200202903.

87.     DOS has failed to comply with the requisite statutory periods that govern compliance under the FOIA.  Therefore, DOS has wrongfully withheld documents from Okada.

88.     Plaintiff Okada is not required to exhaust administrative remedies as DOS has not issued a formal determination regarding the documents.

## COUNT  THREE (DOS – HENEHAN)

89.     Plaintiff Henehan repeats and  realleges the allegations contained in paragraphs one through 67, inclusive.

90.     On September 4, 1997, Plaintiff Henehan, through counsel, submitted a FOIA request seeking information relating to the death of Father Woods.

91.     In October 1999, DOS released documents in part, but withheld responsive portions of documents.

92.     In December 1999, Plaintiff Henehan appealed the withholding of portions of the documents.

93.     In May 2000, DOS responded that it would continue to withhold portions of the documents.

94.     Plaintiff Henehan has exhausted all applicable administrative remedies.

95.     Plaintiff Henehan has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by the DOS of this right.

## COUNT FOUR (DOS – HOLDENRIED)

96.     Plaintiff Holdenried repeat and realleges paragraphs 1 through 67, inclusive.

97.     By letter dated May 30, 2002, Plaintiff Holdenried, through counsel, submitted a FOIA request seeking information related to the death of her father, Frank Holdenried.

98.     By letter dated June 7, 2002, DOS assigned plaintiff's request number 200201872.

99.     DOS has failed to comply with the requisite statutory periods that govern compliance under the FOIA.  Therefore, DOS has wrongfully withheld documents from Plaintiff Holdenried.

100.    Plaintiff Holdenried is not required to exhaust administrative remedies as DOS has not issued a formal determination regarding the documents.

25

## COUNT FIVE (DOS - PORTILLO-BARTOW)

101. Plaintiff Portillo-Bartow repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive.

102. By letter dated July 23, 2002, plaintiff, through counsel, submitted a request for documents related to the disappearances of her father Adrian Portillo Alcantara and her daughters Rosaura Margarita Corillo Portillo and Glenda Corina Portillo.

103. By letter dated September 23, 2002, the DOS assigned plaintiff's request number 200202417.

104. DOS has failed to comply with the requisite statutory periods that govern compliance under the FOIA. Therefore, DOS has wrongfully withheld documents from Plaintiff Portillo-Bartow.

105. Plaintiff Portillo-Bartow is not required to exhaust administrative remedies as DOS has not issued a formal determination regarding the documents.

## COUNT SIX (DOS – JOSLIN)

106. Plaintiff Joslin repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive.

107. In October 1996, Plaintiff Joslin submitted a request for documents related to the murder of Brother James Miller.

108. By letter dated October 22, 1998, DOS released documents in part and withheld portions of other responsive documents.

109. On December 12, 1998, Plaintiff Joslin appealed the DOS decision to withhold portions of responsive documents.

110. Plaintiff has exhausted all applicable administrative remedies.

26

111.   Plaintiff Joslin has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by DOS of his right.

112.   By letters dated September 5, 1997, DOS assigned Plaintiff Joslin four different case control numbers based on various aspects of the request, numbered 9702975, 9702976, 9702977, and 9702978, respectively.

113.   DOS refused to release portions of two documents as to case control number 9702976.

114.   By letter dated December 15, 1999, Plaintiff Joslin appealed the decision of DOS to withhold portions of documents.

115.   By letter dated May 17, 2000, DOS affirmed the decision to withhold documents as to case control number 199702976 .

116.   Plaintiff Joslin has exhausted all administrative remedies as to case control 9702976.

117.   Plaintiff Joslin has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by the DOS of this right.

118.   DOS has failed to comply with the requisite statutory periods that govern compliance under the FOIA as to case control numbers 9702975, 9702977, and 9702978. Therefore, DOS has wrongfully withheld documents from plaintiff Joslin.

119.   Plaintiff Joslin is not required to exhaust administrative remedies as DOS has not issued a formal determination regarding the documents.

## COUNT SEVEN (DIA – LARSON)

120.   Plaintiff Larson repeats and realleges paragraphs 1 through 67, inclusive.

27

121.    On July 21, 1997, Plaintiff Larson, through counsel, submitted a FOIA request to
the DIA for documents relating to the violent assault against her in 1989, or related to the
threats against or bombing of the human rights organization for which she worked.

122.    DIA has failed to comply with the requisite statutory time periods that govern
compliance under the FOIA.  Therefore, DIA has wrongfully withheld documents.

123.    Plaintiff Larson is not required to exhaust administrative remedies as the DIA has
not issued a formal determination regarding the documents.

## COUNT EIGHT (DIA – HOLDENRIED)

124.    Plaintiff Holdenried repeats and realleges the allegations contained in paragraphs
1 through 67, inclusive.

125.    By letter dated May 30, 2002, Plaintiff Holdenried, through counsel, submitted a
FOIA request seeking information related to the death of her father.

126.    By letter dated June 5, 2002, the DIA assigned Plaintiff Holdenried's request
number 0466-2022.

127.    DIA has failed to comply with the requisite statutory periods that govern
compliance under the FOIA.  Therefore, DIA has wrongfully withheld documents from
Plaintiff Holdenried.

128.    Plaintiff Holdenried is not required to exhaust administrative remedies as DIA
has not issued a formal determination regarding the documents.

## COUNT NINE (DIA – PORTILLO-BARTOW)

129.    Plaintiff Portillo-Bartow repeats and realleges the allegations contained in
paragraphs 1 through 132, inclusive.

28

130.    By letter dated July 23, 2002, plaintiff, through counsel, submitted a

FOIA request seeking documents relating to the disappearance of her father, Adrian

Portillo Alcantara, and of her daughters, Glena Corina Portillo and Rosaura Margarita

Corillo Portillo.

131.    Plaintiff has received no correspondence from DIA.

132.    DIA has failed to comply with the requisite statutory periods that govern

compliance under the FOIA.  Therefore, DIA has wrongfully withheld documents from

Plaintiff Portillo-Bartow.

133.    Plaintiff Portillo-Bartow is not required to exhaust administrative remedies as the

DIA has not issued a formal determination regarding the documents.

### COUNT TEN (DIA – KERNDT)

134.    Plaintiff Kerndt repeats and realleges the allegations contained in paragraphs 1

through 67, inclusive.

135.    By letter dated June 3, 2002, Plaintiff Kerndt, through counsel, submitted a FOIA

request seeking documents relating to the death of her sister, Ann Kerndt.

136.    Plaintiff has received no responsive correspondence from DIA.

137.    DIA has failed to comply with the requisite statutory periods that govern

compliance under the FOIA.  Therefore, DIA has wrongfully withheld documents from

plaintiff Kerndt.

138.    Plaintiff Kerndt is not required to exhaust administrative remedies as the DIA

has not issued a formal determination regarding the documents.

29

## COUNT ELEVEN (DIA – JOSLIN)

139.    Plaintiff Joslin repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive.

140.    On August 7, 1997, plaintiff, through counsel, submitted a FOIA request seeking information regarding the murder of Brother James Miller.

141.    On October 7, 1998, DIA responded that it had found no responsive records.

142.    On October 12, 1998, Plaintiff Joslin appealed DIA's finding of no records.

143.    Plaintiff Joslin has not received a response to his appeal.

144.    Plaintiff Joslin has exhausted all administrative remedies.

145.    Plaintiff Joslin has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by DIA of his right.

## COUNT TWELVE (CIA – LARSON)

146.    Plaintiff Larson repeats and realleges the allegations contained in paragraphs through 67, inclusive.

147.    On July 21, 1997, Plaintiff Larson, through counsel, submitted a FOIA request seeking documents seeking information regarding the violent assault against her in 1989, or related to the threats against or bombing of the human rights organization for which she worked.

148.    In January 1998, CIA responded that it found no responsive documents.

149.    On August 4, 1998, Plaintiff Larson appealed the CIA finding of no records.

150.    On January 15, 1999, CIA upheld the decision of a finding of no records.

151.    Plaintiff Larson has exhausted all applicable administrative remedies.

30

152.   Plaintiff Larson has a legal right under the FOIA to obtain the information she

seeks.

## COUNT THIRTEEN (CIA – HOLDENRIED)

153.   Plaintiff Holdenried repeats and realleges the allegations contained in paragraphs

1 through 67, inclusive.

154.   By letter dated April 14, 1999, Plaintiff Holdenried, through counsel, submitted a

request for documents related to the death of her father, Frank Holdenried.

155.   By letter dated May 6, 1999, CIA informed Plaintiff Holdenried that it found no

responsive documents.

156.   Plaintiff Holdenried appealed the CIA finding that no records were found.

157.   CIA affirmed its finding of no responsive records.

158.   Plaintiff Holdenried has exhausted all administrative remedies.

159.   Plaintiff Holdenried has a legal right under the FOIA to the information she seeks.

## COUNT FOURTEEN (CIA – PORTILLO-BARTOW)

160.   Plaintiff Portillo-Bartow repeats and realleges the allegations contained

paragraphs 1 through 67, inclusive.

161.   By letter dated August 23, 2002, plaintiff, through counsel, submitted a request

for documents related to the disappearances of her father, Adrian Portillo Alcantara, and

her daughters, Glenda Corina Portillo and Rosaura Margarita Corillo Portillo.

162.   By letter dated September 11, 2002, the CIA assigned plaintiff's request number

F-2002-01445, and gave a partial substantive response of a finding of no records.

However, with respect to certain items sought in the request, the CIA gave no substantive

information.

163. CIA has failed to comply with the requisite statutory periods that govern compliance under the FOIA. Therefore, CIA has wrongfully withheld documents from Portillo-Bartow.

164. Plaintiff Portillo-Bartow is not required to exhaust administrative remedies as the CIA has not issued a formal determination with regard to certain information sought in Plaintiff Portillo-Bartow's request.

## COUNT FIFTEEN (CIA – JOSLIN)

165. Plaintiff Joslin repeats and realleges paragraphs 1 through 168, inclusive.

166. By letter dated August 7, 1997, Plaintiff Joslin, through counsel, filed a FOIA request seeking information pertaining to the murder of Brother James Miller.

167. In response, the CIA released withheld portions of documents.

168. By letter dated August 23, 1998, Plaintiff Joslin appealed CIA's withholding portions of the documents.

169. By letter dated April 20, 1999, CIA affirmed its decision to withhold certain information.

170. Plaintiff Joslin has exhausted all applicable administrative remedies.

171. Plaintiff Joslin has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by CIA of his right.

## COUNT SIXTEEN (NSA – LARSON)

172. Plaintiff Larson repeats and realleges the allegations contained in paragraphs 1 through 167, inclusive.

173     By letter dated July 21, 1997, Plaintiff Larson, through counsel, submitted a

FOIA request seeking information regarding the incident in which she was stabbed in

1989, or related to the threats against or bombing of the human rights organization for

which she worked.

174.    On January 29, 1998, NSA released portions of certain documents and refused to

release other responsive documents.

175.    On March 16, 1998, Plaintiff Larson appealed NSA's decision to withhold

documents.

176.    On September 21, 1999, NSA released portions of one document but continued to

withhold other documents.

177.    Plaintiff Larson has exhausted all applicable administrative remedies.

178.    Plaintiff has a legal right to the information she seeks, and there is no legal basis

for the denial by NSA of her right.

### COUNT SEVENTEEN (NSA – KERNDT)

179.    Plaintiff Kerndt repeats and realleges the allegations contained in paragraphs 1

through 67, inclusive.

180.    By letter dated March 19, 1998, Plaintiff Kerndt, through counsel, submitted a

FOIA request seeking information regarding the death of her sister, Ann Kerndt.

181.    By letter dated August 4, 1998, NSA withheld responsive documents.

182.    By letter dated September 17, 1998, Plaintiff Kerndt filed an appeal regarding

NSA's refusal to provide documents.

183.    NSA has not responded to Plaintiff Kerndt's appeal.

184.    Plaintiff Kerndt has exhausted all applicable administrative remedies.

185.  Plaintiff Kerndt has a legal right to the information she seeks, and there is no legal basis for the denial of her right.

## COUNT EIGHTEEN (NSA – HENEHAN)

186.  Plaintiff Henehan repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive.

187.  By letter dated September 4, 1997, Plaintiff Henehan, through counsel, submitted FOIA request seeking information regarding the death of Father William Woods.

188.  In February 1998, NSA informed Plaintiff Henehan that it was withholding responsive documents.

189.  On April 4, 1998, Plaintiff Henehan appealed the NSA's refusal to turn over responsive documents.

190.  On June 8, 1998, NSA affirmed its decision to withhold documents in whole or and in part.

191.  Plaintiff Henehan has exhausted all applicable administrative remedies.

192.  Plaintiff Henehan has a legal right under the FOIA to obtain the information he seeks, and there is no legal basis for the denial by the NSA of this right

## COUNT NINETEEN (NSA – PORTILLO-BARTOW)

193.  Plaintiff Portillo-Bartow repeats and realleges paragraphs 1 through 67, inclusive.

194.  On July 23, 2002, Plaintiff Portillo-Bartow, through counsel, submitted a request seeking information related to the disappearances of her father, Adrian Portillo Alcantara, and her daughters, Glenda Corina Portillo, and Rosaura Margarita Corillo Portillo.

195.  Plaintiff Portillo Bartow has not received a response from the NSA.

34

196.    NSA has failed to comply with the requisite statutory periods that govern compliance under the FOIA. Therefore, NSA has wrongfully withheld documents from Plaintiff Portillo-Bartow.

197.    Plaintiff Portillo-Bartow is not required to exhaust administrative remedies as the NSA has not issued a formal determination regarding the documents.

### COUNT TWENTY (NTSB – KERNDT)

198.    Plaintiff Kerndt repeats and realleges the allegations contained in paragraphs 1 through 67, inclusive.

199.    By letter dated June 3, 2002, Plaintiff Kerndt, through counsel, submitted a FOIA request to the NTSB seeking documents regarding the death of her sister, Ann Kerndt.

200.    NTSB responded by stating that it had received plaintiff's request, but provided no further substantive response.

201.    NTSB has failed to comply with the requisite statutory periods that govern compliance under the FOIA. Therefore, NTSB has wrongfully withheld documents from Plaintiff Kerndt.

202.    Plaintiff Kerndt is not required to exhaust administrative remedies as the NTSB has not issued a formal determination regarding the documents.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff prays that this court:

1.  Order defendants to disclose the requested records in their entireties and make copies available to plaintiffs;

2.  Provide for expeditious proceedings in this action;

3. Award plaintiffs their costs and reasonable attorney's fees incurred in this action; and

4. Grant such other relief as this court may deem just and proper.

Respectfully Submitted,

MARK S. ZAID, ESQ.
KRIEGER & ZAID
D.C. Bar #440532
1133 21st St. NW
Suite 800
Washington, DC  20036
(202) 223-9050

SHAWN ROBERTS, ESQ.
DC. Bar #418284
1201 6th Avenue
Suite 9
San Francisco, California  94122
(415) 750-9914

Of Counsel:

TANIA ROSE, ESQ.
California State Bar #151514
2527 College Avenue
Berkeley, California  94704