# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DISTRICT OF COLUMBIA

MEREDITH LARSON, et al.      *

     Plaintiff,        *

v.                    *     Case No.: 1:02CV01937

DEPARTMENT OF STATE, et al.   *

     Defendant       *

                      *

## DECLARATION OF LOUIS F. GILES

I, LOUIS F. GILES, hereby declare and state:

1.   I am the Director of Policy for the National Security Agency ("NSA" or

"Agency") and have served in this position since February 2002.  I have served with NSA

for 28 years, and prior to my current assignment, I held various senior and supervisory

positions including Chief of the Information Assurance Directorate's ("IAD") Customer

Relations Office and Deputy Chief of the Special Programs Staff of the NSA Signals

Intelligence Directorate's Cryptanalysis Group.  As the Director of Policy, I am a TOP

SECRET classification authority, pursuant to Section 1.3 of Executive Order 12958, as

amended 25 March 2003, and I am responsible for the processing of all requests made

pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for NSA records.

It is also my responsibility to assert the FOIA exemptions in the course of litigation.

Through the exercise of my official duties, I have become familiar with the current

litigation arising out of requests for records filed by Plaintiffs Meredith Larson, Patricia

Kerndt, Thomas Henehan, and Adriana Portillo-Bartow.

2.  The purpose of this declaration is to describe the responses that NSA has provided

to the FOIA requests of Plaintiffs Larson, Henehan, Kerndt and Portillo-Bartow.  In order

to provide the necessary context for the discussion, I will describe NSA's origin and

mission.

I.

**ORIGIN AND MISSON OF NSA**

3.  NSA was established by Presidential Directive in October 1952 as a separately

organized agency within the Department of Defense, under the direction, authority, and

control of the Secretary of Defense, who was designated by the President as Executive

Agent of the United States Government for conducting communications security

activities and signals intelligence activities of the United States.  *See* Executive Order

12333, section 1.12(b).

4.  NSA's signals intelligence mission is to obtain information from foreign

electromagnetic signals and to provide reports derived from such information or data,

frequently on a rapid response basis, to national policy makers and the intelligence

community of the United States Government.  A primary signals intelligence mission of

NSA is to intercept communications of foreign governments in order to obtain foreign

intelligence information necessary to the national defense, national security, or the

conduct of the foreign affairs of the United States.  The signals intelligence collection

mission of NSA provides national policy makers and the intelligence community with

highly reliable foreign intelligence information.  Information obtained from intercepted

foreign communications is called communications intelligence ("COMINT").  NSA's

COMINT efforts constitute a substantial part of the core functions and activities of the Agency.

5.  A fundamental tenet of the COMINT process is that the identity of specific communications (commonly referred to as "targets"), the degree of success in exploiting these targets, the vulnerability of particular foreign communications, and the extent of any cryptologic successes are all matters that must be maintained in strictest secrecy because of the fragility of the ability to exploit foreign communications.  Disclosure of the identity of the targets, the degree of success or weakness in exploiting those targets, the vulnerability of particular foreign communications, and the extent of any cryptoanalytic success would encourage countermeasures by the targets of NSA's COMINT efforts.  If a foreign power is successful in defeating an intercept operation, all of the intelligence from that source is lost unless and until NSA can establish new and equivalent exploitation of the foreign power's signals.  If a source becomes unavailable, the military, national policymakers and intelligence community must operate without the information the signals provided.  Such losses are extremely harmful to the national security of the United States.

## II.

## PROCESSING OF THE FOIA REQUESTS OF PLAINTIFFS LARSON, KERNDT, HENEHAN, AND PORTILLO-BARTOW

### Larson's FOIA requests/Case number J9683-97(Count 16)

6.  Plaintiff Larson filed a FOIA request on 21 July 1997 requesting documents "relating to her stabbing on the street in Guatemala City, Guatemala on December 20, 1989."  Plaintiff Larson also requested documents relating to Peace Brigades International; her subsequent visits to Guatemala; meetings with Guatemalan government

officials; and, her meeting with US government officials and congresspersons. *See* Exhibit 1.

7. On 9 September 1997, NSA responded by letter to Plaintiff Larson's attorney indicating that her FOIA request would be expedited. *See* Exhibit 2. The Agency anticipated that a response would be generated by June 1998. *Id.*

8. On 20 January 1998, NSA responded to Plaintiff Larson's FOIA request. Twelve records containing 20 pages were released. *See* Exhibit 3. There were four documents released in their entirety and eight documents released in part. *Id.* The portions of the eight documents released in part, were denied pursuant to 5 U.S.C. § 552(b)(1) and (b)(3). *Id.*

9. On 16 March 1998, Plaintiff Larson filed an agency appeal with NSA. *See* Exhibit 4. On 20 April 1998, NSA issued an interim response indicating that an answer to the appeal would be issued in late May. *See* Exhibit 5.

10. NSA responded to Plaintiff Larson's appeal on 8 June 1998. *See* Exhibit 6. The Deputy Director of the Agency, the Freedom of Information/Privacy Act Appeals Authority, denied Plaintiff Larson's appeal and concluded that the documents were properly withheld. *Id.* The NSA documents were reviewed and found to be currently classified in accordance with Executive Order 12958 and protected from disclosure pursuant to 5 U.S.C. § 552(b)(1) and 5 U.S.C. 552 (b)(3). *Id.* An additional copy of the eight documents, which were released in part, was sent to Plaintiff Larson, with the specific applicable exemption noted next to each deletion as Plaintiff Larson requested. *Id.*

**Patricia Kerndt's[1] FOIA requests/Case number J9396A-98 (Count 17)**

11. Plaintiff Kerndt filed a FOIA request on 19 March 1998 requesting "[a]ll documents relating to in whole or in part to the mysterious air crash and death of Ann Louise Kerndt near Ixcan, Guatemala on November 20, 1976. Aboard the plane were four other U.S. citizens, Father William H.Woods, John Gauker, Selwyn Puig, and Dr. Michael D. Okada." *See* Exhibit 7.

12. On 1 April 1998, NSA informed Plaintiff Kerndt that her request had been received and that it would be expedited due to its humanitarian considerations. *See* Exhibit 8. However, even though the request would be expedited, there remained a queue of expedited requests and it was anticipated that a response would not be forthcoming before January 1999. *Id.*

13. On 4 August 1998, NSA responded to Plaintiff Kerndt's FOIA request and informed her that two responsive records were discovered. *See* Exhibit 9. One document was from NSA and the other belonged to the CIA. *Id.* The NSA document was reviewed and found to be currently classified in accordance with Executive Order 12958 and protected from disclosure pursuant to 18 U.S.C. § 798; Title 50 U.S.C. § 403-3(c)(6); and Section 6, Public Law 86-36 (50 U.S.C. § 402 note.). The document belonging to the CIA was referred to them for their review and direct response to Plaintiff. *Id.*

14. On 17 September 1998, Plaintiff Kerndt appealed the Agency's decision. *See* Exhibit 10. On 7 December 1998, the Deputy Director of the Agency, the Freedom of Information/Privacy Act Appeals Authority, denied Plaintiff Kerndt's appeal and concluded that the document was properly withheld. *See* Exhibit 11. The Deputy

---

[1] In Ms. Kerndt's FOIA request to the Agency, she was identified as Mary Patricia Ahern. She will be referred to herein as Patricia Kerndt, as she has been identified in the District Court documents.

Director further explained that the withheld document was a foreign intelligence report, which merely indicated that a plane crashed on 20 November 1976. *Id.* The document did not contain any additional information such as the identity of passengers, the cause of the crash, who may have been responsible, or government actions. *Id.*

## Henehan's FOIA Requests/Case number J9837A-97 (Count 18)

15. On 4 September 1997, Plaintiff Henehan filed a FOIA request seeking "[a]ll documents relating in whole or in part to the mysterious air crash and death of Father William H. Woods, M.M. near Ixcan, Guatemala on November 20, 1976. Aboard the plane were also four U.S. citizens, John Gauker, Selwyn Puig, Ann Kerndt, and Dr. Michael D. Okada". In addition, Plaintiff Henehan requested fifteen categories of information related to the incident, including information about Guatemalan Troop movements. *See* Exhibit 12.

16. NSA responded to the FOIA request on 18 February 1998, indicating that NSA searched for documents pertaining to Father Woods, John Gauker, Selwyn Puig, Ann Kerndt, Dr. Okada, threats against the Maryknoll Fathers, the investigation of the crashed Cessna 185, and the original FOIA request folder for Father Woods. *See* Exhibit 13. Thirty-six records (58 pages) were disclosed, six in their entirety and thirty in part. *Id.* One hundred thirty-seven records (137 pages) were withheld in their entirety. *Id.* The information denied was protected from disclosure pursuant to 5 USC § 552(b)(1) and (b)(2). *Id.* NSA's responsive letter stated that all records withheld pertained to Guatemalan troop movements, not Father William H. Woods. *Id.* There were documents found which originated with other agencies. Those documents were referred to the other agencies for review. Some of the documents were to be returned to NSA for processing

6

and response after the other agencies review, while some of the documents were to be reviewed by the other agencies and a direct response to Plaintiff Henehan generated. *Id.*

17. Plaintiff Henehan appealed NSA's decision on 17 April 1998. *See* Exhibit 14. On 8 June 1998, the Deputy Director of the Agency, the Freedom of Information/Privacy Act Appeals Authority, denied Plaintiff Henehan's appeal and concluded that the documents were properly withheld pursuant to 5 USC § 552(b)(1), (b)(2) and (b)(3). *See* Exhibit 15. The Deputy Director also advised Plaintiff that NSA had referred two documents to Department of State, and eleven documents to U.S. Information Agency, for review and direct response to Plaintiff; eight documents to Department of Defense General Counsel – four for review and direct response to Plaintiff and four for review and response to NSA; and, five documents to Central Intelligence Agency for review and response to NSA. *Id.*

### Portillo-Bartow's FOIA Requests/Case number 41911(Count 19)

18. On 25 July 2002, Plaintiff Portillo-Bartow, filed a FOIA request seeking documents relating to the disappearance of Adrian Portillo Alcantara, a foreign national, on or about September 11, 1981 in Guatemala City, Guatemala. *See* Exhibit 16. At the time of the FOIA request, Plaintiff Portillo-Bartow was a United States citizen, however, in 1981 she was a foreign national living in Guatemala. *Id.*

19. On 3 December 2002, NSA informed Plaintiff Portillo-Bartow that the Agency could neither confirm or deny the existence of the materials requested pursuant to 5 U.S.C. § 552(b)(1) and (b)(3). *See* Exhibit 17. Specifically, the fact of the existence or nonexistence of documents is a currently and properly classified matter in accordance with Executive Order 12958 and protected from disclosure pursuant to 18 U.S.C. § 798,

Title 50 U.S.C. § 403-3(c)(6); and Section 6, Public Law 86-36. (50 U.S.C. § 402 note).

NSA also advised Plaintiff Portillo-Bartow of her appeal rights. *Id.*

20. Plaintiff Portillo-Bartow filed an appeal via facsimile on February 1, 2003. *See* Exhibit 18. Due to the pending litigation, Plaintiff Portillo-Bartow's appeal was administratively closed by the Agency. Plaintiff Portillo-Bartow was advised of this by letter dated 7 March 2003. *See* Exhibit 19.

## Larson's FOIA Request to DIA - Referral to NSA

21. On July 29, 1996, the Defense Intelligence Agency (DIA) referred a NSA document to the Agency for review and direct response to Plaintiff Larson. The document was discovered pursuant to a July 18, 1995 FOIA request by Plaintiff Larson to DIA.

22. On September 18, 1996, NSA responded to Plaintiff Larson's FOIA request and informed her that the document was reviewed and found to be currently classified in accordance with Executive Order 12958 and protected from disclosure pursuant to 18 U.S.C. § 798; Title 50 U.S.C. § 403-3(c)(5); and Section 6, Public Law 86-36 (50 U.S.C. § 402 note.). *See* Exhibit 20.

23. On November 13, 1996, Plaintiff Larson appealed the Agency's decision. On December 20, 1996, the Deputy Director of the Agency, the Freedom of Information Act/Privacy Act Appeals Authority denied Plaintiff Larson's appeal and concluded that the document was properly withheld. *See* Exhibit 21. The Deputy Director further explained that the document did not relate to Plaintiff Larson or the attack on her. *Id.* The document contained a passing reference to the Peace Brigades International. *Id.*

## FOIA EXEMPTION ONE

24. Section 552(b)(1) of the FOIA provides that the FOIA does not require the release of matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of the national defense or foreign policy and are in fact properly classified pursuant to such Executive Order. The current Executive Order, which establishes such criteria, is Executive Order 12958, as amended 25 March 2003.

25. Executive Order 12958 Section 1.4[2] provides that information may not be considered for classification unless it falls within seven specifically enumerated categories of information. The categories of classified information in the documents at issue here are those found in Section 1.4(b), foreign government information; Section 1.4(c), intelligence activities (including special activities), intelligence sources and methods, or cryptology; Section 1.4(d), foreign relations or foreign activities of the United States, including confidential sources; and Section 1.4(g), scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism.

26. Based upon my review of the NSA records withheld in full or in part from Plaintiffs Larson, Kerndt, and Henehan, I have concluded that the documents contain information that either (1) pertains to intelligence activities, and is derived from intelligence sources and methods, and cryptology; (2) relates to foreign relations or foreign activities of the United States, including confidential sources; (3) relates to the vulnerabilities and capabilities of systems projects and plans relating to the national security; and/or (4) contains foreign government information. The withheld information

---

[2] Executive Order 12958 was amended on 25 March 2003. The fact of the existence or nonexistence of such information is properly classified under sections 1.4(b)(c)(d) and (g) of the amended order, formerly sections 1.5(b)(c)(d) and (g).

is currently and properly classified SECRET and TOP SECRET pursuant to Executive

Order 12958, as amended, sections 1.2(1) and (2), and its disclosure reasonably could be

expected to cause damage, serious damage, or exceptionally grave damage to the national

security. The information was reviewed for classification under the current classification

Executive Order, Executive Order 12958 and is marked with the proper classifications.

Therefore, that information is exempt from disclosure pursuant to FOIA Exemption 1.

27. The information at issue, withheld from Plaintiffs Larson (¶ 8), Kerndt (¶ 14) and

Henehan (¶16), is derived from the most sensitive and fragile SIGINT targets.  It

identifies the targets whose communications have been exploited or pertains to

intelligence collection assignments and the technical details of collection.  Disclosure of

any of this information would inform those targets of their vulnerabilities and of NSA's

specific capabilities, sources, and methods.  If those targets learned or suspected that their

communications were being successfully exploited, they would quickly act to engage

countermeasures to deny access to those communications by changing their methods.  It

could take several years and special efforts to regain a capability to exploit these

communications.  The loss of these communications, which are highly prized for their

content, reasonably could be expected to cause serious damage or exceptionally grave

damage to United States national security and foreign relations interests.  To provide

additional information regarding the withheld documents would lead to the disclosure of

exempt information.

28.  Based upon my review of the decision to neither confirm nor deny existence of

the documents as to Plaintiff Portillo-Bartow, I have concluded that the fact of the

existence, or non-existence, of the information pertains to intelligence activities,

intelligence sources and methods, and cryptology.  Further, the information would concern vulnerabilities and capabilities of systems, the success or lack of success in collecting information, projects or plans relating to the national security.  The decision to neither confirm nor deny the existence or non-existence of the requested documents -- is currently and properly classified SECRET pursuant to Executive Order 12958 section 1.4 (c) and (g) and requiring an answer to whether or not records exist reasonably could be expected to cause serious damage to the national security.  Therefore, the decision to neither confirm nor deny the requested records is within exemption one of the FOIA, 5 U.S.C. § 552(b)(1).

## FOIA EXEMPTION TWO

29. Section 552(b)(2) of the FOIA exempts from release information related solely to the internal personnel rules and practices of an agency.  Courts have interpreted the exemption to encompass internal matters of a more substantial nature, the disclosure of which would risk circumvention of a statute or agency regulation.  Sensitive computer-related information that might permit unauthorized access to agency communications systems has been held to qualify for Exemption 2 withholding.

30. Specifically, as to Plaintiff Henehan's request, based upon my review of the information withheld from the set of thirty documents withheld in part, (¶ 16) I have concluded that some of these documents contain e-mail routing information that appears before the text of messages and would reveal how NSA's information network is constructed.  The release of such information could expose the network to unauthorized access.  Therefore, that information is exempt from disclosure pursuant to Exemption 2 of the FOIA, 5 U.S.C. § 552(b)(2).

## FOIA EXEMPTION THREE

31. Section 552(b)(3) of the FOIA provides that the FOIA does not require the release of matters that are specifically exempted from disclosure by statute, provided that the relevant statute requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or establishes particular criteria for withholding or refers to particular types of matter to be withheld. *See* 5 U.S.C. § 552(b)(3). Information about NSA's COMINT efforts directly relates to among the Agency's most core functions and activities. These functions and activities are protected from public disclosure by several statutes. Congress has passed these statutes to protect the fragile nature of NSA's COMINT efforts, including, but not limited to, the existence and depth of signal intelligence-related analytical successes, weaknesses and exploitation techniques. These statutes recognize the vulnerability of signals intelligence to countermeasures of a foreign power and the significance of the loss of valuable foreign intelligence information to national policymakers and the intelligence community.

### III.

### NSA'S UNIQUE STATUTORY PRIVILEGE

32. The first of these statutes is a statutory privilege unique to NSA. NSA's statutory privilege is set forth in section 6 of the National Security Agency Act of 1959, Public Law 86-36 (50 U.S.C. § 402 note). Section 6 of the NSA Act provides that "**[n]othing in this Act or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, of any information with respect to the activities thereof, . . .**" (emphasis added). By this language Congress expressed it's finding that disclosure of any information relating to NSA

12

activities is potentially harmful.  The courts have held that the protection provided by this statutory privilege is, by its very terms, absolute.  *See, e.g., Linder v. NSA*, 94 F. 3d 693 (D.C. Cir. 1996).  Section 6 states unequivocally that, notwithstanding any other law, including the FOIA, NSA cannot be compelled to disclose any information with respect to its activities.  *See Hayden v. NSA,* 608 F.2d 1381 (D.C. Cir. 1979).  Further, while in this case the harm would be very serious, NSA is not required to demonstrate specific harm to national security when invoking this statutory privilege, but only to show that the information relates to its activities.  *Id*.  To invoke this privilege, NSA must demonstrate only that the information sought to be protected falls within the scope of section 6. NSA's functions and activities are therefore protected from disclosure regardless of whether or not the information is classified.

33. The second applicable statute is 18 U.S.C. § 798.  This statute prohibits the unauthorized disclosure of classified information (i) concerning the communications intelligence activities of the United States or (ii) obtained by the process of communication intelligence derived from the communications of any foreign government.  The term "communications intelligence," as defined by Section 798, means that the procedures and methods used in the interception of communications and obtaining of information from such communications by other than the intended recipients.

34. Finally, the third applicable statute -- Section 103 (c)(6) of the National Security Act of 1947 -- provides that the Director of Central Intelligence, as head of the intelligence community, shall protect intelligence sources and methods from unauthorized disclosure.  *See* 50 U.S.C. § 403-3(c)(6).  NSA, as one of the member

agencies of the U.S. intelligence community, must also protect intelligence sources and methods. *See, e.g.,* 50 U.S.C. § 401a(4)(C), and Section 1.7(e) of Executive Order 12333. Like the protection afforded to core NSA activities by Section 6 of the NSA Act of 1959, the protection afforded to intelligence sources and methods by the National Security Act of 1947 is absolute. *See Central Intelligence Agency v. Sims*, 471 U.S. 159 (1985). Whether the sources and methods at issue are classified is irrelevant for purposes of the protection afforded by the National Security Act. *Id.*

35. Based on my review of the information withheld from Plaintiffs Larson, Kerndt and Henehan, I have concluded that not only does Section 552(b) (1) protect the information from disclosure, but also, some of the information is protected from disclosure by Public Law 86-36, Section 6, because it concerns the organizations, functions, activities, and names of employees of the NSA as described above; is protected from disclosure by 18 U.S.C. § 798 because disclosure would likely reveal classified information derived from NSA's exploitation of foreign communications; and is protected from unauthorized disclosure by 50 U.S.C. § 403-3(c)(7) because it concerns intelligence sources and methods.

36. As to Plaintiff Portillo-Bartow, the decision to neither confirm nor deny the requested records is protected by each of the foregoing statutes because any substantive response concerns core functions and activities of the Agency, which includes communications intelligence and because providing a substantive response would likely impair intelligence sources and methods. The fact of the existence or non-existence of the records sought, therefore is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(3)

because of the authority to withhold information found in Section 6 of Public Law 86-36, 18 U.S.C. § 789, and 50 U.S.C. § 403-3(c)(6).

37. Moreover, even though in the case of Plaintiff Portillo-Bartow the fact of the existence or non-existence of records is classified, information relating to NSA's functions and activities is protected from disclosure under NSA's statutory privilege regardless of whether or not it is classified. To disclose whether or not NSA has any specific intercepted messages would reveal information most integrally related to one of NSA's core activities, its foreign signals intelligence collection operations. This type of information falls expressly within the scope of section 6 of Public Law 86-36 and is thus absolutely protected from disclosure by NSA's statutory privilege under exemption 3 of the FOIA.

38. The withheld information is protected from disclosure by each of the foregoing statutes because it concerns the functions and activities of the Agency, which includes communications intelligence, and because disclosure of the information would likely impair intelligence sources and methods. The withheld information, therefore, is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(3) because of the authority to withhold information found in Section 6 of Public Law 86-36, 18 U.S.C. § 798, and 50 U.S.C. § 403-3(c)(6).

Should the Court require additional details, I can provide a supplemental classified declaration *ex parte in camera* for the courts consideration.

I declare under penalty of perjury that the facts set forth above are true and correct. Executed pursuant to 28 U.S.C. § 1746.

LOUIS F. GILES

Executed this 22nd day of May , 2003.

Giles Declaration, Ex. 1

# COALITION MISSING

## U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

July 21, 1997

National Security Agency/Central Security Service
ATTN: Q-43
Fort George G. Meade, Md. 20755-6000

Re: *Freedom of Information/Privacy Act Request* for MEREDITH LARSON

Dear Sir/Madam:

We have been retained by U.S. citizen Meredith Larson to represent her in obtaining documents related to her stabbing on the street in Guatemala City, Guatemala on December 20, 1989. Ms. Larson had been working as a volunteer human rights observer with PBI (Peace Brigades International or, sometimes, International Peace Brigade; in Spanish--Brigadas de Paz, Brigadas de Paz Internacional; BPI) in Guatemala from August to December 1989 when she and two Canadian co-workers (Mitchell Goldberg & Rusa Jeremic) were attacked by men with knives. The unknown assailants slashed Ms. Larson's chest and upper body. Her social security number is 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 and she was born in Arlington, Va. on July 9, 1966. She lived in Great Falls, Va. between 1978 and 1984 and attended Dartmouth College in Hanover, N.H. from 1984 to 1988. From 1990 to 1995, she lived in San Francisco, Calif. She currently resides in Chapel Hill, N.C.

Documents relating to this request include but are not limited to cable traffic, airgrams, notes, letters, memos, memoranda of conversation, reports, analyses, interviews, briefings, correspondence, diplomatic notes, démarches, or non-papers. Please advise us if Meredith Larson's name or the name of Peace Brigades International (PBI) is contained in other "See Reference" files as well, so that we can make a decision whether to have such files searched.

Pursuant to the Freedom of Information Act and Privacy Act (FOIA), 5 U.S.C. § 552, as amended, we request disclosure of the documents described on the attached pages for inspection and copying. We further request that all documents be reviewed in their entirety and that no information be omitted on the grounds of non-relevance. This request includes a call for a copy of Ms. Larson's entire original FOIA/PA file created as the result of her 1995 request and subsequent appeals, including the search slips and any document created or used in the search for records requested.

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, we ask that you nonetheless exercise your legally-authorized discretion to disclose them as the value of the documents clearly outweighs any agency regulation or privacy interest that might be asserted. Please note that § 1.8 of Clinton Executive Order 12958, 60 F.R. 19825, provides that *in no case shall information be classified in order to:*

*(1) conceal violations of law, inefficiency, or administrative error;*

3321 12th St. Washington, DC  20017  T.(202)529-6599  F. (202) 526-4611  e-mail: ghrc@igc.apc.org
A PROJECT OF THE GUATEMALA HUMAN RIGHTS COMMISSION/USA

2

*(2) prevent embarrassment to a person, organization, or agency;...or*
*(4) prevent or delay the release of information that does not require protection in the interest of*
*national security.*

Attorney General Reno's Oct. 4, 1993 memo on the FOIA, 1993 WL389373 (White House)
urged government officials to favor discretionary release of documents rather than withhold them.
In that memo, Janet Reno also noted that the Justice Department would no longer routinely
defend agency withholding without justification. Similarly, on Oct. 4, 1993, President Clinton
directed the executive branch to "renew their commitment to the Freedom of Information Act, to
its underlying principles of government openness, and to its sound administration." 1993 WL
389373 (White House).

Given that the President ordered his Intelligence Oversight Board (IOB) to conduct a wide-
ranging investigation into certain aspects of U.S. policy toward Guatemala, a precedent of
disclosure has been established concerning human rights information on Guatemala maintained by
the U.S. government. Many government documents have already been declassified in response to
the IOB report which specifically stated:

> As intelligence on the cases was reported to the U.S. government
> officials, very little of it was shared with victims or their surviving
> family members. The IOB believes, however, that in such cases the
> United States should provide its citizens more information
> whenever possible.

IOB Report, page 8.

As the FOIA requires, in the event you determine that a document contains exempt material,
please release all reasonably segregable nonexempt portions of records. If no information is
"reasonably segregable", we request a line by line review for segregability. To permit us to reach
an intelligent and informed decision whether or not to file an administrative appeal of any denied
material, please describe any withheld documents (or portions thereof) and explain in full the basis
for your exemption claims. If documents are withheld, please state the date, origin, and number
of pages in each document. If documents are classified, please treat this FOIA request as a
request to declassify them. If words and phrases are excised, please black them out rather than
white them out.

Please waive all fees in connection with this request. Disclosure of the records that we have
requested is clearly within the public interest, and, therefore, constitutes an appropriate
circumstance for the waiver of fees. Should you decline to waive the fees, please notify us
immediately and describe the specific reasons in writing. If fees are not waived, we agree to pay
search, review, and copy costs up to $100.

Our request involves information bearing on the extent of the U.S. government's knowledge of or

3

involvement in the stabbing of Meredith Larson. As evidenced by the press accounts of Ms. Larson's case, the subject of this request is very much in the public interest. Given the Guatemala-CIA revelations in the spring of 1995 and the summer of 1997 and the release of the Intelligence Oversight Board (IOB) report in June 1996 , the public has a great interest in understanding more about the human rights situation in Guatemala and about specific human rights cases. Ms. Larson's case was documented in congressional language accompanying cuts to military aid to Guatemala in 1990 and has received coverage on CBS' *60 Minutes*. In April 1995, 13 senators called on President Clinton to declassify as much information as possible on a select list of both U.S. and Guatemalan human rights victims in Guatemala, and Meredith Larson's case was on that list. In May 1996, over 100 members of the House of Representatives sent a letter to President Clinton requesting a broad declassification of information pertaining to human rights violations in Guatemala.

The Guatemala Human Rights Commission/USA continues to receive requests from the news media and private citizens for updated information on Ms. Larson's case. The role of U.S. agencies in Guatemala has been the subject of several congressional hearings during the last few years. The public will benefit by gaining a better understanding of the U.S. government's intelligence operations and its relationship with Guatemala and its military forces. This relationship is part of American history and should be studied.

Moreover, the information we are seeking goes to the heart of the American government's operations and activities abroad and will provide the basis for scholarly research and other analytical work, particularly on Constitutional government and its relation to the modern administrative state, i.e. the rule of law and the democratic process. In addition to distributing information we obtain through our network of media contacts, the Guatemala Human Rights Commission/USA and St. Mary's University Human Rights Clinic will archive and analyze the records Meredith Larson receives and disseminate the information contained to lawyers, human rights advocates, policy makers, and academics.

To speed disclosure of the requested records, please release them as they become available to you, without waiting until all documents have been processed. Given the great value of these records to the public interest, we ask that you expedite the handling of this request, rather than routinely apply the "first in, first out" approach. As you know, eight years have elapsed since the attack and Ms. Larson still knows almost nothing about the identity or motives of her attackers.

NSA offices having responsive documents would include (but are not limited to) the Office of the Director and Deputy Director; the General Counsel; and the Inspector General.

If you have any questions regarding the identity of the records, their location, the scope of the request, or any other matter, please call J. Michael Springmann at (202) 529-6599; Linette Tobin at (301) 588-8066; or Monica Schurtman at (210) 431-5711. We look forward to receiving your response within the 10-day statutory limit. We understand that we may appeal if we do not receive a response or if documents are withheld or redacted.

4

Documents and reports should be sent to:

Linette Tobin/Monica Schurtman<br>
Guatemala Human Rights Commission/USA<br>
3321 12th Street N.E.<br>
Washington, D.C. 20017

Very truly yours,

_____                    _____
Monica Schurtman, Esquire                           Linette Tobin, Esquire

Giles Declaration, Ex. 2



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND  20755-6000

9 September 1997

Serial: J9683-97

Ms. Linette Tobin
Guatemalan Human Rights Commission/USA
3321 12th Street, N.E.
Washington, D.C.  20017

Dear Ms. Tobin:

This responds to your letter of July 21, 1997, in which you ask that Ms. Meredith Larson's Freedom of Information Act (FOIA) request for records pertaining to "her stabbing on the street in Guatemala City, Guatemala on December 20, 1989," be expedited. Please be advised that a FOIA request may be expedited whenever it is demonstrated that (1) an individual's life or personal safety would be jeopardized by failure to process a request immediately; (2) the substantial due process rights of the requester would be impaired by the failure to process the request immediately and the information sought is not otherwise available; and (3) other narrowly construed exceptional circumstances exist. This Agency considers your request on behalf of Ms. Larson an exceptional circumstance due to its humanitarian consideration, and we will expedite portions of your request.

Ms. Larson's original request (J9421-95) included a search for documents from December 20, 1989, through July 25, 1995. Mr. James Cavanaugh responded to this request on October 2, 1995. Since we have already addressed that portion of your request in Ms. Larson's direct request, we will not process that portion again. In another of Ms. Larson's direct requests (J9767-96), she asks for all documents included in FOIA requests J9421-95 and J9555-96 which you also request. Since no exceptional circumstances exist in reference to the documents contained in this request, it will remain in our regular queue for processing. The remaining portions of your request will be processed expeditiously. Specifically, we will search for documents pertaining to her stabbing and Peace Brigades International from July 26, 1995, through July 21, 1997, along with her subsequent visits to Guatemala, her meetings with Guatemalan government officials, and her meetings with US government officials and congresspersons.

Even though Ms. Larson's request will be expedited, there is a queue of these expedited Guatemalan cases.  We will process the expedited requests on a  two-track queue: first-in, first-out system and easy-hard. The first-in, first-out system is employed in fairness to all other Guatemalan requesters. Regarding the easy-hard processing, we

Serial: J9683-97

believe it is needless for a requester to wait a long period of time to learn that the Agency has no records responsive to his request or to obtain records that do not require a lengthy search and review.   In Ms. Larson's case,  the request does not constitute an "easy" one. Therefore, we do not anticipate responding to this request any earlier than June, 1998.

We encourage you to be patient regarding the processing of your FOIA request. We will respond as soon as we can.

Sincerely,

JAMES P. CAVANAUGH
Deputy Director of Policy

**<u>Giles Declaration, Ex. 3</u>**



NATIONAL SECURITY AGENCY
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9683A-97

20 January 1998

Ms. Linette Tobin
Coalition Missing
3321 12th St.
Washington, DC 20017

Dear Ms. Tobin:

This letter is in response to your Freedom of Information Act (FOIA)/Privacy Act (PA) request of 21 July 1997, on behalf of Meredith Larson, relating to her stabbing on the street in Guatemala City, Guatemala on December 20, 1989 and Peace Brigades International.   This request is placed in an "all other" fee category, and due to its humanitarian consideration, this Agency has elected to waive all fees and expedite our processing of it.  As stated in our letter of September 9, 1997, since we conducted a search from December 20, 1989 through July 25, 1995 for documents pertaining to Ms. Larson's first request (J9421-95), we conducted a search from July 26, 1995 through July 21, 1997 for this request for documents pertaining to Ms. Larson's stabbing and Peace Brigades International, as well as for her subsequent visits to Guatemala, her meetings with Guatemalan government officials, and her meetings with US government officials and congresspersons.  This updates our search from Ms. Larson's previous request.

FOIA and PA mandate the release of government records to the public if the documents are not protected from release in accordance with specified exemptions. The FOIA allows individuals access to all government records, which would include name-retrievable files and any other type of government records. The PA allows access to records the government maintains on the individual and which are retrievable by name or other personal identifiers. In processing records responsive to Ms. Larson's request, we located documents responsive only to the FOIA.

Twelve (12) records (20 pages) responsive to this request are enclosed. Some of the information denied is currently and properly classified in accordance with Executive Order 12958. This information meets the criteria for classification as set forth in section 1.5, subparagraphs:

> (c) intelligence activities (including special activities), intelligence sources or methods, or cryptology; and
> (g) vulnerabilities or capabilities of systems, installations, projects or plans relating to the national security.

Serial: J9683A-97

The information remains classified SECRET as provided in section 1.3 of Executive Order 12958. The information is classified because its disclosure could reasonably be expected to cause grave damage to the national security. Because the information is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552(b)(1)).

Further, this Agency is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in the withheld material. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are:

> 18 U.S. Code 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons;
>
> 50 U.S. Code 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and
>
> Section 6 of the National Security Agency Act of 1959 (Public Law 86-36, 50 U.S. Code 402 note), which provides that no law shall be construed to require the disclosure of the personnel, functions, or activities of NSA.

We have determined that such information exists in these records, and we are protecting it accordingly.

The withholding of records in part may be construed as a partial denial of your request, and you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days after notification of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority, National Security Agency, Suite 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will respond to the appeal within 20 working days after receipt.

On November 13, 1997, an NSA FOIA officer spoke with you concerning Ms. Larson's interest in the "Report on the Guatemala Review, June 28, 1996, Intelligence Oversight Board," since the case officer suspected you already had a copy. As agreed, we are not providing a copy of this report even though it is responsive to this request.

Serial:  J9683A-97

Documents originating with other government agencies have been referred to those agencies for review and direct response to you.

Sincerely,

JOANN H. GRUBE
Deputy Director of Policy

Encl:
  a/s

**<u>Giles Declaration, Ex. 4</u>**

19 MAR 1998

March 16, 1998

NSA/CSS FOIA Appeal Authority
National Security Agency
Suite 6248
Fort George G. Meade, MD 20755-6248

### Re: FREEDOM OF INFORMATION ACT APPEAL FOR MEREDITH LARSON
### Case No. J9683A-97

Dear Sir/Madam:

This is an appeal from your letter dated January 20, 1998 responding to the Freedom of Information Act and Privacy Act request of Meredith Larson to the National Security Agency dated July 21, 1997.

1.  You state that you are denying information and withholding materials pursuant to : two FOIA exceptions: Section 552(b)(1) which protects classified materials and Section 552(b)(3) which protects materials protected from disclosure by statute. Please clarify if you have withheld entire documents or if all the withheld information has been excised from the documents which you released.  If any documents were withheld in their entirety, please provide a listing of such documents.

2.  You advise that documents originating from other government agencies have been referred to them for review.  Please provide us with the names and addresses of these agencies, as well as a contact person, so that we may follow up on these documents as appropriate.

3.  With regards to the released, but excised documents, please indicate which FOIA exception you believe applies to each particular redaction.

4.  With respect to the information which you have withheld as "classified," please 1) demonstrate that the documents continue to be properly classified, and 2) define the real or expected damage that could result from declassification. In no case shall information be classified in order to (1) conceal violations of law, inefficiency, or error, (2) prevent embarrassment to a person, organization, or agency, or (3) prevent or delay the release of information that does not require protection in the interest of national security.  EO 12958, Section 1.8.

Please recall that this case involves the stabbing attack on a U.S. citizen and subsequent investigations related to such attack. As the innocent victim of this violent crime, Ms. Larson is certainly entitled to know as much as her government about her case.

Keeping this in mind, we ask that the withheld information be once again reviewed and either declassified or released as a matter of discretion. On October 4, 1993, President Clinton directed the executive branch to "renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration." 1993 WL 389373 (White House). Attorney General Reno wrote:

> The Department will no longer defend an agency's withholding of information merely because there is a "substantial legal basis" for doing so. Rather, in determining whether or not to defend a nondisclosure decision, we will apply a presumption of disclosure.

Attorney General Reno continued:

> I firmly believe that these exemptions are best applied with specific reference to such harm . . . . . Where an item of information might technically or arguably fall within an exemption, it ought not to be withheld from a FOIA requester unless it need be.

Attorney General Reno reminded agency officials that the FOIA exemptions are discretionary, rather than mandatory.

> Accordingly, I strongly encourage your FOIA officers to make "discretionary disclosure" whenever possible under the Act. . . . [A]gencies can make discretionary FOIA disclosures as a matter of good public policy without concern for future "waiver consequences" for similar information.

Similarly, the Intelligence Oversight Board (IOB) which conducted an investigation into Ms. Larson's case, along with those of Jennifer Harbury, Dianna Ortiz, and Michael Devine, issued a report in 1995 stating:

> As intelligence on the cases was reported to the U.S. government officials, very little of it was shared with victims or their surviving family members. The IOB believes, however, that in such cases the United States should provide its citizens more information whenever possible.

IOB Report, page 8.

Thirteen United States senators have also taken a special interest in Ms. Larson's case as shown in an April, 1995 letter to President Clinton in which they request declassification of as much information as possible on Ms. Larson's case. In light of the above, we urge that the withheld and excised information be released in your discretion.

In reviewing the exceptions claimed by your agency for withholding information, please keep in mind that the exemptions are discretionary and that the presumption is for disclosure.

Thank you for your courtesies.  We hope to hear from you within the 20 day time limit.  I can be reached at (301) 588-8066 if you have any questions.

Very truly yours,

Linette Tobin
Attorney for Meredith Larson
Law Office of David Goren
8600 Second Avenue
Silver Spring, MD 20910



**NATIONAL  SECURITY  AGENCY**

FORT GEORGE G. MEADE, MARYLAND  20755-6000

Serial: J9683A-97

20 January 1998

Ms. Linette Tobin
Coalition Missing
3321 12th St.
Washington, DC 20017

Dear Ms. Tobin:

This letter is in response to your Freedom of Information Act (FOIA)/Privacy Act (PA) request of 21 July 1997, on behalf of Meredith Larson, relating to her stabbing on the street in Guatemala City, Guatemala on December 20, 1989 and Peace Brigades International. This request is placed in an "all other" fee category, and due to its humanitarian consideration, this Agency has elected to waive all fees and expedite our processing of it. As stated in our letter of September 9, 1997, since we conducted a search from December 20, 1989 through July 25, 1995 for documents pertaining to Ms. Larson's first request (J9421-95), we conducted a search from July 26, 1995 through July 21, 1997 for this request for documents pertaining to Ms. Larson's stabbing and Peace Brigades International, as well as for her subsequent visits to Guatemala, her meetings with Guatemalan government officials, and her meetings with US government officials and congresspersons. This updates our search from Ms. Larson's previous request.

FOIA and PA mandate the release of government records to the public if the documents are not protected from release in accordance with specified exemptions. The FOIA allows individuals access to all government records, which would include name-retrievable files and any other type of government records. The PA allows access to records the government maintains on the individual and which are retrievable by name or other personal identifiers. In processing records responsive to Ms. Larson's request, we located documents responsive only to the FOIA.

Twelve (12) records (20 pages) responsive to this request are enclosed. Some of the information denied is currently and properly classified in accordance with Executive Order 12958. This information meets the criteria for classification as set forth in section 1.5, subparagraphs:

      (c) intelligence activities (including special activities),
         intelligence sources or methods, or cryptology; and
      (g) vulnerabilities or capabilities of systems, installations,
         projects or plans relating to the national security.

Serial: J9683A-97

The information remains classified SECRET as provided in section 1.3 of Executive Order 12958. The information is classified because its disclosure could reasonably be expected to cause grave damage to the national security. Because the information is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552(b)(1)).

Further, this Agency is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in the withheld material. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are:

> 18 U.S. Code 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons;
>
> 50 U.S. Code 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and
>
> Section 6 of the National Security Agency Act of 1959 (Public Law 86-36, 50 U.S. Code 402 note), which provides that no law shall be construed to require the disclosure of the personnel, functions, or activities of NSA.

We have determined that such information exists in these records, and we are protecting it accordingly.

The withholding of records in part may be construed as a partial denial of your request, and you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days after notification of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority, National Security Agency, Suite 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will respond to the appeal within 20 working days after receipt.

On November 13, 1997, an NSA FOIA officer spoke with you concerning Ms. Larson's interest in the "Report on the Guatemala Review, June 28, 1996, Intelligence Oversight Board," since the case officer suspected you already had a copy. As agreed, we are not providing a copy of this report even though it is responsive to this request.

Serial: J9683A-97

Documents originating with other government agencies have been referred to those agencies for review and direct response to you.

Sincerely,

JOANN H. GRUBE
Deputy Director of Policy

Encl:
a/s

**Giles Declaration, Ex. 4**



March 16, 1998

NSA/CSS FOIA Appeal Authority
National Security Agency
Suite 6248
Fort George G. Meade, MD 20755-6248

## Re: FREEDOM OF INFORMATION ACT APPEAL FOR MEREDITH LARSON
### Case No. J9683A-97

Dear Sir/Madam:

This is an appeal from your letter dated January 20, 1998 responding to the Freedom of Information Act and Privacy Act request of Meredith Larson to the National Security Agency dated July 21, 1997.

1.      You state that you are denying information and withholding materials pursuant to two FOIA exceptions: Section 552(b)(1) which protects classified materials and Section 552(b)(3) which protects materials protected from disclosure by statute. Please clarify if you have withheld entire documents or if all the withheld information has been excised from the documents which you released. If any documents were withheld in their entirety, please provide a listing of such documents.

2.      You advise that documents originating from other government agencies have been referred to them for review. Please provide us with the names and addresses of these agencies, as well as a contact person, so that we may follow up on these documents as appropriate.

3.      With regards to the released, but excised documents, please indicate which FOIA exception you believe applies to each particular redaction.

4.      With respect to the information which you have withheld as "classified," please 1) demonstrate that the documents continue to be properly classified, and 2) define the real or expected damage that could result from declassification. In no case shall information be classified in order to (1) conceal violations of law, inefficiency, or error, (2) prevent embarrassment to a person, organization, or agency, or (3) prevent or delay the release of information that does not require protection in the interest of national security. EO 12958, Section 1.8.

Please recall that this case involves the stabbing attack on a U.S. citizen and subsequent investigations related to such attack. As the innocent victim of this violent crime, Ms. Larson is certainly entitled to know as much as her government about her case.

Keeping this in mind, we ask that the withheld information be once again reviewed and either declassified or released as a matter of discretion. On October 4, 1993, President Clinton directed the executive branch to "renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration." 1993 WL 389373 (White House). Attorney General Reno wrote:

> The Department will no longer defend an agency's withholding of information merely because there is a "substantial legal basis" for doing so. Rather, in determining whether or not to defend a nondisclosure decision, we will apply a presumption of disclosure.

Attorney General Reno continued:

> I firmly believe that these exemptions are best applied with specific reference to such harm . . . . . Where an item of information might technically or arguably fall within an exemption, it ought not to be withheld from a FOIA requester unless it need be.

Attorney General Reno reminded agency officials that the FOIA exemptions are discretionary, rather than mandatory.

> Accordingly, I strongly encourage your FOIA officers to make "discretionary disclosure" whenever possible under the Act. . . . [A]gencies can make discretionary FOIA disclosures as a matter of good public policy without concern for future "waiver consequences" for similar information.

Similarly, the Intelligence Oversight Board (IOB) which conducted an investigation into Ms. Larson's case, along with those of Jennifer Harbury, Dianna Ortiz, and Michael Devine, issued a report in 1995 stating:

> As intelligence on the cases was reported to the U.S. government officials, very little of it was shared with victims or their surviving family members. The IOB believes, however, that in such cases the United States should provide its citizens more information whenever possible.

IOB Report, page 8.

Thirteen United States senators have also taken a special interest in Ms. Larson's case as shown in an April, 1995 letter to President Clinton in which they request declassification of as much information as possible on Ms. Larson's case. In light of the above, we urge that the withheld and excised information be released in your discretion.

In reviewing the exceptions claimed by your agency for withholding information, please keep in mind that the exemptions are discretionary and that the presumption is for disclosure.

Thank you for your courtesies.  We hope to hear from you within the 20 day time limit.  I can be reached at (301) 588-8066 if you have any questions.

Very truly yours,

Linette Tobin
Attorney for Meredith Larson
Law Office of David Goren
8600 Second Avenue
Silver Spring, MD 20910



NATIONAL SECURITY AGENCY
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9683A-97

20 January 1998

Ms. Linette Tobin
Coalition Missing
3321 12th St.
Washington, DC 20017

Dear Ms. Tobin:

This letter is in response to your Freedom of Information Act (FOIA)/Privacy Act (PA) request of 21 July 1997, on behalf of Meredith Larson, relating to her stabbing on the street in Guatemala City, Guatemala on December 20, 1989 and Peace Brigades International. This request is placed in an "all other" fee category, and due to its humanitarian consideration, this Agency has elected to waive all fees and expedite our processing of it. As stated in our letter of September 9, 1997, since we conducted a search from December 20, 1989 through July 25, 1995 for documents pertaining to Ms. Larson's first request (J9421-95), we conducted a search from July 26, 1995 through July 21, 1997 for this request for documents pertaining to Ms. Larson's stabbing and Peace Brigades International, as well as for her subsequent visits to Guatemala, her meetings with Guatemalan government officials, and her meetings with US government officials and congresspersons. This updates our search from Ms. Larson's previous request.

FOIA and PA mandate the release of government records to the public if the documents are not protected from release in accordance with specified exemptions. The FOIA allows individuals access to all government records, which would include name-retrievable files and any other type of government records. The PA allows access to records the government maintains on the individual and which are retrievable by name or other personal identifiers. In processing records responsive to Ms. Larson's request, we located documents responsive only to the FOIA.

Twelve (12) records (20 pages) responsive to this request are enclosed. Some of the information denied is currently and properly classified in accordance with Executive Order 12958. This information meets the criteria for classification as set forth in section 1.5, subparagraphs:

> (c) intelligence activities (including special activities),
>     intelligence sources or methods, or cryptology; and
> (g) vulnerabilities or capabilities of systems, installations,
>     projects or plans relating to the national security.

Serial: J9683A-97

The information remains classified SECRET as provided in section 1.3 of Executive Order 12958. The information is classified because its disclosure could reasonably be expected to cause grave damage to the national security. Because the information is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552(b)(1)).

Further, this Agency is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in the withheld material. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are:

> 18 U.S. Code 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons;
> 50 U.S. Code 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and
> Section 6 of the National Security Agency Act of 1959 (Public Law 86-36, 50 U.S. Code 402 note), which provides that no law shall be construed to require the disclosure of the personnel, functions, or activities of NSA.

We have determined that such information exists in these records, and we are protecting it accordingly.

The withholding of records in part may be construed as a partial denial of your request, and you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days after notification of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority, National Security Agency, Suite 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will respond to the appeal within 20 working days after receipt.

On November 13, 1997, an NSA FOIA officer spoke with you concerning Ms. Larson's interest in the "Report on the Guatemala Review, June 28, 1996, Intelligence Oversight Board," since the case officer suspected you already had a copy. As agreed, we are not providing a copy of this report even though it is responsive to this request.

Serial: J9683A-97

Documents originating with other government agencies have been referred to those agencies for review and direct response to you.

Sincerely,

JOANN H. GRUBE
Deputy Director of Policy

Encl:
    a/s

**Giles Declaration, Ex. 5**



**NATIONAL SECURITY AGENCY**
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9683A-97
20 April 1998

Law Office of David Goren
ATTN: Ms. Linette Tobin, Esq.
8600 Second Avenue
Silver Spring, MD  20910

Dear Ms. Tobin:

This is an interim response to your 16 March 1998 Freedom of Information Act (FOIA) appeal on behalf of your client, Meredith Larson.  Your appeal was received in the NSA/CSS Office of General Counsel on 19 March 1998. Unfortunately, due to our workload and manning situation, we are unable to provide you a timely response.  I expect to have an answer to your appeal in late May.  We appreciate your understanding in this matter.

Correspondence related to your appeal should refer to case number J9683-97 and be addressed to the National Security Agency, Office of General Counsel, 9800 Savage Road STE 6250, Ft. George G. Meade, MD 20755-6250.  Correspondence may also  be sent by facsimile to 301-688-4546.

Sincerely,

SUSAN A. ARNOLD
Assistant General Counsel
(Civil Litigation and Administrative Law)

**<u>Giles Declaration, Ex. 6</u>**



NATIONAL SECURITY AGENCY

FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial:  J9683B-97
8 June 1998

Linette Tobin, Esq.
Law Office of David Goren
8600 Second Avenue
Silver Spring, Md  20910

Dear Ms. Tobin:

This replies to your 16 March 1998 letter appealing the National Security Agency's (NSA) refusal to release information in response to your 21 July 1997 Freedom of Information Act (FOIA) request. You requested records relating to Peace Brigades International, the 20 December 1989 stabbing of your client Meredith Larson in Guatemala City, Guatemala, as well as other information relating to her visits to Guatemala and various meetings concerning Guatemala. Your original request, the documents responsive to your request, the Deputy Director of Policy's 20 January 1998 response, and your letter of appeal have been reviewed. As a result of this review, I have determined that the information was properly withheld.

On 20 January 1998, the Office of Policy provided you with 12 documents. Four documents were provided to you in their entirety, and eight documents were provided to you in part. No documents were withheld in their entirety. In your appeal letter, you requested that the specific applicable exemptions be marked next to each deletion in the eight documents which were provided in part. Copies of those documents with the exemptions so marked are enclosed. Information is protected against disclosure by 5 U.S.C. § 552(b)(1) and 5 U.S.C. § 552(b)(3), as explained below. We have used abbreviations on the documents to denote the specific Exemption 3 statutes and the subparagraphs of Executive Order 12958 which apply to the withheld information.

Certain information in the documents meets the standards for classification set forth in subparagraph (a) of section 1.2 of Executive Order 12958, and falls under classification categories in section 1.5(c), and (g). The information remains currently and properly classified SECRET in accordance with section 1.3 of Executive Order 12958. The preservation of sensitive intelligence sources and methods precludes the disclosure of this information. The ability to intercept foreign communications and the extent of any successes in analyzing intercepted communications are matters that must be kept in strictest secrecy in order to protect intelligence sources and methods. Accordingly, the information is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1).

Serial:  J9683B-97

The classified information is also protected against disclosure by 5 U.S.C. § 552(b)(3) which provides that the FOIA does not apply to matters that are specifically exempted from disclosure by statute. The applicable statutory provisions with regard to the information at issue are: 18 U.S.C. § 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons; 50 U.S.C. § 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and Section 6 of the National Security Agency Act of 1959 (Public Law 83-36, 50 U.S.C. § 402 note), which provides that no law shall be construed to require the disclosure of the organization, personnel, functions or activities of NSA. Unclassified information, consisting of the names of NSA employees, was also deleted from the documents pursuant to Public Law 86-36.

As your appeal is denied, you are hereby advised of your rights under 5 U.S.C. § 552 to seek judicial review of this determination. You may seek an order from the United States District Court in the district in which you reside, in which you have your principal place of business, in which the Agency's records are situated (U.S. District Court of Maryland), or in the District of Columbia for review of the Agency's actions with respect to your request. 5 U.S.C. § 552(a)(4)(B) sets out your rights in this matter with respect to such judicial action.

Finally, in your appeal letter you ask for information concerning the documents which were referred to other agencies for review. The Office of Policy forwarded one document to the Department of State and 12 documents to the Department of Defense General Counsel for review and direct response to you.

Sincerely,

BARBARA A. McNAMARA
Freedom of Information Act/Privacy Act
Appeals Authority

Encls:
  a/s

**<u>Giles Declaration, Ex. 7</u>**





March 19, 1998

Freedom of Information/Privacy Act Requests
National Security Agency
Office of Information Policy, N5131
Ft George G. Meade, MD 20755-6000

Re: **Freedom of Information/Privacy Act Request** for Ann Louise Kerndt

Dear Sir/Madam:

We have been retained by U.S. citizen Mary Patricia Ahern to represent her in obtaining documents related to the mysterious air crash and death of Ann Louise Kerndt, who was in an airplane piloted by Father William Hervey Woods, Jr., near the Ixcan, Guatemala on November 20, 1976. Mary Patricia Ahern's social security number is 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. She lives in Washington, D.C.

Ann Louise Kerndt was in Guatemala for the first time to begin a two-year assignment to an agricultural project with the Direct Relief Foundation. On November 20, 1976, a small plane, piloted by Father Woods, crashed, killing Ann Louise Kerndt, and the four U.S. citizen passengers, Father Woods, John Gauker, Selwyn Puig, and Dr. Michael D. Okada. The Cessna 185 was in sound mechanical condition, the weather was good, and Father Woods was an experienced pilot.

Ann Louise Kerndt was born in Lacrosse, Wisconsin on March 3, 1956. Her social security number is 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. She attended the University of Puebla, Mexico for one year after which she accepted an agricultural assignment in Guatemala with the Direct Relief Foundation. Ann Louise Kerndt, an agronomist, was to teach a French method of intensive agriculture developed for use in the tropics. Her first stop in Guatemala was to work as a translator in a hospital in the highlands of Guatemala.

Pursuant to the Freedom of Information Act and Privacy Act (FOIA), 5 U.S.C. § 552, as amended, we request disclosure of the documents described on the attached pages for inspection and copying. We further request that all documents be reviewed in their entirety and that no information be omitted on the grounds of non-relevance.

Documents relating to this request include but are not limited to cable traffic, airgrams, notes, letters, memos, electronic mail, tape and video recordings, photographs, memoranda of conversation, or interviews, reports, analyses, briefings, correspondence, diplomatic notes, or démarches.

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, we ask that you nonetheless exercise your legally-authorized discretion to disclose

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

ST. MARY'S UNIVERSITY



them as the value of the documents clearly outweighs any agency regulation or privacy interest that might be asserted. Also, especially given that Ms. Kerndt's death occurred more than 20 years ago, the likelihood that disclosure of information would cause risk to privacy concerns, law enforcement operations, or current national security interests is slim. Please note that § 1.8 of Clinton Executive Order 12958, 60 F.R. 19825, provides that *in no case shall information be classified in order to:*

*(1) conceal violations of law, inefficiency, or administrative error;*

*(2) prevent embarrassment to a person, organization, or agency;...or*

*(4) prevent or delay the release of information that does not require protection in the interest of national security.*

President Clinton's and Attorney General Reno's Oct. 4, 1993 Memorandum for Heads of Departments and Agencies regarding the FOIA urged government officials to favor discretionary release of documents and to "renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration." Also, given that in 1995, the President ordered his Intelligence Oversight Board (IOB) to conduct a wide-ranging investigation into certain aspects of U.S. policy toward Guatemala, a precedent favoring disclosure has been established concerning human rights information pertaining to Guatemala.

As the FOIA requires, in the event you determine that a document contains exempt material, please review the document line-by-line and release all reasonably segregable portions. To permit us to reach an informed decision about whether to file an administrative appeal of any withheld material, please describe any withheld documents (or portions thereof) by date, origin, and number of pages and explain fully the basis for withholding.

If documents are classified, please treat this FOIA request for declassification review under §3.6 of Executive Order 12958, Mandatory Declassification Review (60 FR 19825).

Please waive all fees in connection with this request. Disclosure of the records that we have requested is clearly within the public interest, and, therefore, constitutes an appropriate circumstance for the waiver of fees.

Our request involves information bearing on the extent of the U.S. government's knowledge of the suspected murder of Ann Louise Kerndt and four other U.S. citizens. Given recent revelations about U.S. activities in Guatemala and in the spring of 1995 and the extent of the U.S. government's knowledge of human rights violations committed in Guatemala, the summer of 1997 and the release of the Intelligence Oversight Board (IOB) report in June 1996, the public has a great interest in understanding more about the human rights situation in Guatemala and about specific human rights cases. In May 1996, over 100 members of the House of Representatives sent a letter to President Clinton requesting a broad declassification of information pertaining to human rights violations in Guatemala. Should you decline to waive the fees, please notify us immediately and describe the specific reasons in writing.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

ST. MARY'S UNIVERSITY



The American public will benefit by gaining a better understanding of the U.S. government's intelligence operations and activities abroad as well as its historical relationship with Guatemala and its military forces, particularly in relation to the death of a woman who went to Guatemala to aid those in need through her agricultural assignment with the Direct Relief Foundation. Mary Patricia Ahern, Ann Louise Kerndt's sister, is filing this FOIA request for one of her siblings -- a woman killed while fulfilling her life's and her foundation's goal of helping the poorest build lives of justice and dignity.

To speed disclosure of the requested records, please release them as they become available to you, without waiting until all documents have been processed. Given the great value of these records to the public, we ask that you expedite the handling of this request. More than twenty years have passed since Ann Louise Kerndt's death and her family still knows almost nothing about the circumstances surrounding her death.

If you have any questions regarding the identity of the records, their location, the scope of the request, or any other matter, please call Sascha Kemper at (210)431-5740. We look forward to receiving your response within the 10-day statutory limit. We understand that we may appeal if we do not receive a response or if documents are withheld or redacted.

Documents and reports should be sent to:

Sascha Kemper/Monica Schurtman
Center for Legal and Social Justice
2507 N.W. 36th Street
San Antonio, Texas 78228

Very truly yours,

Monica Schurtman, Esq. and Sascha Kemper
On behalf of Coalition Missing and Mary Patricia Ahern

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

ST. MARY'S UNIVERSITY



Kerndt, NSA 1

**SUBJECT OF REQUEST**

**ANN LOUISE KERNDT**

All documents relating to in whole or in part to the mysterious air crash and death of Ann Louise Kerndt near Ixcán, Guatemala on November 20, 1976.  Aboard the plane were four other U.S. citizens, Father William H. Woods, John Gauker, Selwyn Puig, and Dr. Michael D. Okada.

At a minimum, responsive records ought to be found in categories or covered by the following **TAGS** dealing with security, assistance to citizens, aid, aviation, petroleum, military affairs, political relations, intelligence, national security, terrorism, narcotics, crime, and justice: ASEC, CASC, EAID, EAIR, EPET, MARR, MASS, MOPS, PGOV, PINR, PINS, PREL, PTER, SNAR, KCRM, KJUS.

Subjects relating to this request include but are not limited to:

1.   Information on when and how any U.S. agency, agent, or official, including but not limited to the National Security Agency (NSA), the Defense Intelligence Agency (DIA), Department of Defense-Army-Southern Command, the Department of Defense-Army, the Department of Defense (DOD), the State Department, the U.S. Embassy in Guatemala, its Political and Consular Sections, its Defense Attaché's Office, its Legal Attaché's Office, its intelligence operatives, the Department of Transportation (DOT), the Federal Bureau of Investigations (FBI), Central Intelligence Agency (CIA), and the Drug Enforcement Agency (DEA) first knew of the crash and death of Ann Louise Kerndt.

2.   The arrest, detention, or questioning of Guatemalan citizens or armed forces personnel in the crash of Father Wood's airplane in which Ann Louise Kerndt was traveling.

3.   Any information regarding possible motives for an attack on Ann Louise Kerndt, Father William H. Woods, John Gauker, Selwyn Puig, Dr. Michael D. Okada, or Direct Relief Foundation personnel.

4.   Information regarding any investigation of Ann Louise Kerndt by any agent, official, or agency of the U.S. government, including the NSA, prior or subsequent to the crash of the airplane in which Ann Louise Kerndt was traveling.

5.   Information regarding any investigation of Ann Louise Kerndt by any agent, official, or agency of the Guatemalan government police or armed forces.

6.   Any information regarding efforts on the part of the U.S. government, including the NSA, to investigate the crash of the airplane or Ann Louise Kerndt's death.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

ST. MARY'S UNIVERSITY



Kerndt, NSA 1

7.  Any information regarding any investigation of the crash by the Guatemalan government, including but not limited to, officials of the Ministry of the Interior, the Ministry of Defense, the police, and the Guatemalan judiciary.

8.  Documents which may suggest a link between the death of Ann Louise Kerndt and oil rights in the Ixcán or the purchase of land near or in the Ixcán by Guatemalan officials or agents.

9.  Any records containing names or identities of possible witnesses to the crash.

10. Any records regarding Guatemalan military or death squad activity in the Ixcán during the year prior to the crash on Nov. 20, 1976.

11. Any information that Ann Louise Kerndt was in danger, had received threats or warnings, or that her name was on a death list.

12. Any information regarding communication to the NSA by the Department of Defense, Department of Defense-Army-Southern Command, the U.S. Embassy, the DIA, the DOD-Army, the CIA, the FBI, members of Congress, or member's of Ms. Kerndt's family, or agents of the Guatemalan military, police, or government, about Ms. Kerndt's death.

13. Any information regarding communication from the NSA to the Department of Defense-Army-Southern Command, the U.S. Embassy, the DIA, the DOD, the DOD-Army, members of Congress, the FBI, CIA, or member's of Ms. Kerndt's family, or to agents of the Guatemalan military, police, or government, about Ms. Kerndt's death.

14. Any information that Ms. Kerndt's or the Direct Relief Foundation was the subject of inquiry, investigation, or warnings by members of the U.S. government or the Guatemalan government.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

ST. MARY'S UNIVERSITY



Cessna, NSA 1

## SUBJECT OF REQUEST

## INVESTIGATION OF THE CRASHED CESSNA 185

Subjects related to this include, but are not limited to:

1.  Any documents related to the cause of the crash of Father Woods' Cessna in which Ann Louise Kerndt was traveling.

2.  Any documents either supporting or contradicting the Guatemalan government's statement that the plane crashed because of bad weather.

3.  Any documents supporting or contradicting the Guatemalan government's statement that the plane had caught fire.

4.  Any documents supporting or contradicting the Guatemalan government's statement that the plane had crashed because of engine failure.

5.  Any documents concerning the visit of Armand Edwards, U.S. National Transportation Safety Board, to Guatemala in connection with the crash and Ann Louise Kerndt's death.

6.  Any documents relating to the plane's missing windshield and side windows.

7.  Any documents related to the removal of the bodies from the plane.

8.  Any information suggesting that the plane had been fired upon or shot down.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228
(210) 431-2596
FAX (210) 431-5700
1-800-267-4848

# COALITION MISSING

U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

## NOTICE OF APPEARANCE AS ATTORNEY OR REPRESENTATIVE

Date:

At the request of _MARY PATRICIA AHERN #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_,
Name                                    Social Security Number

_3128   19th St. NW   WASHINGTON DC 20010_
Address

I hereby enter my appearance as attorney for such person in all matters relating to Freedom of Information Act requests filed with U.S. government agencies.

I am an attorney and a member in good standing of the Bar of the Supreme Court of the United States or of the highest court in the following State or the District of Columbia:

_New York_                  _Court of Appeals_
State                        Name of Court

Pursuant to the Privacy Act of 1974, I hereby consent to the disclosure to the following named attorney of any record pertaining to me which appears in any U.S. government system of records.

Monica Schurtman, Esq.
Linette Tobin, Esq.

_MARY PATRICIA AHERN_        _Mary Patricia Ahern_      _Aug 8, '97_
Name of Person Consenting    Signature                  Date

_M Schurtman_                _Monica Schurtman_         _2/20/98_
Name of Attorney             Signature                  Date

---

**Giles Declaration, Ex. 8**



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE

FORT GEORGE G MEADE, MARYLAND 20755-6000

Serial: J9396-98

0 1 APR 1998

Center for Legal & Social Justice
ATTN.: Sascha Kemper/Monica Schurtman
2507 N.W. 36th Street
San Antonio, TX 78228

Dear Mr. Kemper and Ms. Schurtmam,

This is in response to your Freedom of Information Act (FOIA)
request of 19 March 1998 in which you ask on behalf of Mary Patricia
Ahern for records pertaining to the "air crash and death of Ann Louise
Kerndt, who was in an airplane piloted by Father William Hervey Woods,
Jr., near the Ixcan, Guatemala on November 20, 1976". You asked that
the request be expedited and that fees be waived. Please be advised that
a FOIA request may be expedited whenever it is demonstrated that (1) an
individual's life or personal safety would be jeopardized by failure to
process a request immediately; (2) the substantial due process rights of the
requester would be impaired by the failure to process the request
immediately and the information sought is not otherwise available; and (3)
other narrowly construed exceptional circumstances exist. We consider
Ms. Ahern's request to be one of exceptional circumstances, and the case
will be expedited due to its humanitarian considerations. Fees will be
waived also due to humanitarian considerations.

Even though Ms. Ahern's request will be expedited, there is a queue
of requests being expedited because of humanitarian reasons, and we do
not anticipate responding to this case any earlier than January 1999.

We encourage you to be patient regarding the processing of your
FOIA request. We will respond as soon as we can.

Sincerely,

BARBARA PAISLEY
Chief
FOIA/PA Services

**<u>Giles Declaration, Ex. 9</u>**

CENTRAL SECURITY SERVICE

FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9396A-98

0 4 AUG 1998

Center for Legal & Social Justice
Sascha Kemper/Monica Schurtman
2507 N.W. 36th Street
San Antonio, TX 78228

Dear Mr. Kemper and Ms. Schurtman,

This responds to your Freedom of Information Act (FOIA) request of 19 March 1998 in which you asked for, on behalf of Mary Patricia Ahern, records pertaining to the "air crash and death of Ann Louise Kerndt, who was in an airplane piloted by Father William Hervey Woods, Jr., near the Ixcan, Guatemala on November 20 1976." In processing your request under the FOIA, two responsive records, a National Security Agency (NSA) document and a document belonging to another agency, were found.

The NSA document has been reviewed by this Agency and found to be currently and properly classified in accordance with Executive Order 12958. This document meets the criteria for classification in subparagraph (b)(1) of section 1.5 and remains classified SECRET as provided in section 1.3 the Executive Order 12958. The information is classified because its disclosure could reasonably be expected to cause serious damage to the national security. Because the information is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552 (b) (1)).

In addition, this Agency is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in this document. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are Title 18 U.S. Code 798; Title 50 U.S. Code 403-3 (c) (6); and Section 6, Public Law 86-36 (50 U.S. Code 402 note). No portion of the information was reasonably segregable.

Since your request has been denied, you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days from the date of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority (N5P5), National Security Agency, 9800 Savage Road STE 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularly, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will endeavor to respond to the appeal within 20 working days after receipt, absent any unusual circumstances.

Serial J9396A-98

In addition, the document which originated with another government agency, has been forwarded to that agency for their review and direct response to you.

Sincerely,

JOANN H. GRUBE
Deputy Director of Policy

**Giles Declaration, Ex. 10**



September 17, 1998

NSA/CSS FOIA Appeal Authority (N5P5)
National Security Agency
9800 Savage Road STE 6248
Fort George G. Meade, MD 20755-6248

     Re:    Agency Serial No.: J9396A-98
              Kerndt, Ann Louise

Dear Sir or Madam:

     This is an administrative appeal under the Freedom of Information Act ("FOIA"), 5 U.S.C. 552, regarding a request filed on behalf of Mary Patricia Ahern with the Department of Defense ("DoD"). This request was then separately mailed to the National Security Agency/Central Security Service. The request concerns documents regarding the death of Mrs. Ahern's sister, Ann Louise Kerndt, who was in an airplane piloted by Father William Hervey Woods, Jr., near the Ixcan, Guatemala on November 20, 1976, when the airplane crashed.

     We are appealing on the basis of a letter from Joann H. Grube, Deputy Director of Policy, dated August 4, 1998, denying our request in full. The denial was based on the Agency's claim that the material is exempt under the following provisions: 5 U.S.C. section 552 (b)(1); Title 18 U.S.C. 798; Title 50 U.S.C. 403-3 (c)(6); and Section 6, Public Law 86-36 (50 U.S.C. 402 note). (*See* attached letter from Ms. Grube dated August 4, 1998.)

     Specifically, we appeal the blanket application of exemption (b)(1). With respect to the (b)(1) exemption, once the existence of a record pertaining to a subject has been acknowledged, it is nearly impossible to imagine how every portion of that record could be exempt from disclosure, especially since almost twenty-two years have passed since Ms. Kerndt's death. The FOIA specifically requires that all reasonably segregable nonexempt material in a document be released. *Department of Defense v. Federal Labor Relations Authority*, 114 S.Ct. 1006 (1994). It does not seem that this provision of the Act was complied with, given that not one portion of the document was released.

     The initial reviewing authority denied the responsive document in full. Further, the reviewer provided no evidence that a careful, paragraph by paragraph review was undertaken for segregable material, as pursuant to the standards for application of each of the exemptions cited, or that consideration was given as to how the release of the documents would affect current national security. We request that such a review be conducted, and that all releasable material be immediately disclosed.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228-3918
(210) 431-2596
FAX: (210) 431-5700
1-800-267-4848



Many of the records in the possession of the NSA/CSS will be factual in nature. Even if some parts of the records are exempt under Title 18 U.S.C. 798, Title 50 U.S.C. 403-3 (c)(6), and Section 6, Public Law 86-36 (50 U.S.C. 402 note), it is usually the case that other portions (such as factual content) are not. The disclosure of this factual and historical material does not in any way expose (a) communications intelligence and communications security information (Title 18 U.S.C. 798), (b) intelligence sources and methods (Title 50 U.S.C. 403-3 (c)(6)), and (c) the functions or activities of the NSA/CSS (Public Law 86-36 (50 U.S.C. 402 note)). Therefore, we ask that each portion of the document be independently evaluated to determine whether every portion is, in fact and according to the law, exempt from mandatory disclosure.

Moreover, according to DoD 5400.7-R, Chapter 3, § 200 (3) of the Department of Defense Freedom of Information Act Program (May 1997), both Title 18 U.S.C. 798 and Title 50 U.S.C. 403-3 (c)(6) are part of a list of Title 5 U.S.C. 552 (b)(3) statutes used within the Department of Defense as a basis for exemptions. Additionally, DoD 5400.7-R, Chapter 5, § 304 (b)(5) of the DoD FOIA Program, states that *"when the denial is based upon an exemption 3 statute, the response, in addition to citing the statute relied upon to deny the information, shall state whether a court has upheld the decision to withhold the information under the statute, and shall contain a concise description of the scope of the information withheld."* Your response did not contain a concise description of the scope of the information withheld as demanded by the DoD Directive.

For these reasons, we are asking for a more searching review of the responsive document. Also, consideration should be given to the public interest in disclosure. In the case of Ann Louise Kerndt, the contribution that the factual material would make to public debate clearly outweighs all other concerns. The Clinton administration has publicly stated the government's commitment to as full disclosure as possible. (*see* Executive Order 12958, 60 F.R. 19825, and President Clinton's and Attorney General Reno's Oct. 4, 1993, Memorandum for Heads of Departments and Agencies.) Again, it is difficult to fathom how every portion of this record could be exempt from disclosure due to its content possibly affecting current national security nearly twenty-two years after the incident.

Lastly, consideration should be paid especially to Mrs. Ahern's interest in obtaining information that can shed light on the death of her sister. It has been over twenty years since Mrs. Ahern's sister, Ann Louise Kerndt, died. She has spent many of those years in pursuit of answers to the most basic questions surrounding her death. She still does not know why Ms. Kerndt died, the identities of those responsible for her death, the possibility of a cover-up by the Guatemalan military, and the possible role her government might have played in these events. Not knowing these basic facts has caused Mrs. Ahern great anguish. We ask that our request for release be given careful, sympathetic consideration, and that any releasable and segregable material be disclosed.

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228-3918
(210) 431-2596
FAX: (210) 431-5700
1-800-267-4848



If you have any questions about this appeal, please call me at (210)431-5740.  Thank you for your attention to this matter.

Sincerely,

Sascha Kemper

CENTER FOR LEGAL AND SOCIAL JUSTICE
IMMIGRATION AND HUMAN RIGHTS CLINIC
2507 N.W. 36th STREET
SAN ANTONIO, TEXAS 78228-3918
(210) 431-2596
FAX: (210) 431-5700
1-800-267-4848

**<u>Giles Declaration, Ex. 11</u>**

FORT GEORGE G. MEADE, MARYLAND 20755–6000

Serial: J9396B-98
7 December 1998

Center for Legal and Social Justice
ATTN: Sascha Kemper
2507 N.W. 36th Street
San Antonio, TX 78228

Dear Mr. Kemper:

   This replies to your 19 March 1998 letter appealing the National Security
Agency's (NSA) refusal to release one document responsive to your request under the
Freedom of Information Act (FOIA). You requested information on behalf of Mary
Patricia Ahern, pertaining to the "air crash and death of Ann Louise Kerndt, who
was in an airplane piloted by Father William Hervey Woods, Jr., near the Ixcan,
Guatemala on November 20, 1976." Your original request, the document responsive
to your request, the Director of Policy's 4 August 1998 letter denying release of the
document, and your letter of appeal have been reviewed. As a result of this review, I
have determined that the document was properly withheld.

   The withheld document is a foreign intelligence report. The document located
in response to your FOIA request indicates a plane crashed on 20 November 1976
and that seven persons were killed. It does not contain any other information such
as identity of passengers, cause of the crash, who may have been responsible, or
government actions. The protection of sensitive intelligence sources and methods
precludes the disclosure of this document. In your letter of appeal you have
questioned our not finding any "reasonably segregable" portions. The document
contains no substantive or intelligible portions that can be segregated and released.
Release of any portion of the report could reveal specific information regarding
communications intelligence which is both classified and protected by statute and,
therefore, exempt from disclosure as detailed below. The courts have consistently
approved the withholding of NSA records similar to the one at issue here.

   The information meets the standards for classification set forth in
subparagraph (a) of section 1.2 of Executive Order 12958. In addition, the
information meets the specific criteria for classification established in section 1.5(b),
(c) and (g). The information remains currently and properly classified TOP SECRET
in accordance with section 1.3 of Executive Order 12958. Accordingly, the record is
exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1).

   The document is also protected against disclosure by 5 U.S.C. § 552(b)(3) which
provides that the FOIA does not apply to matters that are specifically exempted from
disclosure by statute. The applicable statutory provisions with regard to the

Serial: J9396B-98

information at issue are 18 U.S.C. § 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons; 50 U.S.C. § 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and Section 6 of the National Security Agency Act of 1959 (Public Law 83-36, 50 U.S.C. § 402 note), which provides that no law shall be construed to require the disclosure of the organization, personnel, functions or activities of NSA.

As your appeal is denied, you are hereby advised of your right to seek judicial review of my decision pursuant to 5 U.S.C. § 552(a)(4)(B) in the United States District Court in the district in which you reside, in which you have your principal place of business, in which the Agency's records are situated (U.S. District Court of Maryland), or in the District of Columbia.

Sincerely,

for  BARBARA A. McNAMARA
Freedom of Information Act/Privacy Act
Appeals Authority

2

**Giles Declaration, Ex. 12**

*Rec'd 9-16-97*
*RA*
*97937-97*

# COALITION MISSING

## U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

September 4, 1997

Freedom of Information/Privacy Act Requests
National Security Agency/Central Security Service
Attn: Q-43
Fort George G. Meade, MD 20755-6000

Re: *Freedom of Information/Privacy Act Request* for **William Hervey Woods, Jr.**

Dear Sir/Madam:

We have been retained by U.S. citizen Father Thomas P. Henehan to represent him in obtaining documents related to the mysterious air crash and death of Father William H. Woods, near the Ixcan, Guatemala on November 20, 1976. Father Henehan's social security number is 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. He lives in Maryknoll, New York.

Father Woods worked in Guatemala for 18 years as a missionary, the last few which he devoted to organizing agricultural cooperatives for the indigenous Mayans in the Ixcan jungle. On November 20, 1976, a small plane he was piloting crashed, killing Father Woods and his four U.S. citizen passengers, John Gauker, Selwyn Puig, Ann Kerndt, and Dr. Michael D. Okada. The Cessna 185 was in sound mechanical condition, the weather was good, and Father Woods was an experienced pilot.

Father Woods was born in Houston, Texas on September 14, 1931. He entered the Maryknoll seminary in Illinois in 1949, then later spent time as a Maryknoll in Massachusetts (1953-1954) and New York (1957-1958). Between 1954 and 1957, Father Woods studied in Mexico, ministered to migrant farm workers in California, and served as chaplain in a hospital in Houston, Texas. In 1958, he was transferred to Guatemala where he ministered with the Maryknoll Father and Brothers/Catholic Foreign Mission Society of America, Inc. until his death in 1976.

Documents relating to this request include but are not limited to cable traffic, airgrams, notes, letters, memos, memoranda of conversation, reports, analyses, interviews, briefings, correspondence, diplomatic notes, or démarches. Please advise us if William H. Woods' name is contained in other "See Reference" files as well, so that we can make a decision regarding whether to have such files searched.

Pursuant to the Freedom of Information Act and Privacy Act (FOIA), 5 U.S.C. § 552, as amended, we request disclosure of the documents described on the attached pages for inspection and copying. We further request that all documents be reviewed in their entirety and that no information be omitted on the grounds of non-relevance.

2

If you regard any of these documents as potentially exempt from the FOIA's disclosure requirements, we ask that you nonetheless exercise your legally-authorized discretion to disclose them as the value of the documents clearly outweighs any agency regulation or privacy interest that might be asserted. Please note that § 1.8 of Clinton Executive Order 12958, 60 F.R. 19825, provides that *in no case shall information be classified in order to:*

*(1) conceal violations of law, inefficiency, or administrative error;*
*(2) prevent embarrassment to a person, organization, or agency;...or*
*(4) prevent or delay the release of information that does not require protection in the interest of national security.*

Attorney General Reno's Oct. 4, 1993 memo on the FOIA, 1993 WL389373 (White House) urged government officials to favor discretionary release of documents rather than withhold them. In that memo, Janet Reno also noted that the Justice Department would no longer routinely defend agency withholding without justification. Similarly, on Oct. 4, 1993, President Clinton directed the executive branch to "renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration." 1993 WL 389373 (White House). Given that in 1995, the President ordered his Intelligence Oversight Board (IOB) to conduct a wide-ranging investigation into certain aspects of U.S. policy toward Guatemala, a precedent of disclosure has been established concerning human rights information on Guatemala maintained by the U.S. government.

As the FOIA requires, in the event you determine that a document contains exempt material, please review the document line-by-line and release all reasonably segregable portions. To permit us to reach an informed decision about whether to file an administrative appeal of any withheld material, please describe any withheld documents (or portions thereof) by date, origin, and number of pages and explain in full the basis for withholding. If documents are classified, please treat this FOIA request as a request to declassify. If words and phrases are excised, please black, rather than white, them out.

Please waive all fees in connection with this request. Disclosure of the records that we have requested is clearly within the public interest, and, therefore, constitutes an appropriate circumstance for the waiver of fees. Should you decline to waive the fees, please notify us immediately and describe the specific reasons in writing.

Our request involves information bearing on the extent of the U.S. government's knowledge of the suspected murder of William H. Woods and four other U.S. citizens. Given the Guatemala-CIA revelations in the spring of 1995 and the summer of 1997 and the release of the Intelligence Oversight Board (IOB) report in June 1996 , the public has a great interest in understanding more about the human rights situation in Guatemala and about specific human rights cases. In May 1996, over 100 members of the House of Representatives sent a letter to President Clinton requesting a broad declassification of information pertaining to human rights violations in Guatemala.

3

The American public will benefit by gaining a better understanding of the U.S. government's intelligence operations and activities abroad as well as its historical relationship with Guatemala and its military forces, particularly in relation to the death of a man who had organized woodworking cooperatives, medical clinics, and land resettlement schemes for the Guatemalan people. The Maryknollers, a non-profit missionary order active for at least 50 years in Guatemala, are filing this FOIA request for one of their own -- a priest killed while fulfilling his organization's goal of helping the poorest build lives of justice and dignity.

To speed disclosure of the requested records, please release them as they become available to you, without waiting until all documents have been processed. Given the great value of these records to the public, we ask that you expedite the handling of this request. More than twenty years have passed since Father Woods' death and the Maryknolls still know almost nothing about the identity or motives of those who brought down the plane.

NSA offices most likely to have responsive documents include, at a minimum: *Office of the Director* and *Deputy Director;* the *General Counsel;* the *Inspector General;* overseas telecommunications units, *TCU,* located at American Foreign Service Posts and elsewhere, particularly in Guatemala.

If you have any questions regarding the identity of the records, their location, the scope of the request, or any other matter, please call Linette Tobin at (301) 588-8066. We look forward to receiving your response within the 10-day statutory limit. We understand that we may appeal if we do not receive a response or if documents are withheld or redacted.


Documents and reports should be sent to:

Linette Tobin/Monica Schurtman
Guatemala Human Rights Commission/USA
3321 12th Street N.E.
Washington, D.C. 20017




Very truly yours,

Linette Tobin, Esq.

# COALITION MISSING

U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

## NOTICE OF APPEARANCE AS ATTORNEY OR REPRESENTATIVE

Date:     07/24/97

At the request of     FR. THOMAS P. HENEHAN, MM     ,     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     ,
                      Name                                 Social Security Number

     P.O. BOX 303, MARYKNOLL, NY  10545-0303
Address

I hereby enter my appearance as attorney for such person in all matters relating to Freedom of
Information Act requests filed with U.S. government agencies.

I am an attorney and a member in good standing of the Bar of the Supreme Court of the United
States or of the highest court in the following State or the District of Columbia:

     D.C.                         Court of Appeals
State                            Name of Court

Pursuant to the Privacy Act of 1974, I hereby consent to the disclosure to the following named
attorney of any record pertaining to me which appears in any U.S. government system of records.

Monica Schurtman, Esq.
Linette Tobin, Esq.

REV. THOMAS P. HENEHAN, MM          _Thomas P. Henehan_          07/24/97
Name of Person Consenting            Signature                    Date

_Linette Tobin_                                                   9/4/97
Name of Attorney                     Signature                    Date

3321 12th St. Washington, DC  20017   T.(202)529-6599  F. (202) 526-4611  e-mail: ghrc@igc.apc.org
A PROJECT OF THE GUATEMALA HUMAN RIGHTS COMMISSION/USA

# COALITION MISSING

### U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

---

### SUBJECT OF REQUEST

### *WILLIAM H. WOODS*

All documents relating in whole or in part to the mysterious air crash and death of Father William H. Woods, M.M. near Ixcán, Guatemala on November 20, 1976. Aboard the plane were also four U.S. citizens, John Gauker, Selwyn Puig, Ann Kerndt, and Dr. Michael D. Okada.

At a minimum, responsive records ought to be found in categories indexed or covered by the following **TAGS** dealing with security, assistance to citizens, aid, aviation, petroleum, military affairs, political relations, intelligence, national security, terrorism, narcotics, crime, and justice: ASEC, CASC, EAID, EAIR, EPET, MARR, MASS, MOPS, PGOV, PINR, PINS, PREL, PTER, SNAR, KCRM, KJUS.

Subjects relating to this request should include but are not limited to:

- Information on when and how any U.S. agency, agent, or official, including but not limited to the State Department, the U.S. Embassy in Guatemala, its Political and Consular Sections, its Defense Attaché's Office, its Legal Attaché's Office, and the CIA first knew of the crash and death of Father Woods.

- The arrest, detention, or questioning of Guatemalan citizens or armed forces personnel in the crash of Father Woods' aircraft.

- Any information regarding possible motives for an attack on William H. Woods.

- Information regarding any investigation of Father Woods carried out by the Guatemalan government, police, or armed forces prior to the crash.

- Information regarding any investigation of Father Woods by any agent, official, or agency of the U.S. government prior to or subsequent to the crash of William H. Woods' airplane.

- Any information regarding any efforts on the part of the U.S. government, including the FBI or NTSB, to investigate the crash or Father Woods' death.

- Any information regarding any investigation of the crash conducted by the Guatemalan government, including but not limited to, the Ministry of the Interior and the Guatemalan judiciary.

---

2

- Documents which may suggest a link between the death of Father Woods and oil rights in the Ixcán or the purchase of land near or in the Ixcán by Guatemalan officials or agents.

- Any records containing names or identities of witnesses to the crash.

- Any records regarding Guatemalan troop movements in the Ixcán region around the time of the crash.

- Any documents regarding the evidence related to the plane crash or the evaluation thereof.

- Any documents related to Father Woods' meetings with any Guatemalan government official, including but not limited to, General Kjell Laugerud.

- A copy of the embassy death report or any document referring to the recovery, examination, viewing, or transport of Father Woods' body.

- Copies of the death notice cable and any follow up messages regarding Father Woods' death to or from the U.S. embassy.

- Any information that Father Woods was in danger or that his name was on a death list or that other persons should not fly with him.

# COALITION MISSING

## U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

---

### SUBJECT OF REQUEST

### *THREATS AGAINST WILLIAM H. WOODS OR THE MARYKNOLL FATHERS AND BROTHERS/CATHOLIC FOREIGN MISSION SOCIETY OF AMERICA, INC.*

All documents relating in whole or in part to any threats against or surveillance of Father Woods or the Maryknoll Fathers and Brothers/Catholic Foreign Mission Society of America, Inc. in Guatemala.

At a minimum, responsive records ought to be found in categories indexed or covered by the following **TAGS** dealing with security, assistance to citizens, aid, aviation, petroleum, military affairs, political relations, intelligence, national security, terrorism, narcotics, crime, and justice: ASEC, CASC, EAID, EAIR, EPET, MARR, MASS, MOPS, PGOV, PINR, PINS, PREL, PTER, SNAR, KCRM, KJUS.

Subjects related to this request include, but are not limited to:

- Information on when and how any U.S. agency, agent, or official, including but not limited to the State Department, the U.S. Embassy in Guatemala, its Political and Consular Sections, its Defense Attaché's Office, its Legal Attaché's Office, and the CIA first knew of any threats against or surveillance of Father Woods, the Maryknoll Society, or any of its members in Guatemala.

- Information regarding the warning given to William H. Woods by U.S. Ambassador Francis E. Meloy that Woods was in danger from Guatemalan government or military officials.

- Any information regarding possible motives for the threats against Father Woods or the Maryknoll Society.

- Any information regarding any investigation of the Maryknoll Society conducted by the Guatemalan government, police, or security forces.

- Any documents accusing or suggesting that the Maryknolls were involved in subversive or communist activities in Guatemala or otherwise disregarded the laws of that country.

---

# COALITION MISSING
## U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

---

### SUBJECT OF REQUEST

### *INVESTIGATION OF THE CRASHED CESSNA 185*

Subjects related to this request include, but are not limited to:

- Any documents related to the cause of the crash of Father Woods' Cessna.

- Any documents either supporting or contradicting the Guatemalan government's statement that the plane had caught fire.

- Any documents supporting or contradicting the Guatemalan government's statement that the plane crashed because of bad weather.

- Any documents supporting or contradicting the Guatemalan government's statement that the plane had crashed because of engine failure.

- Any documents concerning the visit of Armand Edwards, U.S. National Transportation Safety Board, to Guatemala in connection with Father Woods' crash.

- Any documents relating to the plane's missing windshield and side windows.

- Any documents related to the removal of the bodies from the plane.

- Any information suggesting that the plane had been fired upon or shot down.

---

3321 12th St. Washington, DC  20017   T.(202)529-6599  F. (202) 526-4611  e-mail: ghrc@igc.apc.org
A PROJECT OF THE GUATEMALA HUMAN RIGHTS COMMISSION/USA

# COALITION MISSING

U.S. CITIZENS MURDERED, TORTURED, ASSAULTED OR MISSING IN GUATEMALA

---

### SUBJECT OF REQUEST

## *THE ORIGINAL 1995 FOIA REQUEST FOR WILLIAM H. WOODS*

▸ Documents concerning the 1995 FOIA and Privacy Act requests regarding the air crash and death of Father William H. Woods, M.M., originally filed by Father Stephen Judd, M.M. This request includes, but is not limited to, a copy of the entire original FOIA/PA file created as the result of his 1995 request, including the search slips and any document used or generated in acting upon the request.

---

**Giles Declaration, Ex. 13**

NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9837A-97

18 February 1998

Ms. Linette Tobin
Coalition Missing
3321 12th St.
Washington, DC 20017

Dear Ms. Tobin:

This letter is in response to your Freedom of Information Act (FOIA) request of 4 September 1997, on behalf of Father Thomas P. Henehen of the Maryknoll Fathers and Brothers, relating to the "mysterious air crash and death of Father William H. Woods, near the Ixcan, Guatemala on November, 1976." This request is placed in an "all other" fee category, and due to its humanitarian consideration, this Agency has elected to waive all fees and expedite our processing of it. We searched for documents pertaining to Father Woods, John Gauker, Selwyn Puig, Ann Kerndt, Dr. Okada, threats against the Maryknoll Fathers, the investigation of the crashed Cessna 185, and original FOIA request folder for Father Woods. Responsive documents pertain to only Guatemalan troop movements, the first request for information concerning Father Woods, and references to Father Woods during the DODGC/IG investigations.

Thirty-five (35) records (58 pages) responsive to this request are enclosed and one hundred thirty-seven (137) other records (137 pages) are withheld in their entirety. Some of the information denied is currently and properly classified in accordance with Executive Order 12958. This information meets the criteria for classification as set forth in section 1.5, subparagraphs:

      (b) foreign government information;
      (c) intelligence activities (including special activities),
          intelligence sources or methods, or cryptology;
      (g) vulnerabilities or capabilities of systems, installations,
          projects or plans relating to the national security.

The information remains classified TOP SECRET, SECRET, and CONFIDENTIAL as provided in section 1.3 of Executive Order 12958. The information is classified because its disclosure could reasonably be expected to cause exceptionally grave damage to the national security. The information is exempt from declassification in accordance with Section 1.6(d) of E.O. 12958. Because the information is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552(b)(1)). All records withheld in their entirety pertain to only Guatemalan troop movements.

Serial: J9837A-97

In addition, subsection (b)(2) of the FOIA exempts from disclosure matters related solely to the internal personnel rules and practices of an agency. This exemption has been held to apply to matters that are "predominantly internal" the release of which would "significantly risk circumvention of agency regulations or statutes." Crooker v. Bureau of Alcohol, Tobacco, and Firearms, 670 F.2d 1051, 1074 (D.C. Cir. 1981). Some information meets the criteria for exemption (b)(2) protection as that statutory provision has been interpreted and applied by the Federal Judiciary. The information being protected under subsection (b)(2) is limited to e-mail routing information that appears before the text of a message and would reveal how NSA's information network is constructed. The release of such information could expose the network to unauthorized access.

Further, this Agency is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in the withheld material. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are:

> 18 U.S. Code 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons;
> 50 U.S. Code 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and
> Section 6 of the National Security Agency Act of 1959 (Public Law 86-36, 50 U.S. Code 402 note), which provides that no law shall be construed to require the disclosure of the personnel, functions, or activities of NSA.

We have determined that such information exists in these records, and we are protecting it accordingly.

The withholding of records in whole and in part may be construed as a partial denial of your request, and you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days after notification of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority, National Security Agency, Suite 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will respond to the appeal within 20 working days after receipt.

Serial: J9837A-97

On December 1, 1997, an NSA FOIA officer spoke with you concerning Father Henehan's interest in non-responsive documents located in Father Wood's first request (J9599-95) folder, since the current request asks for all documents concerning Father Woods located in the first FOIA request folder. As agreed, we have considered these documents as responsive to this request.

Documents originating with other government agencies have been referred to those agencies for review and direct response to you. In addition, we have referred nine (9) documents (15 pages) to other agencies for their review and return to NSA. We will respond to you on that information once this process has been completed.

Sincerely,

JOANN H. GRUBE
Deputy Director of Policy

Encl:
 a/s

**Giles Declaration, Ex. 14**

*rec'd FOIA app 98*

April 17, 1998

NSA/CSS Freedom of Information Act Appeal Authority
National Security Agency
Suite 6248
Fort George G. Meade, MD 20755-6248

### Re: Freedom of Information Act Appeal for Father William Woods
J9837A-97

Dear Sir/Madam:

This is an appeal from the attached letter of the National Security Agency dated February 18, 1998 which releases 35 records (some with redactions) and withholds 137 pages in their entirety.

Please conduct a line-by-line review these 137 pages as it is difficult to image that every line of those 137 pages must be withheld and that no portions are excisable. Moreover, please identify every document withheld by author, origin, subject matter, and date, and state with specificity which FOIA exemption applies to each page.

With regards to the excised portions of the released documents, please designate next to each excision the specific applicable exemption.

You state that the withholdings are necessary because the information is properly classified [exemption (b)(1)], it reveals predominantly internal matters the release of which would significantly risk circumvention of agency regulations or statutes [exemption (b)(2)], or it is exempted by federal statute [exemption (b)(3).

With regards to the first exemption, please define for each document withheld, the national security interest which would be endangered by declassification, and the real or expected damage that could result. Remember that under no circumstances may information be classified to (1) conceal violations of law, inefficiency, or administrative error, (2) prevent embarrassment to a person, organization, or agency, or (3) prevent or delay the release of information that does not require protection in the interest of national security. EO 12958, Section 1.8. You state that the records withheld in their entirety pertain to Guatemalan troop movements. Please fully describe how release of that information would "cause exceptionally grave damage to the national security."

Regarding the second exemption, please identify the agency regulation or statute that would be significantly circumvented by disclosure, and again what harm would result.

The Attorney General has reminded agencies that exemptions are discretionary, rather than mandatory, and has urged government officials to favor discretionary release of documents rather than withholding. She also noted that the Justice Department would no longer routinely defend agency withholding without justification. Janet Reno FOIA Memorandum, October 4, 1993. President Clinton has directed the Executive Branch to renew its commitment to the Freedom of Information Act and to its "underlying principles of government openness." White House, October 4, 1993.

Specifically, in reference to Guatemala human rights abuses cases, over 100 members of the House of Representatives requested declassification in 1996. In response the President ordered an investigation and the Intelligence Oversight Board released a report in 1996. The Report specifically notes that U.S. government officials have not shared their intelligence with victims, and declares that the U.S. "should provide its citizens more information whenever possible."

This case involves the mysterious death of a Catholic priest, Father Woods, in Guatemala in 1976, and threats received by either Father Woods or his Catholic companions. Discretionary release would be especially appropriate in this case, as Father Woods was violently killed while performing missionary work abroad, and his survivors and his religious order only hope to learn what the U.S. government already knows about the circumstances of his senseless death.

Finally, you state that documents originating with other agencies have been referred to them. Please state how many documents and to whom they were referred, so that we may follow up as necessary.

Thank you in advance for your thorough response. I can be reached at (301) 588-8066 if you have any questions. We hope to hear from you within the 20 working day time limit.

Very truly yours,

Linette Tobin

**<u>Giles Declaration, Ex. 15</u>**

NATIONAL SECURITY AGENCY

FORT GEORGE G. MEADE, MARYLAND 20755-6000

Serial: J9837A-97
8 June 1998

Linette Tobin, Esq.
Law Office of David Goren
8600 Second Avenue
Silver Spring, Md 20910

Dear Ms. Tobin:

This replies to your 17 April 1998 letter appealing the National Security Agency's (NSA) refusal to release information in response to your 4 September 1997 Freedom of Information Act (FOIA) request. You requested records relating to the 20 November 1976 mysterious air crash and death of Father William H. Woods near Ixcan, Guatemala. Your original request, the documents responsive to your request, the Deputy Director of Policy's 18 February 1998 response, and your letter of appeal have been reviewed. As a result of this review, I have determined that the information was properly withheld.

On 18 February 1998, the Office of Policy provided you with 36 documents. Six documents were provided to you in their entirety, and 30 documents were provided to you in part. In your appeal letter, you requested that the specific applicable exemptions be marked next to each deletion in the 30 documents which were provided in part. Copies of those documents with the exemptions so marked are enclosed. Information is protected against disclosure by 5 U.S.C. § 552(b)(1), 5 U.S.C. § 552(b)(2), and 5 U.S.C. § 552(b)(3), as explained below. We have used abbreviations on the documents to denote the specific (b)(3) statutes and the subparagraphs of Executive Order 12958 which apply to the withheld information.

Certain information in the documents meets the standards for classification set forth in subparagraph (a) of section 1.2 of Executive Order 12958, and falls under classification categories in section 1.5(b), (c), and (g). The information remains currently and properly classified TOP SECRET and SECRET in accordance with section 1.3 of Executive Order 12958. Accordingly, the information is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1).

The classified information is also protected against disclosure by 5 U.S.C. § 552(b)(3) which provides that the FOIA does not apply to matters that are specifically exempted from disclosure by statute. The applicable statutory provisions with regard to the information at issue are: 18 U.S.C. § 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons; 50 U.S.C. § 403-3(c)(6), which protects information pertaining to intelligence sources and methods; and Section 6 of the National Security Agency

Serial:  J9837A-97

Act of 1959 (Public Law 83-36, 50 U.S.C. § 402 note), which provides that no law shall be construed to require the disclosure of the organization, personnel, functions or activities of NSA.  Unclassified information, consisting of the names of NSA employees, was also deleted from the documents pursuant to Public Law 86-36.

Finally, section 552(b)(2) of the FOIA provides that the FOIA does not require the release of information related solely to the internal personnel rules and practices of an agency.  Courts have interpreted the exemption to encompass internal matters of a more substantial nature, the disclosure of which would risk circumvention of a statute or agency regulation.  In addition, courts have held that sensitive computer-related information that might permit unauthorized access to agency communications systems qualifies for Exemption 2 withholding.  E-mail routing information which appears before the text of messages was withheld because its release would reveal how NSA's information network is constructed and could expose the network to unauthorized access.  Therefore, that information is exempt from disclosure pursuant to 5 U.S.C. § 552(b)(2).  No substantive information pertaining to the subject of your request is withheld under this exemption.

The 137 other documents which were withheld in their entirety are foreign intelligence reports issued between September 1976 and February 1977.  None of the documents refer to Father Woods, nor do they contain information which may indicate what happened to Father Woods.  They are considered responsive only because they contain information about Guatemalan troop movements.

In your letter of appeal you have questioned our not finding any "reasonably segregable" portions of the documents which were withheld in their entirety.  The documents contain no substantive or intelligible portions that can be released.  The preservation of sensitive intelligence sources and methods precludes the disclosure of this information.  The ability to intercept foreign communications and the extent of any successes in analyzing intercepted communications are matters that must be kept in strictest secrecy in order to protect intelligence sources and methods.  Release of any portion of the reports could reveal specific information regarding communications intelligence which is both classified and protected by statute, and therefore, exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1) and 5 U.S.C. § 552(b)(3), as detailed above.  The courts have consistently approved the withholding, in their entirety, of NSA records similar to those at issue here.

I have provided as much specificity as possible concerning the intelligence activities that led to the creation of the withheld foreign intelligence reports and have identified the potential harm which would result from the disclosure of the documents.  Moreover, any particularized index of the withheld reports would reveal information properly classified and protected by the statutes cited above.  The U.S. Court of Appeals for the District of Columbia has recognized that information

2

Serial:  J9837A-97

disclosed by an Agency about withheld documents does not have to contain facts that, if made public, would compromise the secret nature of the information. Vaughn v. Rosen, 484 F.2d 820, 826 (1973), cert. denied, 415 U.S. 977 (1974).

As your appeal is denied, you are hereby advised of your rights under 5 U.S.C. § 552 to seek judicial review of this determination. You may seek an order from the United States District Court in the district in which you reside, in which you have your principal place of business, in which the Agency's records are situated (U.S. District Court of Maryland), or in the District of Columbia for review of the Agency's actions with respect to your request. 5 U.S.C. § 552(a)(4)(B) sets out your rights in this matter with respect to such judicial action.

Finally, in your appeal letter you ask for information concerning the documents which were referred to other agencies for review. The Office of Policy forwarded two documents to the Department of State and one document to the United States Information Agency for review and direct response to you. In addition, they forwarded eight documents to the Department of Defense General Counsel; four for review and direct response to you, and four for review and response to us. Finally, they forwarded five documents to the Central Intelligence Agency for review and response to us. The Office of Policy will respond to you once the documents are returned to us.

Sincerely,

BARBARA A. McNAMARA
Freedom of Information Act/Privacy Act
Appeals Authority

Encls:
    a/s

3

**Giles Declaration, Ex. 16**

**TANIA ROSE**
**ATTORNEY AT LAW**
**2527 COLLEGE AVENUE**
**BERKELEY, CA 94704**
**TEL. 510.849.1900**

July 23, 2002

National Security Agency
Pam Phillips
Chief, FOIA Services
Office of Information Policy
Ft. George Meade, MD

## BY FACSIMILE TRANSMISSION

Re:  Freedom of Information/Privacy Act Request for ADRIAN PORTILLO
ALCANTARA

**To whom it may concern:  On or about July 12, 2002, I sent a freedom of**
**information act request for Adrian Portillo-Bartow. This is a revised request for**
**Adrian Portillo Alcantara, NOT Adrian Portillo-Bartow.**

I have been retained by U.S. citizen Adriana Portillo-Bartow  to represent her in
obtaining documents related to the disappearance of her father Adrian Portillo Alcantara,
on or about September 11, 1981  Guatemala City, Guatemala. Adrian Portillo Alcantara,
along with five other people, ( three of whom were daughters of the requester Adriana
Portillo-Bartow), were taken from his home on or about September 11, 1981, by whom
the Guatemala Historical Clarification Commission has come to believe were agents of
the State of Guatemala.  At the time of Adrian Portillo Alcantara's  detainment, he was
seventy years old. His residence, from where he was taken, was located at 2nd Avenida 1-
57 of Zone 11 of Guatemala City.  Also taken from the residence at the same time were
five other women and girls, ranging in age from 23 years to eighteen months.  Not one of
them has been seen or heard from since September 11, 1981.

    While, because Adrian Portillo Alcantara  and his relatives are disappeared, and
therefore there are no certificates of death, I have included notations from the United

Nations Historical Clarification Commission Report, Annex 1, Volume 1, Adriana
Portillo's Testimony, Illustrative Case #87. This report can also be accessed on the
worldwide web at. www. Watchproject.org. Upon arrival at the cite, click on "English",
then "Cases".

Documents relating to this request include but are not limited to cable traffic, airgrams,
notes, letters, memos, memoranda of conversation, reports, analyses, interviews,
briefings, correspondence, diplomatic notes, or non-papers. Please advise us if Mr.
Adrian Portillo Alcantara's name is contained in other "See reference" files as well, so
that we can make a decision whether to have such files searched.

Pursuant to the Freedom of Information and Privacy Act , 5 U.S.C. 552, as amended, we
request disclosure of the documents described as follows:

- Any documentation mentioning the raid on Mr. Adrian Portillo Alcantara's  home;
- News articles relating to the same subject;
- Any documentation regarding the existence of a "safe-house" located at 2nd Avenida
  1-57 of Zone 11, Guatemala City;
- The investigation of Adrian Portillo Alcantara's disappearance in Guatemala by
  either Guatemalan officials or officials of any other government;
- Any communications or reports of any nature made to U.S. officials regarding Mr.
  Adrian Portillo Alcantara's disappearance;
- Any communications of any kind between U.S. and Guatemalan officials or other
  sources of information about Mr. Adrian Portillo Alcantara;
- Any communications of any kind between U.S. and Guatemalan officials or other
  sources of information about  Glenda Corina Portillo, Mr. Alcantara's granddaughter;
- Any communication of any kind between U.S. and Guatemalan Rosaura Margarita
  Corillo Portillo, Mr. Alcantara's granddaughter.

I request that all documents be reviewed in their entirety and that no information be
omitted on the grounds of non-relevance.  If you regard any of these documents as
potentially exempt under the statutorily prescribed exemptions, we ask that you
nonetheless exercise your legally authorized discretion to disclose them as the value of
the documents outweighs any agency regulation.

Please waive all fees in connection with this request.  Disclosure of the records is clearly
within the public interest as the production of such documents may significantly enhance
the public's knowledge both of what happened in this incident, and will enhance the
public's knowledge of the activities of the Department of Defense. The documents are

not being sought for a commercial purpose; rather they are sought by Ms. Portillo-Bartow so that she can attempt to uncover what happened to her loved ones.

Furthermore, to speed disclosure of the requested materials, please release them as they become available to you, without waiting for all the documents to be processed. Given the great value of these records to the public interest, and to Ms. Portillo-Bartow who has been awaiting for many years to discover what happened to her father and her daughters, Glenda Corina And Rosaura Margarita, who were disappeared with her father, receiving the documents as soon as is possible as they become available to you is appreciated.

Should you decline to waive the fees, please notify me immediately and describe the reasons in writing. If fees are not waived, I agree to pay for costs up to $250.00.

If you have any questions about any aspect of this request, please call me at the above number. I look forward to receiving your response.

Very Truly Yours,

TANIA ROSE

NOTICE OF APPEARANCE AS ATTORNEY OR REPRESENTATIVE

DATE :

At the request of Adriana Portillo-Bartow, Social Security number _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_,
and contact address of _3441 w.59th pl. Chicago, IL 60629_, I hereby enter my appearance as
attorney for such person in all matters relating to Freedom of Information Act requests filed with
U.S. Government agencies.

I am an attorney in good standing of the Bar of California and licensed to practice before all the
courts of the State of California.

Pursuant to the Privacy Act of 1974, and the Freedom of Information Act, I hereby consent to
the disclosure to Tania Rose of any record pertaining to Adrian Portillo Alcantara, which appears
in any U.S. government system of records, and I consent to her seeking documents on my behalf:

Name of person consenting:        _Adriana P Bartow_            Date:  6/20/2002

                                   Adriana Portillo-Bartow

                                                               Date: 7/10/02

                                   Tania Rose

On this 1st of July 2002
sworn by Irene Saldana

"OFFICIAL SEAL"
Irene Saldana
Notary Public, State of Illinois
My Commission Expires Feb. 21, 2003

Thursday, July 11, 2002



  

United Nations Historical Clarification Commission (CEH) Report

Annex I, Volume 1, ADRIANA PORTILLO'S TESTIMONY, ILLUSTRATIVE CASE #87
THE DETENTION AND FORCED DISAPPEARANCE OF SIX MEMBERS OF THE PORTILLO FAMILY, INCLUDING THREE LITTLE GIRLS.
*"These sixteen years have been the greatest torture that could possibly exist... Years of agony, desperation, anguish, pain."* 1

I. Antecedents

Adrián Portillo Alcántara was born in El Salvador and left from that country into exile in 1952 because of his participation in labor unions. He began living in Guatemala and, after a time, became a Guatemalan citizen.

From his first marriage he had eight adult children—two daughters and six sons. He married again (after the death of his wife in 1972), and another daughter was born from that marriage. Several grandchildren were also part of the family group.

Adrián Portillo Alcántara made a living as an insurance sales agent, an activity he was involved in until the time of his disappearance.

His sons left their studies after the first years of secondary school and began to help their father. The daughters, on the other hand, were able to finish their secondary education.

According to one of his daughters, Adrián Portillo Alcántara was *"a revolutionary from the time he was very young. He was very political and very aware of reality and of the great concept of social justice. He had been able to teach us a low for justice and equality for all."* 2 These ideals inspired in his children, according to their own words, *"the need to do something ,"* and they felt that there was no choice but to join *"the already existing efforts to change the situation of the country ."* 3 That was how the father, along with the brothers and sisters, joined the Organization of the People in Arms (ORPA), with various levels of participation therein.

In 1978, one of Adrián Portillo's sons was recruited to serve in the Army when he was 17 years old. He stayed in the institution during almost the whole period of his obligatory service, until he deserted in April of 1981 *"because of the insanity of the armed conflict and because of what it meant to be a member of the armed forces ,"* 4 It seems that shortly before the end of his required 30 months of service, some revolutionary propaganda started to appear among his belongings, an occurrence which made him fear for his life and which ultimately led him to flee.

On July 25, 1981 there was a military operation in the Vista Hermosa II neighborhood in Zone 15 of the capital city that ended in the death of several men and women. The Army had detected a guerrilla safe house and had attacked it with a large number of soldiers and with heavy weaponry. The next day the newspapers alluded to the event describing some of the dead bodies and accompanying the article with photographs. One of the photos was of Carlos Alfredo Portillo Hernández, a 23 year old son of Adrián who was a guerrilla combatant. His sister states: *"When I read the newspapers I realized that the description of one of the bodies, including the clothing, and the photograph that [accompanied the article] were of my brother ."* 5 No family member ever went to claim the body because *"at that time, admitting that a family member was a guerrilla was tantamount to a death sentence ."* 6

Military operations of this kind, carried out to dismantle guerrilla safe houses, and the death or disappearances of the occupants of the houses were frequent during that time. 7 In one case registered by the Historical Clarification Commission, state security forces detected houses that had been set up in Guatemala by Salvadoran insurgent groups. On April 17 of 1981, there was a raid in Zone 15 of the capital in which Berta Menjívar de Lobo, her five year old son Walter Ernesto Lobo Menjívar, and Luis Antonio Saracay, all Salvadoran citizens, were all disappeared. On the following night, a group of armed men broke into another safe house, this time along the highway which goes from the capital to Mixco. One of the people living in the house, a Chilean by the name of Iride del Carmen Marasso de Burgos, had left the house before the break-in to communicate with one of the disappeared people in the house in Zone 15. She was also never heard from again. At the time of her disappearance she was 8 months pregnant. The whereabouts of these victims, including the 5 year old boy and the baby about to be born has never been discovered.8

II. The Facts Related to the Incident

On Friday, September 11, 1981, around nine thirty in the morning, young armed men, dressed in civilian clothing, riding in vehicles with polarized windows and without license plates, went to some offices located on 9th Calle between Avenida Elena and First Avenida of Zone 1 of the capital. Two of them entered the offices, one carrying a rifle and the other a pistol.9 They asked for Adrián Portillo Alcántara, 70 years of age, who was visiting the offices at the time. They had a police composite drawing of him. Once he was identified, they proceeded to interrogate him, asking him, among other things, about the person who had been with him earlier that day when he was driving his truck. Portillo Alcántara answered that that person was his son, Angel Antonio, but that he had gone to the bus terminal in Zone 4 to pick up some family members who were arriving. The truth is that Angel Antonio was present at that location, and was able in this way to avoid being recognized, and at the same time be a witness to what was occurring. Once they heard his explanations, the armed men took his father out of the office at gunpoint, and forced him into a vehicle. *"I was able to see when my father was made to get into the car, and that afterwards the car headed towards the center of the city ."* 10

After witnessing his father's detention, Angel Antonio went by bus to his father's home to tell his family members who were there what had happened. When he arrived, he realized that there was a military operation going on around the block where his father lived. It was being directed by a man who appeared to be the same man who had interrogated and detained his father shortly before.

Vehicles without license plates, military jeeps and an undetermined number of armed men—some dressed in civilian clothing and others in military uniform—carrying radio transmitters, had taken possession of the house located on 2nd Avenida 1-57 of Zone 1 of Guatemala City.

*"It was a surprise when suddenly the Army came, but not just like that* [with their faces uncovered, but rather] *with ski masks they call paramontanas, but they were definitely from the Army ."* The soldiers *"surrounded practically the whole block. They had the whole block surrounded and then other private cars arrived. According to what people were saying in those times, they were cars of the Secret Police ."* When they arrived, *"they broke down the door forcibly (. . ) This was at approximately eleven o'clock in the morning ."* One witness did not see the soldiers take people out of the house, but she noticed something unusual: *"What seemed to strange to me was that when they did that* [broke into the house], *a light blue (. . ) double-cabin pickup truck went in and (. . .) since before there used to be a garage there, they went in that way. They backed in, you could say, and (...) they were carrying something inside ,"* even though, *"no, we never found out what it was ."* The news media came about 35 or 40 minutes after the operation had begun, and it ended *"at about three thirty (. . .) or four* [in the afternoon]." Two agents were left guarding the place. 11

The raided house was the residence of Adrián Portillo Alcántara, his wife, Rosa Elena Larín de Portillo who was 23 years of age, and their daughter Alma Argentina who was only 18 months old. On the day the incident took place, two of Adrián Portillo Alcántara's young granddaughters, Rosaura Margarita and Glenda Corina Carrillo Portillo, 10 years old and 9 years old respectively, were visiting from Jutiapa and were also in the house. In addition, Edilsa Guadalupe Alvarez Morales, 18 years of age, who was the life partner of Manuel Alfonso, another son of the owner of the house, was also present. Some neighbors told family members that during the military operation, they heard the voices of women and children crying and asking for help.12 The Security Forces, however, said that they had found the house empty. The press echoed the official version: *"Aside from the [subversive material] that was seized, there were no arrests reported of people who were residing in the place of reference. When the public security*

http://www.watchproject.org/testimonies.html

Thursday, July 11, 2003

agents arrived, the house was uninhabited."13

Angel Antonio Portillo, who had arrived at his father's house when the operation was beginning, chose to walk along the sidewalk to a corner store, where he asked the store-owner what was going on. Later, *"still suffering from tremendous shock ,"* he decided to leave the area, and go towards *"the house of my boss (. . .) with whom I worked selling books and who lived in Zone 5 ."* 14

At about two in the afternoon, Adriana Margarita Portillo, the mother of Glenda Corina and Rosaura Margarita, arrived at her father's house with the wife of her brother, Angel Antonio, and her niece and nephew. They found the entire block surrounded by agents of the National Police, the Ambulatory Military Police, the Judicial Police and soldiers. Upon approaching the house, they were intercepted and interrogated *"by a guy who appeared to be in charge*  [who] *was tall and thin, with fair skin, curly brown hair and eyes which were green or light brown. He wore round gold-colored glasses and had a thin mustache. He was dressed very well and appeared to be very well educated ."* 15 When Adriana Margarita asked about her family members, the military men at first told her that they were not there. Moments later, they told here they were there, and asked her if she wanted to go inside and see them. They did not go into the house out of fear, and they left the place quickly. From the street they were able to see that some men were washing the floor of the house with a hose and brooms.

She was never able to learn any more about the whereabouts and the fate of Adrián Portillo Alcántara, his wife and daughter-in-law, or about the three kidnapped children.

### III. After the incident

On the following day, the newspapers found out about the operation and identified the house where Adrián Portillo had been living, publishing photographs and exact references of the address, as a "safe house" of the guerrillas. In fact, the ORPA did acknowledge to the Historical Clarification Commission that *"it was a safe house(. . .) and (. . .) compañero Portillo was in charge of that house ."* 16

Following that incident, the surviving family members of Portillo Alcántara lived in fear that they would become the next victims. One of his children moved with her family to the capital: "We were try to lose ourselves amidst all the people, so for three years we stayed in the city without saying absolutely anything to anybody."17 Later, little by little, the family members started to leave the country.

The family members looked for support outside the country from non-governmental and governmental human rights organizations. Their case was taken up by the United Nations Working Group on Forced Disappearances and, since 1993, the Presidential Commission on Human Rights (COPREDEH). On April 1, 1998 they appeared before the Public Ministry in Guatemala, and made statements about the events which occurred, asking that the disappearance of their family members be investigated.

Government authorities never acknowledged that the detention of the disappeared persons had taken place. On July 31, 1998, the Historical Clarification Commission consulted the Army about the case. The army, in a note bearing the date of August 20 of the same year, answered stating that there was no information in their files about the case. They attached the transcription of a newspaper article dated September 12, 1981.

### IV. Conclusions

The Historical Clarification Commission, having studied the facts relevant to the case, has come to believe that Adrián Portillo Alcántara was illegally detained by agents of the State, who later covered up the crime. The fact that the arresting agents did not inform the competent authorities, and the fact that they continue to cover up - even today - what they know about the whereabouts of Portillo Alcántara, constitutes a forced disappearance for which the Guatemalan State is responsible.

The existing indications and testimonies convince this Historical Clarification Commission that security forces of the State, during an operation undertaken in the residence located on 2nd Avenida 1-57 of Zone 11 of the capital, illegally detained Rosa Elena Latín de Portillo–23 years of age, Alma Argentina Portillo Latín–18 months old, Edilsa Guadalupe Alvarez Morales–18 years old, Rosaura Margarita Carrillo Portillo–10 years of age, and Glenda Corina Carrillo Portillo–9 years of age. The refusal of the arresting agents to recognize the detention of these people, and the lack of information about their whereabouts, also constitute a forced disappearance.

The forced disappearances of the people named above constitute grave violations of their human rights, and illustrate the extremes of cruelty with which the Security Forces acted within the pretext of counterinsurgency struggle, turning young children into victims of their repression, and destroying entire families through their actions.

The fact that some of the victims participated in a guerrilla organization does not represent in the least a legal or moral justification for the crimes described.

The lack of official acknowledgement of these events represents a serious obstacle to the ability to find information about the whereabouts of the victims, and certainly to national reconciliation.

### V. List of Victims

**Forced Disappearances:**
Adrian Portillo Alcántara
Alma Argentina Portillo
Edilsa Guadalupe Alvarez Morales
Glenda Corina Carrillo Portillo
Rosa Elena Muñoz Latín de Portillo
Rosaura Margarita Carrillo Portillo
Berta Menjívar de Lobo (Salvadoran)
Walter Ernesto Lobo Menjívar (Salvadoran child)
Luis Antonio Saracay (Salvadoran)
Carmen Marrasco de Burgos (Chilean)

1. Direct witness (mother and daughter of the victims) CEH.
2. Direct witness (family member of the victims) CEH.3. Ibid.
4. Direct witness, CEH.
5. Direct witness (family member of the victims) CEH.
6. Ibid.
7. Reference witness, CEH.
8. C §65. April, 1981, Guatemala City
9. Direct Witness (family member of the victims) CEH. According to the witness, one of the individuals was "of muscular build, dark skinned, almost mulatto, with curly hair, approximately 25 years old, and approximately 1.65 meters in height and 150 pounds in weight. He was armed with a Galil rifle, the regulation weapon of the Guatemalan Army." The other individual was, "of thin build, light skinned, approximately 1.70 meters in height and weighing about 130 pounds, curly hair combed back, carrying a .45 or .9 mm calibre weapon.
10. Ibid.
11. Direct Witness, CEH.
12. Reference Witness, CEH.
13. *Diario el Gráfico* , September 13, 1981.
14. Ibid.
15. Direct witness (family member of victim), CEH.
16. Direct witnesses (former members of the ORPA leadership) CEH.
17. Direct witness, CEH. I 67

**Giles Declaration, Ex. 17**

FOIA Case: 41911
03 December 2002

Ms. Tania Rose
Attorney At Law
2527 College Avenue
Berkeley, CA 94704

Dear Ms. Rose:

This responds to your Freedom of Information Act (FOIA) request, submitted via facsimile on 25 July 2002, for information on the disappearance of Adrian Portillo Alcantara on or about 11 September 1981. Your letter has been assigned Case Number 41911. Please refer to this case number when contacting us about your request. For purposes of this request and based on the information you provided in your letter, you are considered an "all other" requester. Your request has been processed under the provisions of the FOIA. Since processing fees were minimal, no fees were assessed.

We have determined that the fact of the existence or non-existence of the materials you request is a currently and properly classified matter in accordance with Executive Order 12958. Thus, your request is denied pursuant to the first exemption of the FOIA which provides that the FOIA does not apply to matters that are specifically authorized under criteria established by an Executive Order to be kept secret in the interest of national defense or foreign relations and are, in fact properly classified pursuant to such Executive Order.

In addition, this Agency is authorized by various statutes to protect certain information concerning its activities. The third exemption of the FOIA provides for the withholding of information specifically protected from disclosure by statute. Thus, your request is also denied because the fact of the existence or non-existence of the information is exempted from disclosure pursuant to the third exemption. The specific statutes applicable in this case are Title 18 U.S. Code 798; Title 50 U.S. Code 403-3(c)(6); and Section 6, Public Law 86-36 (50 U.S. Code 402 note).

As your request is being denied, you are hereby advised of this Agency's appeal procedures. Any person denied access to information may file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal must be postmarked no later than 60 calendar days of the date of the initial denial letter. The appeal shall be in writing addressed to the NSA/CSS

FOIA Case:  41911

FOIA Appeal Authority (DC321), National Security Agency, 9800 Savage Road STE 6248, Fort George G. Meade, MD  20755-6248.  The appeal shall reference the adverse determination and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes that the determination is unwarranted.  The NSA/CSS FOIA Appeal Authority will endeavor to respond to the appeal within 20 working days after receipt, absent any unusual circumstances.

Sincerely,

LOUIS F. GILES
Director of Policy

**<u>Giles Declaration, Ex. 18</u>**

**TANIA ROSE**
**ATTORNEY AT LAW**
**2527 COLLEGE AVENUE**
**BERKELEY,CA 94704**
**TEL. 510.849.1900**

1 February 2003

**NSA/CAA FOIA APPPEAL AUTHORITY**
**National Security Agency**
**9800 Savage Road, Suite 6248**
**Fort George G. Meade, MD 20755-6248**

**FOIA APPEAL**
**BY FACSIMILE TRANSMISSION**

Case number 41911

To Whom It May Concern:

By way of this letter, I am appealing your 3 December 2002 letter in which you determined the following: First, that the fact of the existence or non-existence of the materials requested is currently and properly classified under Executive Order 12958, and that therefore exemption 1 of the FOIA applies to bar production of such information and any documents.

Additionally, you stated that the fact of the existence or non-existence of the information is exempted from disclosure under the third FOIA exception, and cited applicable statutes.

This document request made by me on behalf of my client Adriana Portillo-Bartow, concerns her father,  Adrian Portillo Alcantara, and her two daughters who in September 1981 were disappeared by whom the Guatemala Historical Clarification Commission has come to believe were agents of the State of Guatemala. At the time of Adrian Portillo Alcantara's  detainment, he was seventy years old. His residence, from where he was taken, was located at 2nd Avenida 1-57 of Zone 11 of Guatemala City. Also taken from the residence at the same time were five other women and girls, ranging in age from 23 years to eighteen months. Not one of them has been seen or heard from since September 11, 1981.

The documents sought concern an incidents having occurred twenty-one years ago.  For that reason alone, it appears that the law dictates that the documents should be released.  I ask  that even if somehow after so many years the documents are considered "currently and properly classified", that this agency exercise its discretion to release the information due to the public interest in the disclosure of the information.

With regard to your citation to the third exemption, that is that cited specific statutes apply to prevent disclosure, as you are aware you have the burden of proof as to whether the requested information fits within the category of information authorized to be withheld. By way of this appeal, I request that you identify how the requested information fits within the categories of information sought to be withheld by the cited statutes.

Again, as stated above, the information requested is over twenty years old, and if any documents exist, their age alone renders their release required.  Again I ask that this agency exercise its discretion to release the requested information and documentation if any exists.

I look forward to hearing from you.

Very Truly Yours,

TANIA ROSE

**Giles Declaration, Ex. 19**



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE. MARYLAND 20755-6000

Case No. 41911/Appeal No. 1801
10 March 2003

Ms. Tania Rose
Attorney at Law
2527 College Avenue
Berkeley, CA  94704

Dear Ms. Rose:

This responds to your 1 February 2003 letter on behalf of your client Adriana Portillo-Bartow appealing the National Security Agency's (NSA) decision to neither confirm nor deny the existence of records relating to your request for information on the disappearance of Adrian Portillo Alcantara on or about 11 September 1981.

It is our understanding that you filed suit on 1 October 2002 in the United States District Court for the District of Columbia, Case No. 1:02CV01937, regarding this matter. Accordingly, we are administratively closing this appeal.

Sincerely,

ANNA T. SMITH
Associate General Counsel
(Administration & Litigation)

**Giles Declaration, Ex. 20**



NATIONAL SECURITY AGENCY
CENTRAL SECURITY SERVICE
FORT GEORGE G. MEADE, MARYLAND 20755

Serial: J9555-96

18 September 1996

Ms. Meredith Larson
117A East Longview Street
Chapel Hill, NC 27516

Dear Ms. Larson:

An NSA-originated document, responsive to your Freedom of Information / Privacy Act (FOIA/PA) request of July 18, 1995, for documents concerning you and threats to and bombing of Peace Brigades International in 1989, was located by the Defense Intelligence Agency. Personnel there referred the document to the National Security Agency/Central Security Service (NSA/CSS) on August 19, 1996, for direct response to you. Your request has been processed under the FOIA.

This document contained information pertaining to only "Peace Brigades International." This is the same document denied you in your direct request to NSA (FOIA Case J9421-95). This document have been reviewed by this Agency again as required by the FOIA and is still found to be currently and properly classified in accordance with Executive Order 12958. This document meets the criteria for classification as set forth in subparagraphs (c) and (g) of section 1.3 and remains classified TOP SECRET as provided in section 1.3 of Executive Order 12958. The document is classified because its disclosure could reasonably be expected to cause exceptionally grave damage to the national security. Because the document is currently and properly classified, it is exempt from disclosure pursuant to the first exemption of the FOIA (5 U.S.C. section 552(b)(1)).

Furthermore, NSA is authorized by various statutes to protect certain information concerning its activities. We have determined that such information exists in this document. Accordingly, those portions are also exempt from disclosure pursuant to the third exemption of the FOIA which provides for the withholding of information specifically protected from disclosure by statute. The specific statutes applicable in this case are Title 18 US. Code 798; Title 50 US. Code 403-3(c)(5); and

20

Serial: J9555-96

Section 6, Public Law 86-36 (50 US. Code 402 note). No portion of the information is reasonably segregable.

Since your request has been denied, you are hereby advised of this Agency's appeal procedures. Any person denied access to information may, within 60 days after notification of the denial, file an appeal to the NSA/CSS Freedom of Information Act Appeal Authority. The appeal shall be in writing addressed to the NSA/CSS FOIA Appeal Authority, National Security Agency, Suite 6248, Fort George G. Meade, MD 20755-6248. The appeal shall reference the initial denial of access and shall contain, in sufficient detail and particularity, the grounds upon which the requester believes release of the information is required. The NSA/CSS Appeal Authority will respond to the appeal within 20 working days after receipt.

Sincerely,

JAMES P. CAVANAUGH
Deputy Director of Policy

Enc.
a/s

**Giles Declaration, Ex. 21**



NATIONAL SECURITY AGENCY
FORT GEORGE G. MEADE, MARYLAND 20755–6000

Serial: J9555A-96
20 December 1996

Ms. Meredith Larson
117A East Longview Street
Chapel Hill, NC  27516

Dear Ms. Larson:

This replies to your 13 November 1996 letter appealing the National Security Agency's (NSA) refusal to release a document referred to this Agency by the Defense Intelligence Agency (DIA) in response to your 18 July 1995 request under the Freedom of Information Act (FOIA) for records pertaining to Peace Brigades International (and those that refer to PBI or International Peace Brigades) in Guatemala in 1989 and 1990. Your original request to the DIA, the NSA document responsive to your request, the Director of Policy's 18 September 1996 letter denying release of the document, and your letter of appeal have been reviewed. As a result of this review, I have determined that the document was properly withheld.

The document located by DIA, and at issue here, is the same document that NSA located in its initial search for documents responsive to your 18 July 1995 FOIA request to NSA. The document is from August 1989. The document was found to be responsive because it contains a passing reference to the "International Peace Brigades" and the fact that the organization is involved with individuals seeking protection or asylum. The document does not relate to you or the attack on you. There is no information in the document about threats received by PBI or a bombing of PBI's offices.

In your letter of appeal you also question the adequacy of NSA's previous search, citing the Intelligence Oversight Board's (IOB) Report on the Guatemala Review (June 28, 1996) which indicated that NSA located only one of five documents responsive to your request. I understand how the information released in the IOB's report would cause you to be frustrated with the NSA FOIA process. I assure you that our FOIA processing is intended to provide the public with access to non-exempt information. In your case, searches were conducted using all of the terms relating to PBI which you provided to us (Peace Brigades International, International Peace Brigades, and PBI), as well as search terms which we expected would yield information on any Americans, not just those affiliated with PBI, who were stabbed or attacked in Guatemala. One document was located. It is the same NSA document which DIA located in its search.

During the processing of your November 1995 appeal, we received information from the Department of Defense (DoD) task force on Guatemala which identified an

Serial: J9555A-96

additional document responsive to your FOIA request. The document was not located in our initial search because PBI was referred to as "Peace Brigade," a term that was not used in our search. We reviewed and withheld the document in response to your appeal. The document (dated January 1990) is a report covering events in Guatemala in 1989. It briefly mentions an attack against members of the Peace Brigade during the last week of December 1989. As I explained in April 1996, the document does not identify any of the victims or the attackers.

The IOB's Report was released subsequent to our response to your November 1995 appeal. We were not aware prior to the report that we had not addressed all of the responsive documents in your case. The document we located in response to your initial request to this Agency was the document the IOB referred to as "one out of five" in its report. The additional document which we addressed on appeal in April 1996 is another of the five documents.

Following receipt of your November 1996 appeal, I obtained the other three documents which the IOB identified as responsive. One document is dated August 1989 and the other two are dated September 1989. All three documents briefly mention an attack on the Peace Brigades (or Peace Brigade Headquarters) in the context of examples of violence in Guatemala. The documents are not specifically about the attack. As I explained above, our initial search included the word "International" before or after Peace Brigades. Therefore, we did not locate the three documents.

The document referred to us by DIA and the three documents identified by the IOB are foreign intelligence reports. In your letter of appeal you have questioned our not finding any "reasonably segregable" portions that could be released. I found no substantive or intelligible portions that can be released. The preservation of sensitive intelligence sources and methods precludes the disclosure of this information. The ability to intercept foreign communications and the extent of any successes in analyzing intercepted communications are matters that must be kept in strictest secrecy in order to protect intelligence sources and methods. Release of any portion of the reports could reveal specific information regarding communications intelligence which is both classified and protected by statute and, therefore, exempt from disclosure as detailed below. The Federal Judiciary has consistently approved the withholding, in their entirety, of NSA records similar to those at issue here.

The information meets the standards for classification set forth in subparagraph (a) of section 1.2 of Executive Order 12958. In addition, the information meets the specific criteria for classification established in section 1.5(c) and (g). The information remains currently and properly classified TOP SECRET in accordance with section 1.3 of Executive Order 12958. Accordingly, the reports are exempt from disclosure pursuant to 5 U.S.C. § 552(b)(1).

2

Serial: J9555A-96

The information is also protected against disclosure by 5 U.S.C. § 552(b)(3) which provides that the FOIA does not apply to matters that are specifically exempted from disclosure by statute. The applicable statutory provisions with regard to the information at issue are: 18 U.S.C. § 798, which prohibits the release of classified information concerning communications intelligence activities to unauthorized persons; 50 U.S.C. § 403-3(c)(5), which protects information pertaining to intelligence sources and methods; and Section 6 of the National Security Agency Act of 1959 (Public Law 86-36, 50 U.S.C. § 402 note), which provides that no law shall be construed to require the disclosure of the organization, personnel, functions or activities of NSA.

Because I am withholding the document referred to us by DIA, as well as the three documents identified by the IOB, you may consider this to be a denial of your appeal. You are hereby advised of your rights under 5 U.S.C. § 552 to seek judicial review of this determination. You may seek an order from the United States District Court in the district in which you reside, in which you have your principal place of business, in which the agency records are situated (U.S. District Court of Maryland), or in the District of Columbia for the production of any Agency information which you consider to have been improperly withheld by this Agency. 5 U.S.C. § 552(a)(4)(B) sets out your rights in this matter with respect to such judicial action.

Your request for copies of the FOIA/PA files that were created as a result of your requests and appeals has been forwarded to the Office of Policy to be processed in turn as a new request under the FOIA. The case number assigned to the request is J9767-96. Please be advised that NSA does not hold the search slips or documents used by other government agencies to search for records responsive to your requests. You will need to request that information directly from the appropriate agencies.

Sincerely,

WILLIAM P. CROWELL
Freedom of Information Act/Privacy Act
Appeals Authority