# EXHIBIT D

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

MEREDITH LARSON, ET AL.,          )
                                  )
                                  )
          Plaintiffs,             )          CIVIL ACTION
     v.                           )          NO. 02-1937 (PLF)
                                  )
UNITED STATES DEPARTMENT OF       )
STATE, ET AL.,                    )
                                  )
                                  )
                                  )
          Defendants.             )
                                  )

### DECLARATION OF WILLIAM H. MCNAIR
### INFORMATION REVIEW OFFICER, DIRECTORATE OF OPERATIONS
### UNITED STATES CENTRAL INTELLIGENCE AGENCY

INTRODUCTION

I, WILLIAM H. MCNAIR, do hereby declare and say:

1.  I am the Information Review Officer ("IRO") for
the Directorate of Operations ("DO") of the Central
Intelligence Agency ("CIA" or "Agency").  I have held
operational and executive positions in United States
intelligence agencies since 1962, and with the CIA in the
DO since 1982.  I served as Associate IRO for the DO from
July 1993 until I was appointed to my present position in
February 1994.  As DO/IRO, I am responsible for the review
of documents containing information originated by the DO,
or otherwise implicating DO interests which may be

responsive to Freedom of Information Act ("FOIA") or

Privacy Act ("PA") requests. As part of my official

duties, I ensure that determinations as to the admission or

denial of the existence or nonexistence of records in CIA

files, or as to the release or withholding of information

in CIA documents are proper.

2.   The Executive Director of the CIA has appointed me

Records Validation Officer ("RVO") for purposes of this and

certain other litigations. As RVO, I am authorized to

access all Agency records on any subject relevant to this

litigation, and authorized to sign declarations on behalf

of the Agency regarding Agency searches for records, and

the contents of any located records, including those

located in, or containing information under the cognizance

of CIA directorates other than the DO.

3.   As a senior CIA official and under a written

delegation of authority pursuant to Executive Order 12958,

§ 1.4(c), I hold original classification authority at the

TOP SECRET level. Executive Order No. 12958, 3 C.F.R. 333

(1995) (hereinafter E.O. 12958). Therefore, I am

authorized to conduct classification reviews and to make

original classification and declassification decisions.

4.   I make the following statements based upon my

personal knowledge, information made available to me in my

2

official capacity, the advice and counsel of the CIA Office
of General Counsel, and conclusions I reached and
determinations I made in accordance therewith.

5.   The purpose of this Declaration is to justify, to
the greatest extent possible on the public record, the CIA
responses to plaintiffs' requests for information under the
Freedom of Information Act, 5 U.S.C. § 552, and the Privacy
Act, 5 U.S.C. § 552a.   All of the documents containing
responsive information have been carefully reviewed to
determine what information, if any, could be released to
plaintiffs.   All reasonably segregable, non-exempt
information has been released.

6.   Where documents have been denied in full, I have
determined that no reasonably segregable, non-exempt
portion of those documents exists.   The determination of
segregability was made based upon a careful review of the
documents in this case, both individually and as a whole.
I wish to be clear, however, that a line-by-line review was
conducted for all the documents at issue to identify and
release reasonably segregable, non-exempt portions of
documents.

7.   I have determined that, with respect to plaintiff
Portillo-Bartow's 23 August 2002 request and plaintiff
Joslin's 7 August 1997 request, the responsive CIA

3

documents contain in whole or part information exempt from

release under the following provisions:

(a)  the information withheld is currently and
properly classified pursuant to Executive Order 12958,
as its disclosure could reasonably be expected to
damage the national security, and is therefore exempt
from disclosure pursuant to FOIA Exemption (b)(1);
and/or

(b)  the information withheld, if released, could
reasonably be expected to lead to the unauthorized
disclosure of intelligence sources and methods which
the Director of Central Intelligence is responsible
for protecting from unauthorized disclosure, in
accordance with 50 U.S.C. § 403-3(c)(7).  Such
information is therefore exempt from disclosure
pursuant to FOIA Exemption (b)(3); and/or

(c)  the information concerns the organization,
functions, or official titles of personnel employed by
the CIA, all of which are protected from disclosure
under Section 6 of the Central Intelligence Agency Act
of 1949, 50 U.S.C. § 403g, and therefore exempt from
disclosure pursuant to FOIA Exemption (b)(3).

8.  The National Security Agency, in response to

plaintiff Ahern's FOIA request, referred one document to

CIA for its review and determination with respect to

CIA information contained therein.  The document was

directly released to plaintiff with only the name of a CIA

employee and certain filing information that was deleted

under FOIA exemption (b)(3).  Also, the CIA received two

documents referred by the Defense Intelligence Agency that

were found to be responsive to plaintiff Larson's FOIA

request and released in part with non-substantive

4

information deleted according to FOIA exemption(b)(3).

9. Finally, some of the responsive documents located in the CIA's files originated with other federal agencies. In accordance with standard procedures, CIA referred these documents to the other agencies for their direct response to the plaintiffs.[1]

10. Due to the interrelationship of the plaintiffs' requests, and the fact that the FOIA exemptions claimed by CIA apply to more than one request, I have, for the Court's convenience, divided this declaration into three parts: one explaining the procedures used by the CIA to search for responsive documents, a second setting forth the facts of the plaintiffs' four FOIA requests, and a third enumerating and explaining the FOIA exemptions claimed by CIA.

## PART I

PROCEDURES USED BY CIA TO SEARCH FOR RESPONSIVE DOCUMENTS

11. The CIA's Information and Privacy Coordinator ("Coordinator") is responsible for managing the FOIA, PA and Executive Order 12958 Mandatory Declassification Review ("MDR") programs in the CIA. This function includes, among other things, directing the search of CIA records systems pursuant to public requests for records under these

---

[1] E.O. 12958 § 3.7(b) mandates this coordination, commonly referred to as the "third-agency rule."

programs, and directing and coordinating the review of any responsive records retrieved as a result of such a search. This review process includes undertaking any intra-agency and inter-agency coordinations and referrals necessary in light of the information in the responsive records.[2]  As part of the Coordinator's official duties, she ensures that administrative processing, including the search, retrieval, analysis, review, redaction, and release phases are effected consistent with the Agency's legal duties and as efficiently as possible with the personnel and resources available.

12.  With respect to FOIA and PA requests, experienced personnel in the Coordinator's office determine which components of the CIA might reasonably be expected to possess records that may be responsive to each request. The Coordinator's office then forwards copies of the requester's letter to each such component with instructions that a search be made for any responsive documents.

---

[2]  A "coordination" occurs when a CIA document contains information from another agency and the CIA contacts the other agency to obtain guidance on whether to release or withhold that agency's information.  A "referral" occurs when the CIA possesses one or more documents that are responsive to a FOIA request but that originated with another agency.  In such a case, the CIA refers the document(s) to the originating agency for it to process and respond to the requester.

Components then conduct searches among all of their
respective indices that might reasonably be expected to
have any information relating to the subject(s) of the
request.  Component personnel responsible for carrying out
these searches are professionals who conduct all CIA
searches, whether they are for another component of the
Agency, the Director of Central Intelligence, or in
response to a FOIA or PA request.

13.  In the instant cases the searches were conducted
by CIA employees who have access to all pertinent
intelligence, operational and administrative records, are
qualified to search those records, and who do, in fact,
regularly search those records for names or other
information in the course of their professional duties.
Those duties include the search of CIA records in response
to FOIA and PA requests.

14.  In the instant cases, the search focused on the
two CIA directorates determined to be the most likely to
have records responsive to the Plaintiffs' requests--the
Directorate of Operations (DO) and the Directorate of
Intelligence (DI).  In addition, in one case another
directorate, the Directorate of Administration (DA), on its
own initiative, searched for responsive documents.  The DA,
effective June 2001, was renamed the "Mission Support

Office" (MSO) and will be referred to as such in the remainder of this declaration. Also, the Director of Central Intelligence Area (DCI Area) of the CIA conducted some searches in one case.

15. The DO is the CIA component responsible for the clandestine collection of foreign intelligence information from human sources. The DO system of records contains information on persons who are of foreign intelligence or counterintelligence interest to the CIA and other U.S. Government agencies. Appropriately trained DO personnel regularly conduct FOIA and PA searches of the DO system of records as part of their normal responsibilities.

16. The DI is the CIA component that analyzes, interprets, and forecasts foreign intelligence issues and world events of importance to the United States. It is responsible for the production of finished intelligence reports for dissemination to policymakers in the United States government. Appropriately trained DI personnel regularly conduct FOIA and PA searches of the DI system of records as part of their normal responsibilities.

17. The MSO is the principal administrative and support arm of the CIA. It maintains records on all current and former employees of the CIA, whether employed in a contract or a staff capacity, as well as other

8

individuals for whom security processing or evaluation was required, including investigations of any individual having a past, present, or potential relationship with CIA.    The MSO system of records contains information concerning independent contractors and covert assets.    MSO records also include those from the Office of Security (OS).    OS maintains a centralized computer database that contains a record of all security-related documents.    The personnel security database, which can be searched by name and by social security number, includes documents that date back to the inception of the Agency.    Appropriately trained MSO personnel regularly conduct FOIA and PA searches of the MSO system of records as part of their normal responsibilities.

18.    The DCI Area encompasses not only the Director of Central Intelligence (Director) and the Deputy Director of Central Intelligence, but also several components not organized under one of the Agency's four main directorates (MSO, Intelligence, Operations, and Science & Technology), such as the Office of Inspector General and the Office of General Counsel (OGC).    Appropriately trained DCI Area personnel regularly conduct FOIA and PA searches of the DCI Area systems of records as part of their normal responsibilities.

PART II

## A. STATEMENT OF FACTS: PLAINTIFF JOSLIN'S REQUEST DATED 7 AUGUST 1997

19.  Plaintiff Joslin submitted a FOIA/PA request to the CIA by letter dated 7 August 1997 seeking information on the murder of James Alfred Miller.  By letter dated 8 September 1997 CIA acknowledged receipt of the request and indicated it would review it.  The request was assigned reference number F-1997-1955.

20.  Plaintiff Joslin appealed CIA's "inaction" on his FOIA request by letter dated 23 August 1998.  By letter of 5 October 1998 CIA accepted plaintiff Joslin's appeal.

21.  In late 1998 and early 1999 the DO, the DI and the MSO completed a thorough and good faith search for documents responsive to plaintiff Joslin's request based upon information he had provided and following standard procedures and guidelines as explained in detail in Part I above.  They used search terms such as the following: "James Alfred Miller"; "Brother Santiago"; "murder" or "killing" or "attack" combined with "Guatemala"; "Huehuetenango" combined with "Guatemala"; "Brother *  Miller"; "James * Miller"; "Santiago Miller"; "Christian Brothers"; "James A. Miller"; "James Miller"; "Sant*Miller"; and "San*Miller".  Four responsive CIA documents were found.

22. By letter dated 20 April 1999, in response to plaintiff Joslin's appeal, CIA notified Joslin that it had searched those record systems that could reasonably be expected to contain documents responsive to his request and located four responsive records. The four documents were released, with redactions made on the basis of FOIA exemptions (b)(1) and (b)(3). Plaintiff Joslin filed this lawsuit 1 October 2002.

## B. STATEMENT OF FACTS: PLAINTIFF PORTILLO-BARTOW'S REQUEST DATED 22 AUGUST 2002

23. On 23 August 2002 plaintiff Portillo-Bartow submitted a FOIA/PA request to the CIA by letter dated 22 August 2002 seeking information relating to the disappearance of her father, Adrian Portillo Alcantara, and five other people. By letter dated 11 September 2002 CIA acknowledged receipt of the request and indicated it had previously searched for some of the requested information (information about the raid on Adrian Portillo Alcantara's home; and information about the investigation of Adrian Portillo Alcantara's disappearance by officials of any government) without success. It directed plaintiff Portillo-Bartow to the State Department for certain information (information about any communications between US and Guatemalan officials with regard to Adrian Portillo

11

Alcantara, his disappearance, or his granddaughters). It
accepted the request as to other information (the existence
of a "safe-house" located at 2nd Avenida 1-57 of Zone 11,
Guatemala City). The request was assigned reference number
F-2002-1445.

24. In September and October 2002 the DI and the DO
completed a thorough and good faith search for documents
responsive to plaintiff Portillo-Bartow's request based
upon information she had provided and following standard
procedures and guidelines as explained in detail in Part I
above. They used search terms such as the following:
"Adrian Portillo Alcantara"; "Adrian Portillo"; "Adrian
Alcantara"; "Portillo Alcantara"; or "safe-house" or
"safehouse" or "safe house" and "Avenida 1\-57" or "zone
11". Four responsive CIA documents were found.

25. By letter dated 25 October 2002 the CIA notified
Portillo-Bartow that it had located material that is
properly classified and must be denied in its entirety on
the basis of FOIA exemptions (b)(1) and (b)(3).

26. Plaintiff Portillo-Bartow filed this lawsuit 1
October 2002.

27. By letter dated 28 November 2002 plaintiff
Portillo-Bartow appealed CIA's denial.

C.  STATEMENT OF FACTS:  PLAINTIFF HOLDENRIED'S REQUEST

DATED 14 APRIL 1999

28.  Plaintiff Holdenried submitted a FOIA/PA request
to CIA by letter dated 14 April 1999 seeking information
relating to her father, Frank Xavier Holdenried.

29.  By letter dated 6 May 1999, CIA acknowledged
receipt of the request and noted that it had conducted two
previous searches for information on Mr. Holdenried,
including an exhaustive special search on behalf of the
National Security Council (NSC), but had not found any
responsive records.  Nevertheless, CIA stated it would
conduct an updated search for documents in existence since
19 July 1996, the date the NSC officially tasked CIA with
the special search.  The request was assigned reference
number F-1999-0875.

30.  By letter of 26 May 1999 Plaintiff Holdenried
appealed.  CIA accepted the appeal by letter of 8 June 1999
and wrote that it would conduct a search for records on Mr.
Holdenried.

31.  In June, July and October 1999 the DO and the DI
completed a thorough and good faith search for documents
responsive to plaintiff Holdenried's request based upon
information she had provided and following standard
procedures and guidelines as explained in detail in Part I

above. In January and February of 2003 the DCI Area conducted a records search. These CIA components used search terms such as the following: "Frank Holdenried"; "Frank Xavier Holdenried"; "Holdenried"; "U.S. Citizen" and "Livingston" or "Izabal" or "Guatemala" and "kill*" or "murder*" or "assassinat*" or "execut*" and "1983". None of these components found any responsive CIA records.

D. STATEMENT OF FACTS: PLAINTIFF LARSON'S REQUEST DATED

21 JULY 1997

32. Plaintiff Larson submitted a FOIA/PA request to CIA by letter dated 21 July 1997 seeking information relating to her stabbing in Guatemala City, Guatemala in 1989 and attacks on Peace Brigades International.

33. By letter dated 8 September 1997, CIA acknowledged receipt of the request and indicated it would review it. The request was assigned reference number F-1997-1954.

34. By letter of 4 August 1998 plaintiff Larson appealed CIA's "denial and inaction on" the FOIA/PA request. CIA accepted the appeal by letter of 19 August 1998.

35. In September 1998 the DO and the DI completed a thorough and good faith search for documents responsive to plaintiff Larson's request based upon information she had

14

provided and following standard procedures and guidelines

as explained in detail in Part I above. They used search

terms such as the following: "Meredith Larson"; "Peace

Brigades International"; "Guatemala" and "bomb*" or

"attack*" or "grenade" or "explosion" or "exploded" or

"explode" or "exploding" and "Peace Brigade" or "PBI". No

responsive CIA records were found.

36. By letter of 15 January 1999 CIA advised

plaintiff Larson that after a thorough search it had not

identified any CIA documents responsive to her request.

### PART III

#### A. FOIA Exemption (b)(1)

37. FOIA Exemption (b)(1), 5 U.S.C. § 552(b)(1),

provides that the FOIA does not apply to matters that are:

> (A) specifically authorized under criteria
> established by an Executive order to be kept secret in
> the interest of national defense or foreign policy and
> (B) are in fact properly classified pursuant to such
> Executive order.

38. Under the Agency's FOIA and Privacy Act Program,

reviews of information responsive to FOIA requests and

classified under EO 12958, or predecessor Executive orders,

are conducted to determine whether the information is

currently and properly classified.[3] I have determined that

---

[3] Section 1.1(c) of Executive Order No. 12958 defines
classified national security information as "information

the classified information being withheld from plaintiffs
Joslin and Portillo-Bartow continues to meet the standards
for classification under EO 12958.   Section 3.2 of the EO
12958 states: "It is presumed that information that
continues to meet the classification requirements under
this order requires continued protection."   I have
determined that the CIA information being withheld falls
within one of the categories for classified information
listed in Section 1.5 of EO 12958:   intelligence activities
.  .  .  intelligence sources or methods, or cryptology (§
1.5(c)).   The classified information at issue includes
information that could lead to the identification of
individual human sources and details about intelligence
methods and activities.   I have determined that all of the
information withheld on the basis of FOIA Exemption (b)(1)
is within the aforementioned §1.5 category for classified
information.

---

that has been determined pursuant to this order or any
predecessor order to require protection against
unauthorized disclosure and is marked to indicate its
classified status when in documentary form."

## B. FOIA Exemption (b)(3)

39. Since almost all of the information being withheld concerns intelligence sources and/or methods and CIA organizational or functional information, that information is also exempt from disclosure pursuant to FOIA Exemption (b)(3). FOIA Exemption (b)(3) states that the FOIA does not apply to matters that are:

specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

Two (b)(3) withholding statutes exempt the CIA information at issue: Section 103(c)(7) of the National Security Act of 1947, as amended, codified at 50 U.S.C. § 403-3(c)(7), requires the DCI to protect intelligence sources and methods from unauthorized disclosure; and Section 6 of the Central Intelligence Agency Act of 1949, as amended, codified at 50 U.S.C. § 403g, provides that the CIA shall be exempt from the provisions of any law requiring the publication or disclosure of the organization, functions, names, official titles, salaries, or numbers of personnel employed by the CIA. Thus, information falling within the scope of either of these two statutes is exempt from disclosure pursuant to FOIA Exemption (b)(3).

### Intelligence Sources

40. One of the major functions of the CIA is to gather intelligence from around the world that can be used by the President and other government officials in making policy decisions. To do this, the Agency must often depend upon information that can only be garnered from knowledgeable sources under an arrangement of absolute secrecy.

41. Human intelligence sources can be expected to furnish information to the CIA only when they are confident that CIA can and will do everything in its power to prevent the public disclosure of their cooperation and that their cooperation will forever remain secret. In the case of a foreign national abroad who has been cooperating with the CIA, disclosure of that cooperation could cause the target government to take retaliatory action against that person, or, if he is no longer alive, against his surviving family and friends. Even more importantly, it places in realistic jeopardy every individual with whom the foreign national has had contact. Thus, the disclosure of one source in our chain of intelligence sources can ravage an entire spectrum of sources; the damage occasioned by one can be incalculable for many.

42. Disclosure of an individual's cooperation with CIA would also seriously damage this nation's credibility with all other current intelligence sources and undermine CIA's ability to attract potential intelligence sources in the future.

43. This secrecy extends both to the existence of the source's relationship with the CIA and to the kind of information or type of operational assistance the source is supplying. If the U.S. Government were to breach this confidentiality, whether three or thirty years later, present and potential sources throughout the world could reasonably be expected to conclude that the U.S. Government is unable to maintain such confidentiality. Furthermore, they may conclude that cooperation with the United States entails the risk that at some unknown later date the United States will make an official acknowledgment of covert activity in that country, which could jeopardize their career, family, or life. Therefore, to betray such confidentiality would seriously damage this nation's ability to retain present sources and recruit new sources.

44. The Director of Central Intelligence and, derivatively, I take great care in protecting human sources from unauthorized disclosure for another reason beyond the preservation of the intelligence collection capability of

19

the United States.   The lives, safety, and well-being of
persons who provide information critical to this country
deserve protection.   Covert cooperation with U.S.
intelligence is an inherently dangerous venture.
Individuals put a great deal at risk by cooperating with
CIA officers.   In many areas of the world, those
individuals put not only themselves, but also their loved
ones at risk of death, imprisonment, injury, or ostracism.
Such persons deserve our most vigilant protection for
placing themselves in peril for the benefit of the United
States.

45.   For the foregoing reasons, I have determined that
unauthorized disclosure of information which reasonably
would or could be expected to lead to the identification of
an intelligence source is properly classified SECRET
pursuant to the criteria of Executive Order 12958, as its
disclosure could reasonably be expected to cause serious
damage to the national security of the United States, and
is thus exempt from disclosure pursuant to FOIA Exemption
(b)(1).   Coextensively, information which could lead to the
revelation of an intelligence source's identity falls
precisely within the ambit of 50 U.S.C. § 403-3(c)(7), and
is exempt from disclosure pursuant to FOIA Exemption
(b)(3).

## Intelligence Methods

46. Certain of the information requested by plaintiffs has been withheld because its disclosure could reasonably be expected to lead to the unauthorized disclosure of intelligence methods.

47. Generally, intelligence methods are the means by which, and the manner in which, an intelligence agency accomplishes its mission. Most organized professions or businesses employ methods that are common to and, in some cases, unique to that business or profession, to accomplish their goals and objectives. Certain methods used in the conduct of intelligence activities provide them with a special character in records that necessitates protecting the fact of their use, as well as the details of their use, from unauthorized disclosure.

48. Intelligence methods must be protected in situations where a certain capability or technique, or the application thereof, is unknown to those individuals or entities who would take countermeasures. Secret information-collection techniques, capabilities, or technological devices are valuable from an intelligence-gathering perspective only so long as they remain unknown and unsuspected. Once the nature of an intelligence method or the fact of its use in a certain situation is

discovered, its continued successful use is in serious jeopardy.

49. Detailed knowledge of the methods and practices of an intelligence agency must be protected from disclosure because such knowledge would be of material assistance to those who would seek to penetrate, detect, prevent, or damage the intelligence operations of the United States. The result of disclosure of a particular method leads to the neutralization of that method, whether the intelligence methods are those used for the collection of intelligence information, the conduct of clandestine activities, or those techniques utilized in the analysis and evaluation of intelligence information.

50. In exercising the authority and obligation given to him by Congress, the DCI must do more than protect explicit references to an intelligence method. Foreign intelligence services have as one of their primary defensive missions the discovery of the particular

methodologies CIA utilizes.[4]  A primary vehicle for that
effort is scouring the public sector for officially
released intelligence information.  We know that foreign
intelligence services have the capacity and ability to
gather information from myriad sources, analyze it, and
deduce means to defeat a CIA collection effort from
disparate and even seemingly unimportant details.  CIA
officials have consistently testified over the years that
what may seem trivial to the uninformed, may appear to be
of great significance to one who has a broad view of the
scene and may put the questioned item of information in its
proper context.

51.  Accordingly, the DCI in exercising his authority
has the power to withhold a full spectrum of information
concerning particular intelligence methods if it is
determined that such information could reasonably be
expected to assist foreign intelligence services to the
detriment of the United States.  The DCI is the senior

---

[4]  The cost ratio between developing and validating an
intelligence method and negating that method via public
disclosure is hugely disproportionate.  Intelligence
methods can cost many millions of dollars; a single
newspaper story generated by a single disclosure will often
end the utility of the method.  The actual damage and loss
to the United States is not only the cost of the initial
method but also the loss of intelligence during the time it
takes to fund and field a replacement method.

government official who is most familiar with the entire intelligence environment.  Without such protection, the CIA would quickly become impotent.

52.  In summary, it is the fact of the use of a particular intelligence method in a particular situation, in addition to the methodology itself that must be protected.  Since release of this information could lead to the unauthorized disclosure of intelligence methods, such information falls within the ambit of 50 U.S.C. § 403-3(c)(7) and is thus exempt from disclosure pursuant to FOIA Exemption (b)(3).  I have also determined that unauthorized disclosure of information responsive to Plaintiff's FOIA request that pertains to the intelligence methods in question could reasonably be expected to cause serious damage to the national security, through compromise of the methods in question and possible discovery of the intelligence produced by those methods.  Therefore, I have determined that information which reveals the CIA's intelligence methods is properly classified SECRET pursuant to the criteria of Executive Order 12958, as its disclosure could reasonably be expected to cause serious damage to the national security of the United States, and is thus exempt from disclosure pursuant to FOIA Exemption (b)(1).

Classification and Dissemination-Control Markings

53.   Included among the intelligence methods used by
CIA are those concerned with the protection and
dissemination of information.  These methods include
procedures for marking documents to indicate the levels of
classification of different portions of documents and
procedures for restricting dissemination of particularly
sensitive information contained in the documents.  Although
such markings, standing alone, may sometimes be
unclassified, when placed in the context of substantive
reporting or analysis they may reveal or highlight areas of
particular intelligence interest, sensitive collection
sources or methods, or foreign sensitivities.  To avoid
highlighting information that reveals such matters, as a
general rule the Agency withholds all dissemination control
markings and markings indicating the classification levels
of individual paragraphs.  Otherwise, if we only withheld
dissemination control and classification markings in cases
where the accompanying information is of special
intelligence interest, or was collected through
particularly sensitive methods, or implicates foreign
sensitivities, we would be focusing public attention on
those cases.  In any event, as a practical matter, deleting
dissemination control and classification markings rarely

deprives a requester of the information he or she is actually seeking.

## CIA Organization and Functions

54.  Certain Agency-specific information was withheld from disclosure pursuant to FOIA Exemption (b)(3) in conjunction with Section 6 of the Central Intelligence Agency Act of 1949.

55.  Titles or other organizational identifiers of CIA organizational components have been deleted.  Internal CIA filing information has also been withheld since it tends to reveal information pertaining to the structure of the CIA records systems.  This information has been withheld to prevent detailed knowledge of CIA personnel, structure, organization, and procedures from becoming publicly available and possibly used as a tool for hostile penetration or manipulation.  This information is also classified SECRET and, as such, it is exempt under FOIA exemption (b)(1).

56.  The attached Document Index describes the eight CIA documents at issue and explains why those documents have been withheld entirely or in part.

I declare under penalty of perjury of the laws of the
United States of America that the foregoing is true and
correct.

Executed this _20_ day of May 2003.


William H. McNair
Information Review Officer,
Directorate of Operations
Central Intelligence Agency

**<u>McNair Declaration, Ex. 1</u>**

## MEREDITH LARSON, ET AL. V. DEPT. OF STATE, ET AL., DOCUMENT INDEX

This index describes each responsive CIA document and identifies the applicable exemptions for the information withheld.

### JOSLIN, PAUL  F-1997-01955 – FOUR DOCUMENTS

1. Weekly Situation Report Dated 17 February 1982.

This document is a weekly situation report pertaining to international terrorism.  It is "x" pages and contains a number of articles providing information on terrorist actions throughout the world.  Only one of the articles deals with the murder of Brother James Alfred Miller.  The other articles have nothing to do with the murder of Brother Miller and have not been treated for release since they are not responsive to the request.  All of the substantive information about the murder of Brother Miller is disclosed.  The only information withheld from release in the article pertaining to the murder of Brother Miller is the paragraph classification markings, dissemination control markings, and CIA organizational information.  The withheld classification and dissemination control markings are exempt from disclosure pursuant to FOIA exemptions

1

(b)(1) and (b)(3). As explained in the attached

declaration, CIA generally withholds all such information

to avoid highlighting areas of particular intelligence

interest, sensitive collection sources or methods, or

foreign sensitivities. The withheld organizational

markings are exempt from disclosure pursuant to FOIA

exemptions (b)(1) and (b)(3). As explained in the attached

declaration, Section 6 of the CIA Act of 1949 exempts CIA

organizational information from disclosure. This

information is also exempt under FOIA exemption (b)(1)

since it is classified SECRET pursuant to Executive Order

12958 to protect internal organizational data and

information relating to intelligence methods.

    2.   CIA Cable Dated January 1983.

This document is a two-page CIA cable dated January

1983. It discusses the arrests of an American and a

Spaniard by the Government of Guatemala. Virtually all of

the substantive information is released. The only

information withheld from release is certain classification

markings, dissemination control markings, CIA

organizational information, and information that would tend

to identify a source of the information (including the

precise date and time of the cable). The withheld

classification and dissemination control markings are

2

exempt from disclosure pursuant to FOIA exemptions (b)(1)
and (b)(3).  As explained in the attached declaration, CIA
generally withholds all such information to avoid
highlighting areas of particular intelligence interest,
sensitive collection sources or methods, or foreign
sensitivities.  The withheld organizational markings are
exempt from disclosure pursuant to FOIA exemptions (b)(1)
and (b)(3).  As explained in the attached declaration,
Section 6 of the CIA Act of 1949 exempts CIA organizational
information from disclosure.  This information is also
exempt under FOIA exemption (b)(1) since it is classified
SECRET pursuant to Executive Order 12958 to protect
internal organizational data and information relating to
intelligence methods.  The withheld information that would
tend to identify an intelligence source is protected under
FOIA exemptions (b)(1) (it is classified SECRET) and (b)(3)
(it falls within 50 U.S.C. § 403-3(c)(7)).

> 3.   CIA Cable Dated 23 February 1982.

This document is a six-page CIA cable dated 23
February 1982.  It is a weekly situation report on
international terrorism.  It contains a number of articles
providing information on terrorist actions throughout the
world.  Only one of the articles deals with the murder of
Brother James Alfred Miller.  The other articles have

nothing to do with the murder of Brother Miller and have
not been treated for release since they are not responsive
to the request.  All of the substantive information about
the murder of Brother Miller is disclosed.  The only
information withheld from release in the article pertaining
to the murder of Brother Miller is the paragraph
classification markings.  In other portions of the
document, dissemination control markings, certain
classification markings, and CIA organizational information
are deleted.  The withheld classification and dissemination
control markings are exempt from disclosure pursuant to
FOIA exemptions (b)(1) and (b)(3).  As explained in the
attached declaration, CIA generally withholds all such
information to avoid highlighting areas of particular
intelligence interest, sensitive collection sources or
methods, or foreign sensitivities.  The withheld
organizational markings are exempt from disclosure pursuant
to FOIA exemptions (b)(1) and (b)(3).  As explained in the
attached declaration, Section 6 of the CIA Act of 1949
exempts CIA organizational information from disclosure.
This information is also exempt under FOIA exemption (b)(1)
since it is classified SECRET pursuant to Executive Order
12958 to protect internal organizational data and
information relating to intelligence methods.

4

### 4.   CIA Cable Dated 3 March 1982.

This document is a 12-page CIA cable dated 3 March
1982.   It is a weekly situation report on international
terrorism.   It contains a number of articles providing
information on terrorist actions throughout the world.   One
of the articles provides additional information on the
murder of James Alfred Miller.   Another article provides
information on Guatemala's revocation of an order denying
entry to religious workers.   The other articles have
nothing to do with the murder of Brother Miller and have
not been treated for release since they are not responsive
to the request.   All of the substantive information about
the murder of Brother Miller is disclosed.   The only
information withheld from release in the articles
pertaining to the murder of Brother Miller and the
treatment of religious workers is the paragraph
classification markings.   In other portions of the
document, dissemination control markings, certain
classification markings, and CIA organizational information
are deleted.   The withheld classification and dissemination
control markings are exempt from disclosure pursuant to
FOIA exemptions (b)(1) and (b)(3).   As explained in the
attached declaration, CIA generally withholds all such
information to avoid highlighting areas of particular

5

intelligence interest, sensitive collection sources or methods, or foreign sensitivities. The withheld organizational markings are exempt from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3). As explained in the attached declaration, Section 6 of the CIA Act of 1949 exempts CIA organizational information from disclosure. This information is also exempt under FOIA exemption (b)(1) since it is classified SECRET pursuant to Executive Order 12958 to protect internal organizational data and information relating to intelligence methods.

**PORTILLO-BARTOW  F-2002-01445 – FOUR DOCUMENTS**

There is no mention of Adrian Portillo Alcantara or any other member of the Portillo family in the four responsive CIA documents.

1.    CIA Cable.

This document is a three-page CIA cable that reports information obtained from a particular CIA source. The cable provides a general description of the source and a detailed statement of information provided by the source. Only certain people would have been in a position to know the information contained in the cable. This information, when combined with the time period and information outside the cable, could provide enough clues to allow some individuals to determine who provided the information to

6

the CIA.   In other words, it could disclose the identity of
the CIA source.   Other withheld information includes:
classification markings; dissemination control markings;
and CIA organizational information.   Since no meaningful
information can be segregated for release, the document is
denied in its entirety.   The withheld portions are exempt
from disclosure pursuant to FOIA exemptions (b)(1) and
(b)(3).   The exempt information withheld under (b)(1) is
properly classified as SECRET pursuant to Executive Order
12958.   Disclosure of this information would reveal
information pertaining to intelligence sources and methods.
The exempt information withheld under (b)(3) would reveal
internal organization data and information relating to
intelligence sources and methods.

    2.    CIA Cable.

This document is a four-page CIA cable that reports
information obtained from a particular CIA source.   The
cable provides a general description of the source and a
detailed statement of information provided by the source.
Only certain people would have been in a position to know
the information contained in the cable.   This information,
when combined with the time period and information outside
the cable, could provide enough clues to allow some
individuals to determine who provided the information to

the CIA. In other words, it could disclose the identity of the CIA source. Other withheld information includes: classification markings; dissemination control markings; and CIA organizational information. Since no meaningful information can be segregated for release, the document is denied in its entirety. The withheld portions are exempt from disclosure pursuant to FOIA exemptions (b)(1) and (b)(3). The exempt information withheld under (b)(1) is properly classified as SECRET pursuant to Executive Order 12958. Disclosure of this information would reveal information pertaining to intelligence sources and methods. The exempt information withheld under (b)(3) would reveal internal organization data and information relating to intelligence sources and methods.

3. CIA Cable.

This document is a two-page CIA cable that reports information obtained from a particular CIA source. The cable provides a general description of the source and a detailed statement of information provided by the source. Only certain people would have been in a position to know the information contained in the cable. This information, when combined with the time period and information outside the cable, could provide enough clues to allow some individuals to determine who provided the information to

8

the CIA. In other words, it could disclose the identity of
the CIA source. Other withheld information includes:
classification markings; dissemination control markings;
and CIA organizational information. Since no meaningful
information can be segregated for release, the document is
denied in its entirety. The withheld portions are exempt
from disclosure pursuant to FOIA exemptions (b)(1) and
(b)(3). The exempt information withheld under (b)(1) is
properly classified as SECRET pursuant to Executive Order
12958. Disclosure of this information would reveal
information pertaining to intelligence sources and methods.
The exempt information withheld under (b)(3) would reveal
internal organization data and information relating to
intelligence sources and methods.

4. CIA Cable.

This document is a three-page CIA cable that reports
information obtained from a particular CIA source. The
cable provides a general description of the source and a
detailed statement of information provided by the source.
Only certain people would have been in a position to know
the information contained in the cable. This information,
when combined with the time period and information outside
the cable, could provide enough clues to allow some
individuals to determine who provided the information to

9

the CIA.   In other words, it could disclose the identity of

the CIA source.   Other withheld information includes:

classification markings; dissemination control markings;

and CIA organizational information.   Since no meaningful

information can be segregated for release, the document is

denied in its entirety.   The withheld portions are exempt

from disclosure pursuant to FOIA exemptions (b)(1) and

(b)(3).   The exempt information withheld under (b)(1) is

properly classified as SECRET pursuant to Executive Order

12958.   Disclosure of this information would reveal

information pertaining to intelligence sources and methods.

The exempt information withheld under (b)(3) would reveal

internal organization data and information relating to

intelligence sources and methods.

## DOCUMENTS REFERRED TO CIA

### AHERN-KERNDT, PATRICIA

Article by Ricardo Miranda Dated 13 December 1993.

This document is a referral document from the National Security Agency that is an article concerning a demonstration near the military base Tercer Pueblo which discusses how the participants in the demonstration were demanding an end to the nation's militarization and respect of returning refugees' rights. The document is not relevant to the death of Ann Kerndt, Patricia Ahern-Kerndt's sister and is non-responsive to the request. The only information withheld from release in the article is the name of a CIA employee and certain filing information which is exempt from disclosure pursuant to FOIA exemption (b)(3).

### LARSON, MEREDITH

1.  Foreign Broadcast Information Service Cable Dated August 1989.

This document is a referral document from the Defense Intelligence Agency pertaining to acts of violence in Guatemala City. The International Peace Brigades and the Mutual Support Group were the targets of the attacks. Five

11

people were killed and some injured. The document is non-responsive to plaintiff's FOIA request. The only information withheld from release in the document is the name of the drafter (a CIA employee) of the document that is exempt from disclosure pursuant to FOIA exemption (b)(3).

    2.   Foreign Broadcast Information Service Cable Dated December 1989.

    This document is a referral document from the Defense Intelligence Agency pertaining to the stabbing incident involving three members (two Canadian women and one American man) of the International Peace Brigades. This document is relevant to plaintiff's FOIA request and was released in part. The only information withheld from release is the name of the drafter (a CIA employee) of the document that is exempt from disclosure pursuant to FOIA exemption (b)(3).