# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MEREDITH LARSON, ADRIANA
PORTILLO-BARTOW, PAUL JOSLIN,
THOMAS HENEHAN, LISEL HOLDENRIED,
PATRICIA KERNDT, and KIMI OKADA,

        Plaintiffs,

v.                                        1:02cv01937 (PLF)

DEPARTMENT OF STATE, CENTRAL
INTELLIGENCE AGENCY, NATIONAL
SECURITY AGENCY, DEFENSE
INTELLIGENCE AGENCY, and NATIONAL
TRANSPORTATION SAFETY BOARD,

        Defendants.

_____

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Seven plaintiffs filed this Freedom of Information Act ("FOIA") lawsuit in an effort to obtain documents from the defendant agencies regarding various violent acts committed in Guatemala in the 1970s and 1980s.  Before the court at this time are two motions for summary judgment filed by the five defendants.  Docs. 17 & 33.  The plaintiffs have responded (docs. 26 & 35) in opposition to the motions; the defendants have replied (docs. 31 & 37); and the parties have been advised (doc. 39) that the motions would be taken under advisement as of a date certain.

## I.  ALLEGATIONS

### A.  MEREDITH LARSON

In the complaint, it is alleged that, when she was twenty-three years old, Meredith Larson ("Larson") went to Guatemala to work for an international organization that provided nonviolent peacekeeping services in areas threatened with violence and human rights abuses.  On December 20, 1989, as they were walking toward the organization's home office in Guatemala City, Larson and two of her colleagues were attacked by two knife-wielding men.  Larson sustained knife wounds to her chest and left arm.  Previously, the organization had not only been threatened with, but had also experienced, a bombing of its offices.

By letters dated July 21, 1997, Larson submitted FOIA requests to the Department of State ("DOS"), the Defense Intelligence Agency ("DIA"), the Central Intelligence Agency ("CIA"), and the National Security Agency ("NSA"), seeking disclosure of all information related to the violent assault against her in 1989 and to the threats against, and bombing of, the human rights organization for which she worked.

### B.  PAUL JOSLIN

In 1982, Paul Joslin (Joslin"), a member of the Christian Brothers religious order, worked as a teacher in Guatemala.  James Miller ("Miller"), also a member of the Christian Brothers order, was a "sub-director" and teacher at a Christian Brothers school.  On February 10, 1982, a border patrol guard (who was the father of a Guatemalan member of the order) advised the Christian Brothers community that he had overheard two members of the G-2 squad, the security branch of the Guatemalan

military, plotting to get rid of the "sub-director" at a Christian Brothers school.  On

February 13, 1982, Miller was shot and killed outside a house where he and other

students and teachers lived.  Joslin thereafter made repeated attempts without success

to obtain information regarding the perpetrators of this crime through the American

Embassy in Guatemala.

In 1996 and 1997, Joslin submitted  FOIA/Privacy Act ("PA") requests to DOS,

DIA, and CIA, seeking copies of all records pertaining to the death of Brother Miller in

Guatemala in 1982 and related topics.

## C.  THOMAS HENEHAN

Thomas Henehan ("Henehan"), a Maryknoll[1] priest, is a member of the Catholic

Foreign Mission Society of America.  In 1976, Father William Woods ("Woods"), also a

Maryknoll priest, was living and working as a missionary in Guatemala.  On November

20, 1976, Woods, an experienced pilot, was killed when the plane he was piloting

crashed over Guatemala, killing Woods and his four passengers.  Just before the crash,

Woods had been warned by officials at the United States Embassy in Guatemala that

his life was in danger.

After the crash, the Guatemalan government initially claimed that the plane went

down due to bad weather.  When weather reports belied the government's claim, the

government rescinded its initial report, then announced that the plane had exploded and

burned.  A number of witnesses who were in the area at the time of the crash reported

---

[1]  Maryknoll is a United States-based Catholic Mission movement.

not only that Guatemalan military snipers had been seen shooting at the plane but also
that the bodies of the victims and the wreckage of the plane showed no evidence of
burning.  A subsequent investigation undertaken at the behest of Maryknoll and the
victims' families revealed that the Cessna 185 plane was in sound mechanical condition
and the weather was excellent.

On September 4, 1997, Henehan submitted FOIA requests to DOS and NSA,
seeking copies of all records pertaining to the death of Woods.

### D.  KIMI OKADA

In 1976, Dr. Michael Okada went to Guatemala to offer his medical skills to rural
people in need.  He was a passenger in the plane flown by Woods that crashed on
November 20, 1976.  His sister, Kimi Okada ("Okada"), submitted a FOIA request to
DOS on January 21, 2002, seeking copies of all records pertaining to the death of her
brother.

### E.  PATRICIA KERNDT

In 1976, Ann Kerndt, an agronomist, went to Guatemala to work as a volunteer
with Direct Relief Foundation, a California-based organization that supports sustainable
agriculture projects.  Like Dr. Michael Okada, she was a passenger in the plane flown
by Woods that crashed on November 20, 1976.  In 1998 and 2002, her sister, Patricia
Kerndt ("Kerndt"), submitted FOIA requests to NSA, DIA, and the National
Transportation Safety Board ("NTSB"), asking for copies of all records pertaining to the
death of her sister.

### F.  ADRIANA PORTILLO-BARTOW

On September 11, 1981, eight heavily armed men dressed in civilian clothing forcibly abducted Adrian Portillo Alcantara ("Adrian") from his office.  That same day, several men, some in civilian clothing and others in military uniform, forced their way into Adrian's residence, where Adrian's wife, his eighteen-month-old daughter, one of his daughters-in-law, and his two grandchildren were staying.  The grandchildren, Rosaura Margarita Carrillo Portillo and Glenda Corina Carrillo Portillo, are the daughters of the plaintiff, Adriana Portillo-Bartow ("Portillo-Bartow").  Portillo-Bartow has not seen or heard from her father or the other family members in the house, including her daughters, since that fateful day in September, 1981.

In 2002, Portillo-Bartow submitted FOIA requests to DOS, DIA, CIA, and NSA, asking for documents related to the disappearances of her father and two daughters.

## G.  LISEL HOLDENRIED

Frank Holdenried ("Frank") moved to Guatemala in 1976 to offer help to the Guatemalan people who were living in poverty and devastation.  During the night of April 2, 1983, Frank was attacked and killed.  None of his effects, including his wallet, were taken.  Witnesses reported that eight men in military uniforms were responsible for Frank's death.  The United States State Department nonetheless concluded that Frank's death was the result of common crime.

In 2002, Frank's daughter, Lisel Holdenried ("Holdenried"), submitted FOIA requests to DOS, DIA, and CIA, seeking copies of all records pertaining to the death of her father.

## II. FOIA

FOIA requires every federal agency, upon a reasonably articulated request, to make its records "promptly available to any person."  5 U.S.C. § 552(a)(3).  Congress's intent in enacting FOIA was to implement "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language."  Dep't of Defense v. FLRA, 510 U.S. 487, 494, 114 S. Ct. 1006, 127 L. Ed. 2d 325 (1994) (quoting Dep't of the Air Force v. Rose, 425 U.S. 352, 360-61, 96 S. Ct. 1592, 48 L. Ed. 2d 11 (1976)).  To that end, FOIA requires the fullest possible disclosure of an agency's records.  At the same time, FOIA provides a number of narrowly-tailored exemptions--there are nine--under which an agency may deny disclosure of requested records.  5 U.S.C. § 552(b).  At issue in this case are five such exemptions: exemptions for (a) records "to be kept secret in the interest of national defense or foreign policy" ("Exemption 1"); (b) records "related solely to the internal personnel rules and practices of an agency" ("Exemption 2"); (c) records "exempted from disclosure by statute" ("Exemption 3"); (d) "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency" ("Exemption 5"); and (e) records that "would constitute a clearly unwarranted invasion of personal privacy" ("Exemption 6").  Consistent with FOIA's "goal of broad disclosure, the exemptions have been consistently given a narrow compass."  United States Department of Justice v. Tax Analysts, 492 U.S. 136, 151, 109 S. Ct. 2841, 106 L. Ed. 2d 112 (1989).

FOIA provides for *de novo* review of an agency's determination by the district court and places the burden on the agency "to sustain its action."  5 U.S.C. §

552(a)(4)(B).  To carry this burden, an agency must show that it made a good faith effort

to conduct a search for the requested records, using methods which can be

"reasonably calculated to uncover all relevant documents."  Weisberg v. United States

Dep't of Justice, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (quoting Weisberg v. United

States Dep't of Justice, 705 F.2d 1344, 1350-51 (D.C. Cir. 1983)).  The crucial

determination in evaluating an agency's response to a document request is "whether

the government's search for responsive documents was adequate," and not whether

"any further documents might conceivably exist."  705 F.2d at 1351.  An agency may

rely upon affidavits to establish the adequacy of its search, so long as those affidavits

are reasonably detailed, nonconclusory, and submitted in good faith.  Id.

FOIA cases are typically and appropriately decided on motions for summary

judgment.  Al-Fayed v. CIA, 254 F.3d 300, 301 (D.C. Cir. 2001) (noting that, in the

typical FOIA case, "the district court normally has decided an issue, such as the

applicability of a claimed FOIA exemption, on summary judgment").  The district court

may award summary judgment solely on the basis of information provided by an agency

in affidavits or declarations when the affidavits or declarations "describe the documents

and the justifications for nondisclosure with reasonably specific detail, demonstrate that

the information withheld logically falls within the claimed exemption, and are not

controverted by either contrary evidence in the record nor by evidence of agency bad

faith."  Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); see also

Vaughn v. Rosen, 484 F.2d 820, 826-28 (D.C. Cir. 1973), cert. denied, 415 U.S. 977, 94

S. Ct. 1564, 39 L. Ed. 2d 873 (1974).  An agency's affidavits or declarations are

accorded a presumption of good faith, although a plaintiff can rebut this presumption

with evidence of bad faith.  Safecard Servs., Inc. v. SEC, 926 F.2d 1197, 1200 (D.C.

Cir. 1991).

### III.  ANALYSIS

#### A.  NTSB

By letter dated May 30, 2002, Kerndt, through counsel, submitted a FOIA request

to NTSB.  Kerndt sought (1) records of any investigation--conducted either by NTSB or

any Gautemalan government agency--into the reported 1976 crash of a Cessna, Model

185 airplane piloted by Father William Woods in which both Kerndt's sister, Ann, and

Dr. Michael Okada were killed; (2) records of any communication between NTSB and

the Guatemalan government concerning such crash; and (3) records containing the

name of Dr. Mike Okada.  By letter dated November 26, 2002, Kerndt was informed that

NTSB found no records responsive to her request.

Kerndt contends that NTSB failed to make an adequate search in response to

her FOIA request.  NTSB, which says its search was thorough, seeks summary

judgment as to Kerndt's claim against NTSB (Count 20 of the Complaint) based on the

declaration of Melba D. Moye ("Moye"), Chief of the Public Inquiries/FOIA Branch of

NTSB's Office of Research and Engineering, who supervises all facets NTSB's FOIA

program.

According to Moye, NTSB has responsibility for investigating every civil aviation

accident in the United States, although occasionally--pursuant to a request from a

foreign government--it may render assistance to a foreign country in the investigation of

an aviation accident in that country.  Given its focused mission, NTSB maintains four

sets of records: namely, (1) public dockets, which contain NTSB's factual reports and

related materials pertaining to particular accidents; (2) accident briefs, which contain

summary information concerning accidents investigated by NTSB; (3) accident

investigation files, which contain paper copies of documents collected during NTSB

investigations; and (4) safety recommendation files, which contain NTSB's

recommendations intended to address perceived safety issues.  Public dockets are

listed in an electronic index that may be searched by accident date, accident location,

and accident number.  Accident briefs are maintained in a computerized database that

may be searched by accident date, accident location, aircraft category, aircraft make,

aircraft model, aircraft registration, type of operation, and accident number.  Accident

investigation files (which frequently are the only files maintained in the case of foreign

investigations, the foreign country--not NTSB--having the responsibility for determining

cause and completing a report) are indexed by country in which the accident occurred

and, within the investigative files from a particular country, are maintained in

chronological order.  Safety recommendations are contained in a database that may be

searched by accident date, accident location, and type of aircraft.

NTSB offices that conducted the search of records responsive to Kerndt's FOIA

request included the Public Inquiries Branch of the Office of Research and Engineering,

the Office of Aviation Safety, and the Office of Safety Recommendations and

Accomplishments.  Together, these offices maintain and control the four sets of records

maintained by NTSB.  The Public Inquiries Branch searched records involving public

dockets and accident briefs, its search extending to all electronically indexed files available for search without regard to accident date. The Office of Aviation Safety searched the paper copies kept in NTSB's accident investigation files, including all of the investigation files on aviation accidents in Central America without regard to accident date. The Office of Safety Recommendations and Accomplishments searched all of the electronically indexed files in the database of safety recommendations, again without regard to the date of the accident. None of the three offices found any records responsive to Kerndt's FOIA request.

In response to NTSB's motion for summary judgment, Kerndt has submitted the declaration of her brother, Peter Kerndt, who states that an NTSB inquiry into the crash was undertaken--albeit belatedly--after United States Senator Tom Harkin and Representative Michael Blouin intervened on behalf of the crash victims. Peter Kerndt states that, after NTSB twice sent an investigator to Guatemala, his family received from Congressional sources some information that was contained in NTSB's report at the conclusion of its investigation. Given Peter Kerndt's declaration, Kerndt suggests that "it strains credulity to accept that an adequate search was undertaken, or that no records could be found in relation to the request." Doc. 26 at p. 47 n.11. Kerndt also points out that, while Moye describes in her declaration how searches of NTSB's databases may be conducted in general, she does not state what specific search terms were used in response to Kerndt's particular request. Given Moye's lack of specifics, Kerndt suggests that entry of summary judgment in NTSB's favor would not be appropriate.

In <u>Valencia-Lucena v. United States Coast Guard</u>, 180 F.3d 321 (D.C. Cir. 1999), the court explained that, in response to a challenge to the adequacy of its FOIA search, the agency has the burden to provide "a reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials...were searched." <u>Id.</u> at 326 (quoting <u>Oglesby v. United States Dep't of the Army</u>, 920 F.2d 57, 68 (D.C. Cir. 1990)).  Here, although NTSB has provided reasonably detailed information about its databases, it has not described what search terms were used in response to Kerndt's FOIA request in particular.  Without evidence of what search terms were used in NTSB's search of its records, the court-- like Kerndt--is left to wonder whether the search terms entered were specific and/or complete enough to yield concrete results.  Because NTSB has not supported its motion for summary judgment with "a reasonably detailed affidavit, setting forth the search terms" used in its search, <u>id.</u>, NTSB's motion for summary judgment must be denied.

B.  CIA

CIA contends that it is entitled to summary judgment on Count 12 (Larson), Count 13 (Holdenried), Count 14 (Portillo-Bartow), and Count 15 (Joslin).   CIA asserts that all responsive, reasonably segregable, non-exempt records have been released to the requesters.  Responsive records or portions of records that have not been released are allegedly exempt from disclosure under section 552(b).

In support of its motion for summary judgment, CIA has filed the declaration of William H. McNair ("McNair"), the Information Review Officer for CIA's Directorate of Operations ("DO"), the official responsible for reviewing documents containing

information originated by the DO, or otherwise implicating DO interests, that may be responsive to FOIA requests.  For purposes of this litigation, McNair has also been appointed Records Validation Officer, in which capacity he is authorized to access all CIA records on any subject relevant to this litigation.  McNair holds original classification authority at the TOP SECRET level and is fully authorized to make original classification and declassification decisions.

According to McNair, CIA's search in this case focused on the two CIA directorates determined to be the most likely to have records responsive to the requests of Holdenried, Larson, Portillo-Bartow, and Joslin, namely, the DO and the Directorate of Intelligence ("DI").  In addition, on its own initiative, the Directorate of Administration, since renamed the Mission Support Office ("MSO"), searched for records responsive to Joslin's request.  The Director of Central Intelligence Area ("DCI Area") also conducted a search for records responsive to Holdenried's request.

The DO is the CIA component responsible for the clandestine collection of foreign intelligence information from human sources.  The DO system of records contains information on persons who are of foreign intelligence or counterintelligence interest to CIA and other United States Government agencies.

The DI is the CIA component that analyzes, interprets, and forecasts foreign intelligence issues and world events of importance to the United States.  It is responsible for dissemination of finished intelligence reports for dissemination to United States policymakers.

The MSO is CIA's principal administrative support arm.  It maintains records on

(1) all current and former CIA employees, whether employed in a contract or a staff capacity, (2) other individuals for whom security processing or evaluation was or is required, and (3) any individuals having a past, present, or potential relationship with CIA, including independent contractors and covert assets.  MSO records also include those from the Office of Security, which office maintains a centralized computer database containing a record of all security-related documents.

The DCI Area encompasses not only the Director of Central Intelligence and the Deputy Director of Central Intelligence but also several components not organized under one the CIA's four main directorates (DI, DO, MSO, and Science & Technology), including the Office of Inspector General and the Office of General Counsel.  The DCI Area maintains a system of records as part of their normal responsibilities.

1.  Holdenried

Holdenried submitted a FOIA/PA request to CIA by letter dated April 14, 1999, asking for information relating to her father, Frank Xavier Holdenried.  CIA had previously conducted two searches for information regarding Mr. Holdenried, including an exhaustive special search on behalf of the National Security Council, but had found no responsive documents.  The DI, DO, and DCI Area nonetheless conducted updated searches of their records in response to Holdenried's 1999 request, using such search terms as: "Frank Holdenried;" "Frank Xavier Holdenried;" "Holdenried;" "U.S. Citizen" and "Livingston" or "Izabal" or "Guatemala" and "kill*" or "murder*" or "assassinat*" or "execut*" and "1983."  McNair Decl. at ¶ 31.  CIA informed Holdenried by letter dated January 15, 1999, that its updated search had produced no responsive documents.

In its motion for summary judgment, CIA states that its search for documents responsive to Holdenried's request was adequate despite the lack of results. Holdenried has not responded to the CIA's adequacy argument.  Given the lack of response from Holdenried and the specificity of McNair's declaration regarding search terms and search procedures, the court will grant CIA's motion for summary judgment as to Count 13 of the complaint.

## 2. Larson

Larson submitted a FOIA/PA request to CIA by letter dated July 21, 1997, seeking information relating to her stabbing and to the grenade attacks on Peace Brigades International, both of which occurred in 1989 in Guatemala City.  The DO and DI searched for documents responsive to Larson's request using such search terms as: "Meredith Larson;" "Peace Brigades International;" "Guatemala" and "bomb*" or "attack*" or "Grenade" or "explosion" or "exploded" or "explode" or "exploding" and "Peace Brigade" or "PBI."  McNair Decl. at ¶ 35.  No responsive CIA-originated documents were found.  CIA did locate three responsive records that originated with DIA, all three of which were referred to DIA for that agency's review and direct response to Larson.  DIA released portions of each of the three referred documents, withholding other portions pursuant to Exemptions 1, 2, and 3.  DIA also referred two CIA-originated documents to CIA for review and response to Larson.  These two documents--Foreign Broadcast Information Service Cables dated August, 1989, and December, 1989, respectively--were released to Larson with only the name of the drafter (a CIA employee) redacted.

CIA contends that it is entitled to summary judgment because the evidence establishes both that CIA made a thorough and good faith search for responsive documents and also that DIA appropriately withheld exempt information from the three documents referred to DIA by CIA.  In response to CIA's motion for summary judgment, Larson has filed a copy of a document entitled, "Report of the Guatemala Review," dated June 28, 1996, prepared by the Intelligence Oversight Board ("IOB").  In 1996, the IOB provided Larson with a copy of its then-declassified report, which indicates that the "Special Operations" section of the D-2 (Guatemalan Army Directorate of Intelligence) was responsible for the bombing of her organization.  The IOB report also reveals that, although IOB found no significant intelligence bearing on the attack upon Larson herself, IOB concluded that the attack *may* have been carried out either by the Guatemalan security services or by unofficial right-wing elements.  In addition, the report reveals that, at the time of the attacks, CIA was maintaining a close relationship with Guatemala's security and intelligence services, the human rights records of which "were widely known to be reprehensible."  Rose Decl., IOB Report at 2.  Given the information in IOB's report, Larson contends that it is "difficult to believe that the CIA would have no responsive records whatsoever regarding" her request.  Doc. 26 at 31. She asks the court to order CIA to conduct a more thorough search but does not specify what additional terms should be used in another search or what other offices should conduct such a search.

In her response, Larson does not specifically address the three documents that were referred by CIA to DIA or the two documents that DIA referred to CIA, all five of

which were released to her in part.  In conclusory fashion, she simply states that McNair's declaration is "inadequate" to show whether there is any additional segregable material in those partially released documents.

Contrary to Larson's conclusory assertions regarding the inadequacy of McNair's declaration, the court finds that CIA's submissions are reasonably detailed, providing adequate information regarding the search terms used, the offices that conducted the searches, and--where applicable--the applicability of any claimed exemptions.  Where, as here, there is no evidence of bad faith, McNair's declaration is accorded a presumption of good faith.  Because the court is persuaded that CIA made a "good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested," Oglesby v. Dep't of the Army, 920 F.2d at 68, and because CIA has explained--without serious opposition from Larson--the applicability of its claimed exemptions, CIA's motion for summary judgment as to Larson (Count 12) will be granted.

3. Joslin

By letter dated August 7, 1997, Joslin sought information from CIA on the murder of James Alfred Miller.  The DO, DI, and MSO conducted searches using the following search terms: "James Alfred Miller;" "Brother Santiago;" "murder" or "killing" or "attack" combined with "Guatemala;" "Huehuetenango" combined with "Guatemala;" "Brother * Miller;" "James * Miller;" "Santiago Miller;" "Christian Brothers;" "James A. Miller;" "James Miller;" "Sant * Miller;" and "San * Miller."  McNair Decl. at ¶ 21.  Four responsive CIA documents were found, all four of which were released, with redactions

made on the basis of FOIA Exemption 1 and Exemption 3.

Exemption 1 allows agencies to withhold records, or portions of records, that are both "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order."  5 U.S.C. § 552(b)(1).  To support its Exemption 1 claims, CIA relies on Executive Order 12,958,[2] which, among other things, authorizes the classification of information that concerns "intelligence sources or methods."  Exec. Order No. 12,958, § 1.5(c), 60 Fed. Reg. 19,825 (Apr. 17, 1995), reprinted in 50 U.S.C. § 435.

Exemption 3 permits agencies to withhold documents if they are "specifically exempted from disclosure by statute," provided the statute "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  To support its Exemption 3 claims, CIA cites Section 103(c)(7) of the National Security Act of 1947, as amended, codified at 50 U.S.C. § 403-3(c)(7), which requires the Director of Central Intelligence Agency ("Director") to "protect intelligence sources and methods from unauthorized disclosure." It is well-settled that section 403-3(c)(7) is a statute that shields qualifying information from disclosure under FOIA because it meets the two criteria of Exemption 3.

---

[2]  Since this suit began and since McNair prepared and signed his declaration, E.O. 12958 has been superseded by Executive Order 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003).  The new EO has not changed the substantive criteria pertinent to this case.

Assassination Archives and Research Ctr. v. CIA, 334 F.3d 55, 58 (D.C. Cir. 2003)

(citing CIA v. Sims, 471 U.S. 159, 178-79, 105 S. Ct. 1881, 85 L.Ed.2d 173 (1985)).

CIA also cites Section 6 of the Central Intelligence Agency Act of 1949, as amended,

codified at 50 U.S.C. § 403(g), which exempts from FOIA's disclosure requirements the

organization, functions, names, official titles, salaries, or numbers of personnel

employed by CIA.  Like section 403-3(c)(7), section 403g is recognized as a statute that

shields qualifying information from disclosure under FOIA.  Sims, 471 U.S. at 193

(Marshall, J., concurring).

        Courts have long recognized that the judiciary owes some measure of deference

to the executive in cases implicating national security.  See, e.g., Dep't of the Navy v.

Egan, 484 U.S. 518, 530, 108 S. Ct. 818, 98 L. Ed. 2d 918 (1988) (noting that "courts

traditionally have been reluctant to intrude upon the authority of the executive in military

and national security affairs").  In Sims, the Supreme Court considered CIA's claims that

the names and institutional affiliations of certain researchers in a government-

sponsored program were exempt from disclosure under FOIA.  The Court accepted the

Director's judgment that disclosure would harm national security by revealing

intelligence sources and methods, explaining that "[t]he decisions of the Director, who

must of course be familiar with 'the whole picture,' as judges are not, are worthy of great

deference given the magnitude of the national security interests and potential risks at

stake."  Sims, 471 U.S. at 179.  The Court added that "it is the responsibility of the

Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex

and subtle factors in determining whether disclosure of information may lead to an

unacceptable risk of compromising the Agency's intelligence-gathering process." Id. at

180.

The District of Columbia Circuit Court has likewise accorded deference to the

executive in the FOIA context.  See Center for National Security Studies v. Department

of Justice, 331 F.3d 918 (D.C. Cir. 2003) (stating that, "in the FOIA context, we have

consistently deferred to executive affidavits predicting harm to the national security, and

have found it unwise to undertake searching judicial review") (citing cases), cert. denied,

540 U.S. 1104, 124 S. Ct. 1041, 157 L. Ed. 2d 888 (2004); Campbell v. United States

Dep't of Justice, 164 F.3d 20 (D.C. Cir. 1998) (acknowledging that, in the context of

national security exemptions, an agency's declarations merit "substantial weight");

see also  S. Rep. No. 1200, 93d Cong., 2d Sess. 12, U.S.C.C.A.N. 1974, p. 6267 (1974)

(Conference Report on the FOIA Amendments) (suggesting that courts should "accord

substantial weight to an agency's affidavit concerning the details of the classified status

of the disputed record" because "the Executive departments responsible for national

defense and foreign policy matters have unique insights into what adverse affects [sic]

might occur as a result of a particular classified record").        Deference, however, does

not mean acquiescence.  To merit summary judgment, an agency must provide the

court with an explanation regarding the applicability of exemptions that is "full and

specific enough to afford the FOIA requester a meaningful opportunity to contest, and

the district court an adequate foundation to review, the soundness of the withholding."

King v. United States Dep't of Justice, 830 F.2d 210, 218 (D.C. Cir. 1987); see also

Halperin v. CIA, 629 F.2d 144, 148 (D.C. Cir. 1980) (explaining that "summary judgment

may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith").

To satisfy its burden to establish the validity of any exemptions claimed, an agency is required to provide a detailed index "itemizing each item withheld, the exemptions claimed for that item, and the reasons why the exemption applies to that item." Lykins v. United States Dep't of Justice, 725 F.2d 1455, 1463 (D.C. Cir. 1984) (citing Vaughn v. Rosen, 484 F.2d 820, 827-28 (D.C. Cir. 1973)).  CIA in this case submitted such an index--called a Vaughn index--describing the four records found to be responsive to Joslin's FOIA request.

The first record, a weekly situation report dated February 17, 1982, contains an article about the murder of Brother James Alfred Miller.  CIA withheld other articles contained within that record because they have nothing to do with Brother Miller's murder and were, thus, nonresponsive.  CIA also withheld paragraph classification markings, dissemination control markings, and CIA organizational information based on Exemptions 1 and 3.  According to McNair, all substantive information about the murder of Brother Miller contained within the February 17, 1982, situation report has been disclosed to Joslin.

The second record is a two-page CIA Cable dated January, 1983.  This document discusses the arrests of an American and a Spaniard by the Guatemalan government.  Again, CIA redacted certain classification markings, dissemination control markings, and CIA organizational information based on Exemptions 1 and 3.  In

addition, information that would tend to identity an intelligence source (including the precise date and time of the cable) was withheld, also under Exemptions 1 and 3.

The third record is a six-page weekly situation report on international terrorism dated February 23, 1982.  One of several articles in this report concerns the murder of Brother Miller.  Paragraph classification markings were withheld, but all substantive information about the murder of Brother Miller contained within the responsive article has been released.  McNair again invokes Exemptions 1 and 3 to justify the withholding of paragraph classification markings.

The fourth record is a twelve-page weekly situation report on international terrorism dated March 3, 1982.  Two of the articles within this report were found responsive to Joslin's request: (1) an article providing information about Brother Miller's murder; and (2) an article providing information about Guatemala's revocation of an order denying entry to religious workers.  All other articles in the report were redacted as being non-responsive.  Only the paragraph classification markings were withheld-- under Exemptions 1 and 3--from release in the articles pertaining to Brother Miller's murder and to Guatemala's treatment of religious workers.

McNair explained the need for withholding classification and dissemination- control markings in his declaration as follows:

> Included among the intelligence methods used by CIA are those concerned with the protection and dissemination of information.  These methods include procedures for marking documents to indicate the levels of classification of different portions of documents and procedures for restricting dissemination of particularly sensitive information contained in the documents.  Although such markings, standing alone,

> may sometimes be unclassified, when placed in the context of substantive reporting or analysis they may reveal or highlight areas fo particular intelligence interest, sensitive collection sources or methods, or foreign sensitivities.  To avoid highlighting information that reveals such matters, as a general rule the Agency withholds all dissemination control markings and markings indicating the classification levels of individual paragraphs.  Otherwise, if we only withheld dissemination control and classification markings in cases where the accompanying information is of special intelligence interest, or was collected through particularly sensitive methods, or implicates foreign sensitivities, we would be focusing public attention on those cases.  In any event, as a practical matter, deleting dissemination control and classification markings rarely deprives a requester of the information he or she is actually seeking.

McNair Decl. at ¶ 53.

Given the weight of authority counseling deference to CIA in matters involving national security, this court must defer to the agency's judgment that the responsive documents contain information--specifically paragraph classification markings, dissemination control markings, organizational information, and information that could identity an intelligence source--the disclosure of which could impair this nation's national security.  CIA has provided a detailed declaration, or <u>Vaughn</u> index, that describes the four responsive records found in its search and the exemptions that apply in each case.  Moreover, McNair has explained in some detail that the disclosure of the withheld information "may reveal or highlight areas of particular intelligence interest, sensitive collection sources or methods, or foreign sensitivities," which is the type of disclosure that falls squarely within Exemptions 1 and 3.  Although Joslin contends that McNair's declaration fails to establish that the redacted information was properly withheld under

Exemptions 1 and 3, leaving him "to wonder whether the information being denied to

him could shed some light on who was responsible for the assassination of his fellow

Brother, James Miller," doc. 26 at 34, the court finds that CIA has satisfied its burden

under FOIA and is entitled to summary judgment as to Joslin (Count 15).[3]

### 4. Portillo-Bartow

Portillo-Bartow submitted a FOIA/PA request to CIA by letter dated August 22,

2002, seeking information relating to the disappearance of her father, Adrian Portillo

Alcantara, and five other people.  The DO and DI conducted searches using search

terms that included the following: "Adrian Portillo Alcantara;" "Adrian Portillo;" "Adrian

Alcantara;" "Portillo Alcantara;" "safe-house" or "safehouse" or "safe house" and

"Avenida 1\-57" or "zone 11."  McNair Decl. at ¶ 24.  Four responsive documents were

found, none of which mentions Adrian Portillo Alcantara or any other member of the

Portillo family, and all which were fully withheld pursuant to Exemptions 1 and 3.

McNair's declaration reveals that all four documents were fully withheld to protect

the identity of CIA intelligence sources.  The four documents are CIA cables of varying

lengths that describe a source and give detailed statements of information obtained

from that particular source at a particular time.  According to McNair, no meaningful

information can be segregated and released from these cables without compromising

---

[3]  Joslin also contends, with little or no discussion, that McNair's declaration
makes it virtually impossible to determine whether CIA's search was adequate.  The
court finds no merit to this contention, McNair having specifically described the
procedures used, the components doing the searches, and the many search terms that
were used.

the identify of the source(s).  McNair justifies the withholding under Exemptions 1 and 3.

Among other things, Portillo-Bartow questions the adequacy of CIA's search, stating that McNair's declaration does not mention "having undertaken searches related to members of Plaintiff Portillo-Bartow's family other than her father, Adrian Portillo Alcantara--particularly in the names of her two missing daughters, Rosaura Margarita Carrillo Portillo and Glenda Corina Carrillo Portillo."  Doc. 26 at 45.  Portillo-Bartow does not state that she included the names of her two daughters in her request to CIA; nor does she provide the court with a copy of the request that was sent to CIA.  On the other hand, the record does contain copies of two FOIA requests that were sent by Portillo-Bartow's attorney to DOS and NSA concerning the same subject--namely, the disappearance of Portillo-Bartow's father, Adrian Portillo Alcantara, and five others.  In the two requests that are in the record, the daughters' names are not provided.  In the absence of any evidence that Portillo-Bartow or her attorney provided the daughters' names to CIA, the court cannot fault CIA for having failed to use those names as search terms.

Portillo-Bartow also challenges CIA's Exemption 1 and 3 withholdings.  While she does not question CIA's right under those exemptions to protect the identity of its intelligence sources, she nonetheless claims that she should have been provided with the dates of the cables, the citizenship of the sources, whether the sources were or are American public servants and, if so, by what organization were they or are they employed, whether the sources are still alive, and whether they are still living in Guatemala.  CIA maintains that the release of such information would serve no credible

purpose other than to help identify CIA's source(s).

As recognized by the court in <u>Gardels v. CIA</u>, 689 F.2d 1100, 1105 (D.C. Cir. 1982), an agency's assertion that disclosure of a record would compromise or jeopardize an intelligence source is "necessarily a region for forecasts in which informed judgment as to potential future harm should be respected."  <u>See also</u> <u>Halperin</u>, 629 F.2d at 149 (noting that "the purpose of national security exemptions to the FOIA is to protect intelligence sources before they are compromised and harmed, not after").

> In appraising such potential harm "(w)e must take into account...that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself." The CIA has the right to assume that foreign intelligence agencies are zealous ferrets.

<u>Gardels</u>, 689 F.2d at 1106 (quoting <u>Halperin v. CIA</u>, 629 F.2d at 150).

Here, the court finds that CIA has submitted reasonably detailed declarations showing the applicability of Exemptions 1 and 3, both of which clearly apply where protection of an intelligence source's identity is needed.  McNair's statements about the potential harmful effect of disclosure in this instance are plausible on their face, are presumed to be made in good faith, should be given substantial weight, and are sufficient to convince this court to accept CIA's expert judgment regarding the need to withhold the four responsive documents in their entirety.  Accordingly, CIA's motion for summary judgment as to the claims of Portillo-Bartow (Count 14) will be granted.

### C.  DIA

#### 1.  <u>Holdenried, Portillo-Barow, Kerndt, and Joslin</u>

In its original motion for summary judgment, doc. 17, DIA argues that it is entitled to summary judgment on Count 8 (Holdenried), Count 9 (Portillo-Bartow), Count 10 (Kerndt), and Count 11 (Joslin).  DIA claims that, despite searches reasonably calculated to uncover records responsive to the FOIA requests of Holdenried, Portillo-Barow, Kerndt, and Joslin, no records were found.

In support of its motion for summary judgment, DIA has filed the declaration of Robert P. Richardson ("Richardson"), Chief of the FOIA Staff, Defense Intelligence Analysis Center.  Richardson explains that DIA is a component of the Department of Defense ("DOD"), whose mission is to collect, analyze, and provide intelligence on the military capabilities of foreign military forces to the Secretary of Defense, the Joint Chiefs of Staff, and the other components of DOD.  DIA also manages the Defense Attache System for DOD.  When DIA receives FOIA or PA requests, Richardson's staff assistant sends out an "internal tasker" to the Research and Reference Library and, "when appropriate," to other (unnamed) Directorates determined by Richardson to be potential repositories of responsive documents.

According to Richardson, DIA's Research and Reference Library, the agency's principal records repository for intelligence records, maintains automated databases, paper files, and indexes of paper files retired to the records storage repository.  The Research and Reference Library performed the search for records responsive to the requests of Holdenried, Portillo-Barow, Kerndt, and Joslin.  According to Richardson, only the Research and Reference Library was given the search assignment because it "would have the most complete data indexed to the subject of the requests, and would

encompass information which would have originated with other Directorates within DIA."

Richardson Decl. at ¶ 6.  Richardson provides no details about the nature and scope of

the searches performed.  Indeed, other than providing generic information about the

Research and Reference Library, he says little about the particular searches that were

conducted on behalf of Holdenried, Portillo-Barow, Kerndt, and Joslin.  In essence,

Richardson says that searches were performed and no responsive documents were

found.

      Holdenried, Portillo-Barow, Kerndt, and Joslin challenge the adequacy of DIA's

search.  To merit summary judgment on the adequacy of a search, an "agency must

demonstrate beyond material doubt that its search was reasonably calculated to

uncover all relevant documents."  Nation Magazine v. U.S. Customs Service, 71 F.3d

885, 890 (D.C. Cir. 1995) (internal quotation omitted).  Summary judgment may be

based on a declaration, but only if the declaration sets forth sufficiently detailed

information "for a court to determine if the search was adequate."  Id.  Agency affidavits

or declarations that "do not denote which files were searched, or by whom, do not

reflect any systematic approach to document location, and do not provide information

specific enough to enable [the requester] to challenge the procedures utilized" are

insufficient to support summary judgment.  Weisberg v. Dep't. of Justice, 627 F.2d 365,

371 (D.C. Cir. 1980); see also Steinberg v. Dep't of Justice, 23 F.3d 548, 551-52 (D.C.

Cir. 1994) (finding affidavit insufficient where it described in general how the agency

processed the plaintiff's FOIA request but failed "to describe in any detail what records

were searched, by whom, and through what process").

Here, Richardson's declaration is cast in terms too general for the court to

determine whether the agency conducted a reasonable search of its files or not.

Accordingly, DIA's motion for summary judgment as to Holdenried, Portillo-Bartow,

Kerndt, and Joslin must be denied.

### 2.  Larson

By letter dated July 21, 1997, Larson submitted a FOIA/PA request to DIA,

asking for copies of all records pertaining to herself and to Peace Brigades

International.  DIA found one DIA-generated record responsive to Larson's FOIA

request.  That record is described in the Vaughn index attached to Richardson's

declaration as an eleven-page message (classified CONFIDENTIAL), sent by the

attache in Guatemala City to DIA in December of 1994, concerning Congressman Bill

Richardson's visit to Guatemala.  Portions of the message were released to Larson by

letter dated January 9, 1998.  Other portions of the record were withheld pursuant to

FOIA Exemptions 2, 3, and 6.

Exemption 2 permits agencies to withhold documents or portions of documents

that are "related solely to the internal personnel rules and practices of an agency."  5

U.S.C. § 552(b)(2).  The threshold test under Exemption 2 is whether the material

relates to a personnel rule or practice that is "used for predominantly internal purposes."

Crooker v. Bureau of Alcohol, Tobacco & Firearms, 670 F.2d 1051, 1073 (D.C. Cir.

1981) (en banc); see also Audubon Soc'y v. United States Forest Serv., 104 F.3d 1201,

1204 (10th Cir. 1997) (explaining that the phrase "internal personnel" modifies both

"rules" and "practices," meaning that Exemption 2 applies only to internal *personnel*

rules and practices) (citing Jordan v. United States Dep't of Justice, 591 F.2d 753, 764

(D.C. Cir. 1978)).  If it is, an agency may withhold the information by establishing either

that (1) disclosure of the information "may risk circumvention of agency regulation," or

(2) the information "relates to trivial administrative matters of no genuine public interest."

Schwaner v. Dep't of Air Force, 898 F.2d 793, 794 (D.C. Cir. 1990) (internal quotations

and citations omitted).  Information that  "relates to trivial administrative matters of no

genuine public interest" is considered "low 2" material.  Information that "may risk

circumvention of agency regulation," or that concerns substantial internal matters, is

considered "high 2" material.  Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992).

Among other things, DIA invokes Exemption 2 to withhold message routing data

and an Intelligence Information Report number assigned to the attache's message.

Such information is akin to trivial "housekeeping matters appropriately withheld under

Exemption 2."  Schiller, 964 F.2d at 1208 (upholding Exemption 2 withholding of internal

time deadlines and procedures, and recordkeeping directions); see also Lesar v. United

States Dep't of Justice, 636 F.2d 472, 485-86 (D.C. Cir. 1980) (holding that an agency

may invoke Exemption 2 to delete sensitive notations that indicate the agency's

practices as to internal routing and distribution); Scherer v. Kelley, 584 F.2d 170, 176-77

(7th Cir. 1978) (upholding Exemption 2 deletion of administrative markings such as file

numbers, initials, signature and mail routing stamps, references to interagency

transfers, and data processing references), cert. denied, 440 U.S. 964, 99 S. Ct. 1511,

59 L. Ed. 2d 778 (1979).  Larson does not appear to challenge DIA's withholding of this

"low 2" information.

DIA also invokes Exemption 2 to withhold "data pertaining to various items Congressman Richardson discussed with Guatemalan government officials."  DIA <u>Vaughn</u> Index, Doc. 1.  At first blush, this information does not appear to be "related solely to the internal personnel rules and practices" of DIA.  DIA explains in its <u>Vaughn</u> index that [i]f this information was [sic] disclosed, it would reveal certain *internal rules and practices* used by the Defense Attache Office in Guatemala."  <u>Id.</u> (emphasis added).  DIA does not assert that this information concerns the agency's *personnel* rules and practices; nor is its <u>Vaughn</u> index sufficiently detailed to allow this court to make such a determination on its own.  Because almost everything that goes on within a government agency could be said to be related to that agency's "internal rules and practices," DIA's conclusory explanation--if accepted as adequate by this court--would sweep into Exemption 2 virtually every record that DIA maintains.  Congress did not intend such a result, <u>see</u> <u>Jordan</u>, 591 F.2d at 764 (examining the legislative history of Exemption 2 and concluding that "Congress had no intention of exempting a general category of information relating to 'practices of an agency'" but instead intended that the exemption be interpreted "specifically and narrowly"); and this the court will not reach such a result.

Relying on 10 U.S.C. § 424, DIA invokes Exemption 3, discussed previously, to withhold the identity of specific DIA personnel.  Section 424 provides as follows:

> (a) Exemption from disclosure.--Except as required by the President or as provided in subsection (c), no provision of law shall be construed to require the disclosure of-
>     (1) the organization or any function of an organization of the Department of Defense named in subsection (b); or

> (2) the number of persons employed by or assigned or detailed to any such organization or the name, official title, occupational series, grade, or salary of any such person.
>
> (b) Covered organizations.--This section applies to the following organizations of the Department of Defense:
>> (1) The Defense Intelligence Agency.

10 U.S.C. § 424.

To qualify as a withholding statute under Exemption 3, a statute must either (1) require that "matters be withheld from the public in such a manner as to leave no discretion on the issue," or (2) establish "particular criteria for withholding or refer[ ] to particular types of matters to be withheld."  5 U.S.C. § 552(b)(3).  Section 424 qualifies as a withholding statute because it refers to particular types of matters to be withheld, specifically the name, official title, occupational series, grade, or salary of DIA personnel.  Because section 424 so clearly aims to protect the identity of DIA personnel, and despite Larson's protestations to the contrary, the court finds that DIA has properly invoked Exemption 3 to withhold "the identity of specific DIA personnel." DIA <u>Vaughn</u> index, Doc. 1.

Exemption 6 permits agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  The threshold question is whether the requested information is contained in a personnel, medical, or similar file.  <u>United States Dep't of State v. Washington Post Co.</u>, 456 U.S. 595, 598, 102 S. Ct. 1957, 72 L. Ed. 2d 358 (1982).  If it is, then the court must determine whether the information is of "such a nature that its disclosure would constitute a clearly unwarranted invasion of personal

privacy." Id.   This second inquiry requires the court "to balance 'the individual's right of

privacy' against FOIA's policy of opening 'agency action to the light of public scrutiny.'"

United States Dep't of State v. Ray, 502 U.S. 164, 175, 112 S. Ct. 541, 116 L. Ed. 2d

526 (1991) (quoting Dep't of Air Force v. Rose, 425 U.S. 352, 372, 96 S. Ct. 1592, 48 L.

Ed. 2d 11 (1976)).

    The Supreme Court has concluded that Congress meant the phrase "similar

files" to have a broad meaning.   Id. at 600.   In essence, the Court has held that

Exemption 6 is intended to exclude from disclosure not only all personnel and medical

files, but also "*all private or personal information contained in other files* which, if

disclosed to the public, would amount to a clearly unwarranted invasion of the privacy of

any person."   Id. at 602 n.3 (emphasis in original) (citation omitted).   Consequently,

"[w]hen disclosure of information which applies to a particular individual is sought from

Government records, courts must determine whether release of the information would

constitute a clearly unwarranted invasion of that person's privacy."   Id. at 602.

    DIA invokes Exemption 6 to withhold "the names and identifying data of third

parties" from a message classified CONFIDENTIAL.   DIA Vaughn Index, Doc. 1.   The

court assumes, for the sake of argument, that the document constitutes a "similar file"

for the purpose of Exemption 6.   The agency, however, does not disclose whether the

"third parties" are intelligence sources, public officials, or private individuals, whether

they are dead or alive, whether they have been the subject of prior disclosures, whether

the information is stale or current, whether the "identifying data" is personal in nature, or

whether disclosure could place the sources in harm's way .   Without more detailed

information, the court cannot determine whether "release of the information would

constitute a clearly unwarranted invasion of [a particular] person's privacy."  Nor can the

court balance the third parties' right of privacy against FOIA's presumption in favor of

disclosure.

Because DIA has not justified its reliance on either Exemption 2 or Exemption 6

with reasonably specific detail, DIA is not entitled to summary judgment as to the

attache's December, 1994, CONFIDENTIAL message to DIA.

CIA referred three DIA-generated documents responsive to Larson's request to

DIA for review on September 22, 1998.  All three documents--two Defense Intelligence

Terrorism Summaries dated August 18, 1989, and November 15, 1989, and one

confidential message from DIA concerning bodyguard operations in Sri Lanka--were

released to Larson in part on November 19, 2002.  DIA's Vaughn Index reveals that DIA

withheld information from these three documents pursuant to Exemptions 1 (disclosure

of classified intelligence sources and methods), 2 (message routing information), and 3

(identity of DIA personnel).  Larson does not specifically address these documents in

her response to DIA's motion for summary judgment.  The court, moreover, finds

sufficient detail in DIA's Vaughn Index to support the agency's reliance on all three

exemptions.

In addition to the one DIA-generated document found by DIA during its FOIA

search for Larson, DIA found 36 documents that originated with other government

agencies.  DIA referred these documents to the originating agencies for review and

direct response.  Specifically, DIA referred 30 documents to DOS, two documents to

CIA, and one document each to NSA, the Department of the Army ("DOA"), the United States Coast Guard ("USCG"), and the Military Airlift Command ("MAC") Intelligence Center.[4]

All responsive information in the document referred to USCG was released to Larson on June 24, 1998.  The document referred to DOA was released in full to Larson by letter sent January 6, 1999.  All responsive information in the document referred to MAC was released to Larson by letter dated September 11, 1996.  At Larson's request, MAC thereafter conducted a line-by-line declassification review of the non-responsive portion of the referred document and, in addition, conducted an additional search to ensure that no documents were missed.  By letter dated September 16, 1999, MAC released to Larson all declassified non-responsive portions of the DIA-referred document.  Larson does not challenge the specific decisions of DOA, USCG, or MAC.

Although DIA located a total of 37 documents responsive to Larson's FOIA request, Larson argues that DIA failed to conduct an adequate search.  She contends that the inadequacy of DIA's search is evidenced by her discovery on the National Security Archives website of a partially-released document, dated August of 1989, which specifically mentions the Peace Brigades.  According to Larson, this document directly links the Guatemalan Army with potential involvement in the bombing of Peace Brigades' offices in Guatemala City and should have been produced by DIA.  That it was not produced, she says, underscores the inadequacy of DIA's search.

---

[4]  The referrals to CIA, DOS, and NSA either have been or will be addressed in the sections of this order dealing specifically with those agencies.

In response, DIA maintains that the redacted document located by Larson on the National Security Archives website was not and is not a document maintained in DIA's records system.  Indeed, after Larson raised the issue about the document, DIA conducted an additional search for that specific document but found no such document in its records system.  See Richardson Decl #2.  That DIA did not produce the specific document cited by Larson does not support Larson's argument that DIA failed to conduct an adequate search.  Nation Magazine, Washington Bureau v. United States Customs Service, 71 F.3d 885, 889 (D.C. Cir. 1995) (noting that "the failure to turn up [a specific] document does not alone render the search inadequate").  Larson having made no other argument regarding the adequacy of DIA's search, a search that yielded 37 documents, the court is not persuaded that DIA's search was inadequate.

In sum, DIA is not entitled to summary judgment on Larson's claim (Count 7) because it failed to adequately justify its reliance on Exemptions 2 and 6 as to the lone DIA-generated document found in response to Larson's FOIA/PA request. Consequently, DIA's motion for summary judgment as to Count 7 will be denied, without prejudice to DIA's right to (1) submit the document (the eleven-page message (classified CONFIDENTIAL), sent by the attache in Guatemala City to DIA in December of 1994) to the court for in camera review; or (2) submit a Vaughn index that provides a detailed, specific explanation for the agency's reliance on Exemptions 2 and 6.

### D. NSA

NSA contends that it is entitled to summary judgment on Count 16 (Larson), Count 17 (Kerndt), Count 18 (Henehan), and Count 19 (Portillo-Bartow).  In support of

its motion for summary judgment, NSA has filed the declaration of Louis F. Giles

("Giles'), Director of Policy for NSA.  As Director of Policy, Giles has TOP SECRET

classification authority and is responsible for the processing of all FOIA requests.

Giles explains that NSA was established by Presidential Directive in 1952 as a

separately organized agency within the Department of Defense.  The agency is

responsible for communications security and "signals intelligence" activities of the

United States.  NSA's signals intelligence mission is to obtain information from foreign

electromagnetic signals and to provide reports derived from such information to national

policy makers and to the intelligence community of the United States government.

Information obtained from intercepted foreign communication is called communications

intelligence ("COMINT") or signals intelligence ("SIGINT").

Giles explained the importance of COMINT/SIGINT as follows:

> A fundamental tenet of the COMINT process is that the
> identity of specific communications (commonly referred to as
> "targets"), the degree of success in exploiting these targets,
> the vulnerability of particular foreign communications, and
> the extent of any cryptologic successes are all matters that
> must be maintained in strictest secrecy because of the
> fragility of the ability to exploit foreign communications.
> Disclosure of the identity of the targets, the degree of
> success or weakness in exploiting those targets, the
> vulnerability of particular foreign communications, and the
> extent of any cryptoanalytic success would encourage
> countermeasures by the targets of NSA's COMINT efforts.  If
> a foreign power is successful in defeating an intercept
> operation, all of the intelligence from that source is lost
> unless and until NSA can establish new and equivalent
> exploitation of the foreign power's signals.  If a source
> becomes unavailable, the military, national policymakers and
> intelligence community must operate without the information
> the signals provided.  Such losses are extremely harmful to

the national security of the United States.

Giles Decl. at ¶ 5.

### 1. Larson

By FOIA request dated July 21, 1997, Larson requested documents--including "cable traffic, airgrams, notes, letters, memos, memoranda of conversation, reports, analyses, interviews, briefings, correspondence, diplomatic notes, demarches, or non-papers"--relating to Peace Brigades International and to her stabbing on the street in Guatemala City on December 20, 1989.  Giles Decl. at Ex. 1.  NSA responded to Larson's request on January 20, 1998, releasing four documents in full and eight documents in part.  Portions of the partially released documents were withheld pursuant to Exemptions 1 and 3.

As explained previously, Exemption 1 permits agencies to withhold matters that are specifically authorized under criteria established by Executive Order to be kept secret in the interest of national defense or foreign policy and that are, in fact, properly classified pursuant to such Executive Order.  Like CIA, NSA relies on EO 12958, as amended on March 25, 2003.  Among other things, EO 12958 authorizes the classification of (1) foreign government information (§ 1.4(b)); (2) intelligence activities (including special activities), intelligence sources and methods, or cryptology (§ 1.4(c)); (3) foreign relations or foreign activities of the United States, including confidential sources (§ 1.4(d)); and scientific, technological, or economic matters relating to the national security, which includes defense against transnational terrorism.

Giles determined, based on his personal review of the eight NSA records partially

released to Larson, that the withheld information is exempt under 5 U.S.C. §552(b)(1)

because it is currently and properly classified SECRET and TOP SECRET and it

concerns one or more of the above-listed classification categories authorized by EO

12958.  As stated by Giles, the information at issue "is derived from the most sensitive

and fragile SIGINT targets."  Giles Decl. at ¶ 27.  "It identifies the targets whose

communications have been exploited or pertains to intelligence collection assignments

and the technical details of collection."  Id.  "Disclosure of any of this information would

inform those targets of their vulnerabilities and of NSA's specific capabilities, sources,

and methods."  Id.  "To provide additional information regarding the withheld documents

would lead to the disclosure of exempt information."  Id.

Giles also invokes Exemption 3, which permits the agency to withhold matters

specifically exempted from disclosure by statute.  Giles relies on three statutes, all three

of which have been held to be proper exemption statutes for purposes of Exemption 3.

The first, section 6 of the National Security Agency Act of 1959, Pub. L. No. 86-36,

quoted in 50 U.S.C. § 402 note ("Section 6"), has the broadest application.  Section 6

unequivocally provides that "nothing in this Act or any other law...shall be construed to

require the disclosure of the organization or any function of the National Security

Agency, or any information with respect to the activities thereof, or of the names, titles,

salaries, or number of the persons employed by such agency."  The protection afforded

by Section 6 is absolute: NSA may not be compelled to disclose any information with

respect to its activities.  Linder v. Nat'l Security Agency, 94 F.3d 693, 697 (D.C. Cir.

1996); Hayden v. Nat'l Security Agency, 608 F.2d 1381, 1389 (D.C. Cir. 1979) (noting

that, in enacting section 6, Congress was fully aware of the "unique and sensitive activities of the Agency," which require "extreme security measures") (internal citation omitted).  NSA, moreover, is not required to produce a Vaughn index to justify a Section 6 withholding of signals intelligence information.  Linder, 94 F.3d at 697 (explaining that, given the nature of NSA's operations, a Vaughn index of SIGINT reports could cause the very harm that section 6 was intended to prevent).

In addition to Section 6 of Public Law 86-36, NSA relies on two other exempting statutes: (1) 18 U.S.C. § 798(a)(3) & (4), which prohibits the unauthorized disclosure of classified information "concerning the communication intelligence activities of the United States or any foreign government" or "obtained by the processes of communication intelligence from the communications of any foreign government;" and (2) section 103(c)(7) of the National Security Act of 1947, 50 U.S.C. § 403-3(c)(7), which directs the CIA Director, as head of the intelligence community, to "protect intelligence sources and methods from unauthorized disclosure."  As one of the member agencies of the intelligence community, see 50 U.S.C. § 401a(4)(C), NSA is required by section 403-3(c)(7) to protect intelligence sources and methods.

Notwithstanding Larson's protestations to the contrary, the court finds Giles's declaration sufficient to support NSA's withholding of information under both Exemptions 1 and 3.  As explained by Giles, all of the material withheld from Larson consists of information related to the activities, or core mission, of NSA, to wit: intelligence gathering based on electromagnetic signals.  NSA is entitled to summary judgment as to Larson (Count 16).

### 2. Kerndt

Kerndt submitted a FOIA request to NSA by letter dated March 19, 1998, requesting all documents relating to "the mysterious air crash and death of Ann Louise Kerndt, who was in an airplane piloted by Father William Hervey Woods, Jr., near Ixcan, Guatemala on November 20, 1976." Giles Decl. at Ex. 7. NSA advised Kerndt on August 4, 1998, that one NSA-generated document had been found, a classified foreign intelligence report derived from SIGINT targets. Kerndt was informed that, while the document indicated that a plane crashed on November 20, 1976, it did not contain any information as to the identity of passengers, the cause of the crash, who may have been responsible, or government actions. Giles Decl. at ¶ 14.

The document was withheld in full under Exemptions 1 and 3. As he did with the information withheld from Larson, Giles explained that the record withheld from Kerndt (1) was properly classified SECRET and TOP SECRET pursuant to EO 12958 and (2) concerned intelligence-gathering activities, methods, and sources, the disclosure of which would cause "serious damage or exceptionally grave damage to United States national security and foreign relations interests." Giles Decl. at ¶ 27. Just as Giles's declaration is sufficient to sustain NSA's withholding of information from Larson under Exemptions 1 and 3, his declaration is sufficient in Kerndt's case as well. NSA is thus entitled to summary judgment as to Kerndt (Count 17).

### 3. Henehan

On September 4, 1997, Henehan filed a FOIA request seeking "[a]ll documents relating...to the mysterious air crash and death of Father William H. Woods, M.M. near

Ixcan, Guatemala on November 20, 1976."  Giles Decl. at Ex. 12.  While very similar to

Kerndt's FOIA request, Henehan's request was broader, encompassing whole

categories of information not requested by Kerndt, including records regarding threats to

and investigations of the Maryknoll Fathers, copies of the original 1995 FOIA file

(created in response to a FOIA request by Father Stephen Judd) for Father Woods, and

information regarding Guatemalan troop movements in the Ixcan region at or near the

time of the crash.

By letter dated February 18, 1998, NSA sent Henehan 36 records, six in full and

30 in part.  Henehan was advised that 137 records were withheld in their entirety

pursuant to Exemptions 1, 2, and 3.  Henehan was also advised that all records

withheld in their entirety pertained only to Guatemalan troop movements and not to

Father Woods.

NSA invoked Exemptions 1 and 3 for the same reasons they were invoked for

Larson and Kerndt: the withheld information--classified SECRET and TOP SECRET--

pertains to intelligence activities, is derived from "the most sensitive and fragile SIGINT

targets," relates to vulnerabilities and capabilities of systems projects and plans relating

to national security, and/or contains information about foreign governments, foreign

relations, and United States activities (involving confidential sources) in foreign

countries.  In addition, NSA invoked Exemption 2 to withhold email routing information

that appears in some of the 30 documents withheld in part from Henehan.  Giles's

declaration is again sufficient to sustain NSA's withholding of information from Henehan.

NSA referred a number of documents to other agencies for review: two

documents to DOS, one document to the United States Information Agency ("USIA"),
eight documents to the Department of Defense ("DOD"), and 5 documents to CIA.  The
two documents referred to DOS were released in full to Henehan by DOS.  The
document referred to USIA was, in turn, referred to DOS, which released it in full to
Henehan.  There is no issue as to these documents.

CIA released one of the referred documents, a Foreign Broadcast Information
Service ("FBIS") document, directly to Henehan with only CIA personnel information
redacted.  Henehan has not raised a specific objection to the partial release of this
document.  The remaining four documents were returned to NSA after CIA determined
that it had no objection to release of any CIA information contained within.  NSA then
released the four documents with some NSA information withheld pursuant to
Exemptions 1, 2, and 3.  Although Henehan complains generally that Giles's
supplemental declaration fails to describe the agency's justifications for its withholdings
with specific detail, the court finds that Giles's supplemental declaration explains NSA's
reliance on each of the three exemptions with sufficient detail to pass muster.

Of the documents referred to DOD, four were released directly to Henehan with
only the identity of an NSA employee redacted under Exemption 3.  Henehan has not
raised a specific objection to the partial release of these documents.  The remaining
four documents referred to DOD were reviewed and returned to NSA, where certain
NSA information was redacted pursuant to Exemptions 1, 2, and 3.  The four
documents were otherwise released to Henehan.  Again, Giles's supplemental
declaration is sufficient to satisfy NSA's summary judgment burden.

In sum, the court having found that Giles has adequately explained the bases for

NSA's withholdings, NSA is entitled to summary judgment as to Henehan (Count 18).

### 4.  Portillo-Bartow

By letter dated July 25, 2002, Portillo-Bartow filed a FOIA request seeking

documents relating to "the disappearance of her father Adrian Portillo Alcantara, on or

about September 11, 1981, [in] Guatemala City, Guatemala."  Giles Decl., Ex. 16.

In response, NSA advised Portillo-Bartow that it could neither confirm nor deny the

existence of records responsive to her request pursuant to Exemptions 3 and 5.

According to Giles, "the fact of the existence or nonexistence of documents is a

currently and properly classified matter in accordance with Executive Order 12958 and

[is] protected from disclosure pursuant to 18 U.S.C. § 798, Title 50 U.S.C. § 403-3(c)(6);

and Section 6, Public Law 86-36."  Giles Decl. at ¶ 19.  Giles contends that *any*

substantive response that the agency might give "concerns core functions and activities

of the Agency, which includes communications intelligence and because providing a

substantive response would likely impair intelligence sources and methods."  Id. at ¶ 36.

Giles states that he can provide a supplemental classified declaration *ex parte in*

*camera* should additional details be required.

Section 552(a) permits but does not require *in camera* review of withheld

documents.  *In camera* inspection may be appropriate in two circumstances: when

agency affidavits are insufficiently detailed to permit meaningful review of exemption

claims and when evidence of agency bad faith is before the court.  There is no evidence

of agency bad faith in this instance; and, while Giles has provided minimal detail

concerning its response to Portillo-Bartow, his assertions regarding the possible harm

that any disclosure could cause to DIA's very sensitive and fragile intelligence-gathering

functions are enough--without *in camera* review--to satisfy DIA's burden on summary

judgment as to Portillo-Bartow (Count 19).

### E. DOS

DOS contends that it is entitled to summary judgment on Count 1 (Larson),

Count 2 (Okada), Count 3 (Henehan), Count 4 (Holdenried), Count 5 (Portillo-Bartow),

and Count 6 (Joslin).  In support of its motion for summary judgment, DOS has filed the

declaration of Bernard C. Dowling ("Dowling"), Acting Director of DOS's Office of

Information Resources Management Programs and Services ("IPS"), the DOS official

immediately responsible for responding to FOIA requests.  Dowling's declaration

includes a <u>Vaughn</u> index.

### 1.  Portillo-Bartow

By letter dated July 12, 2002, Portillo-Bartow requested all records concerning

the disappearance of her father, Guatemalan citizen Adrian Portillo-Bartow, on or about

September 11, 1981, in Guatemala City.  Portillo-Bartow gave the address of the

residence from which her father, along with five (5) other (unnamed) people, including

two of Portillo-Bartow's daughters, were abducted.

In response to Portillo-Bartow's request, DOS searched three records systems:

the Central Foreign Policy Records (the principal record system of DOS), the retired

files of the Bureau of Western Hemisphere Affairs, and the retired files of the American

Embassy in Guatemala City.  The searches resulted in the retrieval of four documents,

two of which were released to Portillo-Bartow in full.  The other two documents--

telegrams from Embassy Guatemala to DOS dated October 12, 1999, and September

14, 2000--were withheld in full pursuant to Exemption 5.  The UNCLASSIFIED

telegrams--58 and 78 pages respectively--constitute the embassy's draft submissions

for the annual Country Human Rights Report for Guatemala for 1999 and 2000.  The

final reports were written by DOS, were published by Congress, and are now in the

public domain.  According to Dowling, only one brief paragraph in each of the lengthy

reports is responsive to Portillo-Bartow's request.  DOS maintains that the draft

submissions were part of the deliberative process leading to the development of the

"official United States Government position" and, as such, are protected from disclosure

under Exemption 5.

Exemption 5 permits an agency to withhold from disclosure "inter-agency or intra-

agency memorandums or letters which would not be available by law to a party other

than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  To qualify for

withholding under Exemption 5, a document must satisfy two conditions: "its source

must be a Government agency, and it must fall within the ambit of a privilege against

discovery under judicial standards that would govern litigation against the agency that

holds it."  Dep't of the Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8,

121 S. Ct. 1060, 149 L. Ed. 2d 87 (2001).  The deliberative process privilege, the

attorney work-product privilege, and the attorney-client privilege are among the

privileges incorporated into Exemption 5.  NLRB v. Sears, Roebuck & Co., 421 U.S.

132, 149, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975).  DOS invokes the deliberative process

privilege here.

Exemption 5 protects from disclosure any documents that reveal an agency's deliberative process in reaching *policy* decisions.  See NLRB v. Sears, Roebuck & Co., 421 U.S. 132, 150, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975); Jordan v. U.S. Dep't of Justice, 591 F.2d 753, 775 (D.C. Cir. 1978) (*en banc*) (finding that documents reflecting an "agency's group thinking in the process of working out its policy and determining what its law shall be" are exempt under FOIA Exemption 5) (internal quotations omitted).  The underlying purpose of Exemption 5 is to permit agency staffers to provide policymakers with candid advice without fear of public scrutiny and, thus, to "prevent injury to the quality of agency decisionmaking."  Sears, 421 U.S. at 151.

To come within the deliberative process privilege, a document must be both "pre-decisional" and "deliberative."  In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997).  A "pre-decisional" document is one prepared in order to assist an agency decision-maker in arriving at his decision and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency."  Florida House of Representatives v. United States Dep't of Commerce, 961 F.2d 941, 945 (11th Cir. 1992); see also Jordan, 591 F.2d at 774 (describing a pre-decisional document as one that is "antecedent to the adoption of agency policy").  A document is "deliberative" if the disclosure of the materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and, thereby, undermine the agency's ability to perform its functions.  State of Missouri ex rel. Shorr v. United

States Army Corps of Eng'rs, 147 F.3d 708, 710 (8th Cir. 1998); Dudman

Communications Corp. v. Department of Air Force, 815 F.2d 1565, 1568 (D.C. Cir.

1987).  Only the deliberative portion of a document, i.e., that portion of a document that

bears on the formulation or exercise of policy, is privileged.  Jordan v. United States

Dep't of Justice, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc) (noting that a document

is "deliberative" if it is "actually...related to the process by which policies are

formulated").  The privilege generally does not extend to purely factual information that

the document may contain.  Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854,

867 (D.C. Cir. 1980); Petroleum Info. Corp. v. United States Dep't of Interior, 976 F.2d

1429, 1434 (D.C. Cir. 1992) (explaining that factual information generally must be

disclosed while materials embodying officials' opinions are ordinarily exempt).

Non-exempt factual information must be disclosed if it is reasonably segregable from

exempt portions of the record, and the agency bears the burden of showing that no

such segregable information exists.  See EPA v. Mink, 410 U.S. 73,  87-88, 93 S. Ct.

827, 35 L. Ed. 2d 119 (1973).

        Portillo-Bartow does not contest the first prong of the Exemption 5 determination:

whether telegrams between DOS and Embassy Guatemala constitute inter-agency or

intra-agency communications.  Instead, she contends that Dowling's declaration is

insufficient to permit the court to determine whether the telegrams are, in fact, both pre-

decisional and deliberative.  Indeed, the court finds that Dowling's declaration falls far

short of establishing the applicability of Exemption 5 in this instance.

        To justify its reliance on Exemption 5, DOS must provide a relatively detailed

declaration, specifically identifying the reasons why Exemption 5 is relevant and

correlating those claims with the particular part of a withheld document to which they

apply.  Mead Data Cent., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 251 (D.C. Cir.

1977); see also Senate of Puerto Rico v. U.S. Dep't of Justice, 823 F.2d 574, 585 (D.C.

Cir. 1987) (finding that in the absence of "any identification of the specific final decisions

to which...advice or recommendations contained in the withheld documents

contributed," a court is "not positioned to pass upon the applicability...of this privilege");

Parke, Davis & Co. v. Califano, 623 F.2d 1, 6 (6th Cir. 1980) (explaining that, in light of

the "overwhelming thrust of FOIA...toward complete disclosure," Exemption 5 claims

must be supported with "specificity and [in] detail").  To that end, DOS must either

pinpoint an agency decision or policy, or identify a decisionmaking process, to which the

withheld telegrams contributed.

        In his declaration, Dowling states that the published annual reports "cover a

multitude of Guatemalan human rights events and policies."  Dowling Decl., Vaughn

Index Case No. 200202417.  As to the withheld telegrams, he states that draft reports

are "intrinsically pre-decisional" but gives no other justification for his "pre-decisional"

characterization.  Id.  He also states, with no elaboration, that the two withheld drafts

"were part of the deliberative process leading to the development of the official United

States Government position."  Id.  Dowling neither pinpoints an agency policy to which

the telegrams contributed nor identifies the role the telegrams played in a specific

deliberative process.  In essence, Dowling does little more that suggest that the

telegrams are pre-decisional and deliberative because they represent drafts of the

agency's annual reports.  Drafts, however, are not *presumptively* pre-decisional or

deliberative.  A draft may be pre-decisional and/or deliberative *if* it reflects "an agency's

preliminary positions or ruminations about how to exercise discretion on some policy

matter."  Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1433 (D.C. Cir.

1992); see also Arthur Andersen & Co. v. IRS, 679 F.2d 254, 257 (D.C. Cir. 1982)

(noting that the designation of documents as 'drafts' does not end the Exemption 5

inquiry, suggesting that "Coastal States forecloses the...argument that any document

identified as a draft is per se exempt").  Conversely, if draft material does not reveal an

agency's mode of formulating or revealing policy-implicating judgment, Exemption 5

does not protect it from disclosure.

Here, Dowling's declaration is so vague, so lacking in specifics that it fails to

provide this court with a reasonable basis for evaluating DOS's claim under Exemption

5.  As a result, DOS's motion for summary judgment as to the claims of Portillo-Bartow

(Count 5) will be denied without prejudice to DOS's right to (1) submit the document *in*

*camera* for the court's review; or (2) submit a detailed, specific explanation for the

agency's reliance on Exemption 5.

## 2.  Holdenried

In response to Holdenried's May 30, 2002, FOIA request, asking for all records

concerning the death of her father, Frank Holdenried, who was murdered in Livingston,

Izabal, Guatemala, on April 2, 1982, DOS initiated searches in the Central Foreign

Policy Records, the Bureau of Western Hemisphere Affairs, the Office of Passport

Services, the Office of Overseas Citizen Services, and the American Embassy in

Guatemala City.  Thirty-five responsive records were found in the Central Foreign Policy

Records, all of which were released in full to Holdenried.  One document was found in

the Office of Passport Services, and it also was released in full to Holdenried.  No other

documents were found.

In her 2002 FOIA request, Holdenried included the following paragraph:

> Please be aware that Ms. Holdenried made a request for
> documents in 1995, and received some documentation.
> However, some documentation was not submitted to her.
> Please regard this as a renewed request.

Holdenried's FOIA Request at 2.  According to Dowling, Holdenried was advised by

letter dated March 28, 2003, that some of the 36 documents retrieved and released in

response to her 2002 request had also been retrieved and released to her in response

to her earlier FOIA case.  In addition, Holdenried was advised that the information she

was seeking is now available on DOS's website.  Holdenried nonetheless contends that

DOS failed to address in its response to her 2002 request the information that was

withheld in response to her 1995 request.  Holdenried suggests that such failure is

enough to prevent entry of summary judgment in favor of DOS as to Count 4.  The court

thinks not.

In response to Holdenried's 2002 FOIA request, DOS was not required to revisit

Holdenried's 1995 request.  Action on her earlier request came to an end when her

appeal of that case was decided in 1998.  Instead, in response to her 2002 request,

DOS was required to conduct a reasonable search given the search parameters

provided in 2002.[5]  The record reflects that DOS searched in five different record

systems, retrieved 36 documents, and released all of those documents in their entirety

to Holdenried.  Because the record reveals that DOS's search was both reasonable and

undertaken in good faith, the court finds that DOS is entitled to summary judgment as to

Holdenried (Count 4).

### 3.  Joslin

Joslin submitted two FOIA/PA requests to DOS, one in 1996 and one in 1997,

each time requesting information about the death of Brother James Alfred Miller in

Guatemala in 1982.  In response, DOS conducted searches in numerous record

systems, retrieving 77 documents, 68 of which were released in full to Joslin.  Nine

documents were released in part.  As to these nine documents, DOS has submitted a

Vaughn index that explains in ample detail the documents and the reasons the claimed

exemptions were invoked.  Because Joslin has not challenged the exemptions claimed

by DOS, the court will enter summary judgment in DOS's favor as to Joslin (Count 6).

### 4.  Henehan

Henehan submitted a lengthy FOIA/PA request to DOS in September of 1997,

---

[5]  To the extent, if any, Holdenried complains that DOS's more recent search was inadequate because DOS failed to retrieve in that more recent search all of the documents retrieved in the earlier search, her complaint is unavailing.  The record contains neither a copy of Holdenried's 1995 FOIA request nor any other evidence to establish whether the two searches--conducted seven or so years apart--were or should have been the same.  Even if the search parameters were the same or similar, there is no evidence to establish whether the same record systems were searched or whether the record systems searched more recently would necessarily contain all of the documents that were there seven years earlier.

seeking, among other things, information about the air crash and death of Father

William H. Woods, near Ixcan, Guatemala on November 20, 1976.  Henehan provided a

great deal of information about the subjects of his request, and he enumerated

approximately 28 related search topics.  In response, DOS searched seven different

record systems: The Central Foreign Policy Records; the retired files of the Bureau of

Western Hemisphere Affairs; the Bureau of Diplomatic Security; the Bureau of

Intelligence and Research; the Office of the Legal Adviser; the Office of Overseas

Citizens Services; and the Bureau of International Narcotics and Law Enforcement

Affairs.  The various searches resulted in the retrieval of 23 documents, 21 of which

were released in full to Henehan.  The remaining two documents were released in part,

with excisions under Exemption 6.

      According to Margaret P. Grafeld, DOS's current Information and Privacy

Coordinator and Director of the Office of Information Programs and Services, the two

partially released documents are letters between Congressman John Hiler and DOS

regarding the death of American citizens in Guatemala.  The Congressman wrote to

DOS seeking information on behalf of one of his constituents, and the name of that

constituent was excised from the letters.  The two letters have since been released in

their entirety on DOS's website.  Grafeld Decl. at ¶¶ 2-4.

      Henehan has not argued that DOS's search was insufficient.  Indeed, the

evidence--revealing searches of seven different record systems resulting in the retrieval

of 23 documents--suggests that DOS's search was adequate.  The court accordingly

finds that DOS is entitled to summary judgment as to Henehan (Count 3).

### 5. Okada

By letter dated January 21, 2002, Okada submitted a FOIA request to DOS, seeking information regarding the death of her brother, Dr. Michael Okada, in Guatemala in 1976.  DOS retrieved five responsive documents from its search of the Central Foreign Policy Records and the retired records of the Bureau of Western Hemisphere Affairs.  All five documents were released in full to Okada.

Okada contends that DOS's search was inadequate.  In support of her contention, she points to the greater number of documents that were retrieved in response to Henehan's request.  Henehan's request, however, was much broader in scope than Okada's, providing many more search topics.  That DOS retrieved fewer documents in response to Okada's request than it did in response to Henehan's request does *not*, therefore, lead to the conclusion that DOS's search in Okada's case was necessarily insufficient.

In determining whether DOS's search was adequate, the court must look to Dowling's declaration.  Because that declaration lacks detailed information about the scope of its search, this court is unable to determine whether DOS's search was adequate or not.  Accordingly, DOS's motion for summary judgment with regard to Okada (Count 2) will be denied.

### 6. Larson

Larson submitted a FOIA/PA request to DOS in 1997, seeking records on various subjects, including her stabbing in Guatemala City on December 20, 1989, and the grenade attack against Peace Brigades International in May of 1989.  DOS assigned

five different case control numbers to Larson's request, each number pertaining to a

different aspect of her request.  Searches of numerous record systems resulted in the

retrieval of more than 200 documents, some of which were released in full, some in

part, and some withheld entirely.  Larson challenges the withholdings on specific

documents.

Document E25, a telegram from Embassy Guatemala to DOS, was withheld in

part pursuant to Exemption 3.  According to Dowling, the excised material pertains to

the application for and subsequent refusal of a visa request.  Vaughn Index, Case No.

199702795.  To support its Exemption 3 redaction, DOS relies on the Immigration and

Nationality Act, 8 U.S.C. § 1202(f), which section provides as follows:

> The records of the Department of State and of diplomatic
> and consular offices of the United States pertaining to the
> issuance or refusal of visas or permits to enter the United
> States shall be considered confidential and shall be used
> only for the formulation, amendment, administration, or
> enforcement of the immigration, nationality, and other laws
> of the United States.

In Medina-Hincapie v. Department of State, 700 F.2d 737, 742 (D.C. Cir. 1983), the

court held that section 1202(f) qualifies as a withholding statute under Exemption 3.

The same court also noted that the protection afforded by section 1202(f) is not limited

to information contained in an actual visa application (i.e., information supplied by the

applicant); it also covers records pertaining to the approval or denial of the application.

Id. at 743 n.36.

Larson challenges the withholding of information from Document E25 on the

basis that the information does not come from the visa application itself.  Doc. 26 at 21.

Larson's challenge, however, is unpersuasive because the statute does not limit the

protection to a visa application itself.  The statute protects records "*pertaining* to the

issuance or refusal of visas."  8 U.S.C. § 1202(f) (emphasis added).  As described in

DOS's Vaughn Index, the information redacted from Document No. E25 *pertains* to the

issuance or refusal of a visa, is thus protected from disclosure by section 1202(f), and

was accordingly properly exempted under Exemption 3.

Documents E46, E54, and E59, all CLASSIFIED telegrams from Embassy

Guatemala to DOS, were withheld either in part (E46 and E54) or in full (E59) pursuant

to Exemption 1.  In each case, material was withheld to protect the identity of a

confidential source, information that is exempt under section 1.4(d) of EO 12958.  As

revealed in the agency's Vaughn index, the source mentioned in document E46

provided information about the efforts of the World Lutheran Federation to arrange talks

between the Guatemala government and a Guatemalan guerilla umbrella organization.

The government and private sources mentioned in document E54 discussed with

embassy officials the kidnapping of Dr. Carmen A. Valenzuela.  The source mentioned

in document E59 provided details about "a secret human rights development potentially

of major importance in the highly-charged atmosphere of the time."  Dowling Decl.,

Vaughn Index, Case No. 199702795.  In all three instances, the sources requested

confidentiality, and the embassy asked that their identities be protected, noting that

failure to protect the sources' expectation of confidentiality could place each source in

potential physical jeopardy, "even in today's less charged but still insecure climate."  Id.

Although Larson suggests that Dowling's declaration lacks sufficient detail to

pass muster, the court finds that DOS's Vaughn index adequately demonstrates the basis for the withholding of information.  The nature of the information provided by the sources to embassy officials is described, and the sources' request for confidentiality is noted.  DOS asserts that disclosure could result in harm not only to the sources themselves but also to the government's ability to secure cooperation from the same or other sources in the future, and that assertion must be respected by this court.  While the level of detail may not be to Larson's liking, it is sufficient to convince this court that DOS properly invoked Exemption 1 as to Documents E46, E54, and E59.

Documents E7 and E28, telegrams from Embassy Guatemala to DOS, were withheld in part pursuant to Exemption 6, which, as noted earlier, exempts from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6). Document E7 is designated DECONTROLLED, and Document E28 is designated UNCLASSIFIED.  In each case, material was excised from the documents to protect the identity of a source of sensitive information.  The source mentioned in Document E7 provided embassy officials with detailed information about the human rights situation in Guatemala, "much of it contrary to what the government and human rights agencies wanted the embassy to believe."  Dowling Decl., Vaughn Index, Case No. 199702792. The source mentioned in Document E28 discussed a double murder case with embassy officials.  Id. at Case No. 199702795.  DOS maintains that these sources could be placed in danger if their identifies were disclosed.

While documents E7 and E28 do not appear to be "personnel," "medical" or

"similar" files within the meaning of Exemption 6, the Supreme Court has made clear

that the determination of whether personal information about someone is protected by

Exemption 6 "surely [i]s not intended to turn upon the label of the file which contains the

damaging information."  Washington Post Company, 456 U.S. at 601.  Here, DOS has

withheld material from two telegrams that identify persons who gave sensitive

information to embassy officials.  DOS asserts that the sources could be placed in

physical danger if their identities were disclosed.  Given such assertion, the court finds

that disclosure of the sources' personal identifying information represents the type of

privacy invasion that Exemption 6 is designed to prevent.  Washington Post Co., 456

U.S. at 599 (explaining that the primary purpose of Exemption 6 is to "protect individuals

from the injury and embarrassment that can result from the unnecessary disclosure of

personal information"); Holy Spirit Ass'n For the Unification of World Christianity v.

F.B.I., 683 F.2d 562, 565 (D.C. Cir. 1982) (explaining that, "[w]here a person's fear of

reprisals from the subject of his communication is reasonable, on the basis either of

demonstrated fact or of the inferences to be drawn from reasonable claims he makes,

privacy interests support the application of both Exemption 6 and Exemption 7(C)").

Where, as here, a court determines that certain material is private or personal so

as to fall under the purview of Exemption 6, the court must then balance the individual's

privacy interest against the public's interest in having the material disclosed.  In

assessing the public's interest, the court focuses on the degree to which disclosure

would shed light on an agency's performance of its statutory duties and its compliance

with the law.  United States Dep't of Defense v. FLRA, 510 U.S. 487, 497, 114 S. Ct.

1006, 127 L. Ed. 2d 325 (1994) (explaining that "the only relevant public interest in the

FOIA balancing analysis [is] the extent to which disclosure of the information sought

would 'she[d] light on an agency's performance of its statutory duties' or otherwise let

citizens know 'what their government is up to' ") (quoting Dep't of Justice v. Reporters

Comm. for Freedom of Press, 489 U.S. 749, 773, 109 S. Ct. 1468, 103 L. Ed. 2d 774

(1989)).

Here, DOS maintains that the sources could be placed in jeopardy if their

identities are disclosed, and the court must respect DOS's opinion in this matter--a

matter much more within the ken of the agency than of this court.  Clearly, the personal

safety of the sources represents a privacy interest that carries a significant amount of

weight.  Balanced against that weight is the weight of any information that might be

revealed--upon disclosure of the sources' identities--about the agency's operations and

activities.  Larson suggests, generally, that there is a strong public interest in disclosure

because of the history of human rights abuses in Guatemala.  She does not, however,

adequately explain how disclosure of the identities of these particular sources would

shed much, if any, light on the operations of DOS or would otherwise help the public

understand how DOS performs its duties.  In fact, based on the record before it, the

court finds that the public interest in learning the identities of these sources is small.

Because the balance in this case tips in favor of the sources' interest in having their

identity protected and their safety secured, the court finds that DOS has properly

invoked Exemption 6 as to Documents E7 and E28.

DOS having adequately justified the withholdings in each of the documents challenged by Larson, the court will granted DOS's motion for summary judgment as to Larson (Count 1).

## IV.  CONCLUSION

For the foregoing reasons, the court concludes that the defendants' motions for summary judgment must be granted in part and denied in part without prejudice. Accordingly, it is ORDERED:

1.  The defendants' motions for summary judgment (docs. 17 & 33) are GRANTED as to Counts 1, 3, 4, 6, 12, 13, 14, 15, 16, 17, 18, and 19.

2.  The defendants' motions for summary judgment (docs. 17 & 33) are DENIED WITHOUT PREJUDICE as to Counts 2, 5, 7, 8, 9, 10, 11, and 20.

DONE AND ORDERED this   10th   day of  August   , 2005.


   /s William Stafford
WILLIAM STAFFORD
SENIOR UNITED STATES DISTRICT JUDGE
(SITTING BY DESIGNATION)